## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF CONNECTICUT

In re:                 )

                      )      Case No. 11-51024(AHWS)

**SIGG SWITZERLAND (USA), INC.,**    )

                      )      Chapter 11

           Debtor.      )

                      )

                      )

---

### INTERIM ORDER (I) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001 AND 9014 AND (II) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO SECTIONS 105, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), AND 364(E) OF THE BANKRUPTCY CODE; AND (B) USE CASH COLLATERAL PURSUANT TO SECTIONS 105, 362 AND 363 OF THE BANKRUPTCY CODE; AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTY PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE

---

Upon the motion (the "**Motion**"), dated May 20, 2011, of the above-captioned debtor and debtor-in-possession, SIGG Switzerland (USA), Inc. (the "**Debtor**" or "**Borrower**") for Interim Order (I) Scheduling a Final Hearing Pursuant to Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and (II) Authorizing the Debtor to (A) Obtain Postpetition Financing Pursuant to Sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"); and (B) Use Cash Collateral Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code; and (III) Granting Adequate Protection to Prepetition Secured Party Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, seeking, among other things:

(1)     the Scheduling of an interim hearing (the "**Interim Hearing**"), pursuant to Bankruptcy Rule 4001, on the Motion to be held before this Court to consider entry of this interim order (the "**Interim Order**");

(2)     authority, pursuant to this Interim Order and on terms and conditions as set forth in DIP Loan Documents (as defined below) to enter into, execute and deliver that certain Ratification and Amendment Agreement (the "**Ratification**"), among the Debtor, as borrower, and Gerber Finance Inc. ("**Gerber**" or "**DIP Lender**"), and all other documents, agreements, and instruments in connection therewith or related thereto, between the Borrower and the DIP Lender, all of which, if approved on a final basis, would provide the Debtor with a postpetition secured revolving credit facility of up to an aggregate principal amount of approximately $2,300,000.00 at any time outstanding, subject to disbursement timing and conditions as described in the DIP Loan Documents, and grant and ratify the priority security interest in favor of the DIP Lender in the assets of the Debtor, both pre- and post-petition date (the "**Petition Date**") in the above-captioned bankruptcy case (the "**Case**"), (the "**DIP Facility**" or "**Post – Petition Facility**"), and to perform such other and further acts as may be contemplated by, or required in connection with, the definitive documentation memorializing the DIP Facility (such documentation including the Ratification, and the Pre-Petition Loan Documents (defined below) as supplemented, amended and ratified thereby, the "**DIP Loan Documents**"[1]);

(3)     modification of the automatic stay to the extent hereinafter set forth;

---

[1] The Ratification referenced above shall be in a form substantially similar to that attached hereto as Exhibit A.

(4)     authority, pursuant to this Interim Order, to immediately obtain loans under the DIP Facility up to a loaned principal amount of disbursements of no more than $500,000.00, in accordance with the terms and conditions set forth in the DIP Loan Documents, as well as authority to expend all amounts as permitted by the DIP Loan Documents in the period from the Petition Date (defined below) through the entry of a Final Order (defined below) (the "**Interim Period**"), including, without limitation, all fees, expenses and costs owed to or accrued by the DIP Lender, all as described in the interim period budget (the "**Interim Budget**"), which is attached as Schedule 1 hereto, and all of which amounts are to be funded by advances under the DIP Facility;

(5)     authority for the Debtor to (a) grant the liens and security interests described herein to the DIP Lender, effective upon the execution and delivery of the DIP Loan Documents, and (b) perform its obligations under the DIP Loan Documents;

(6)     the granting of adequate protection of the security interests and liens of Gerber, under the Pre-Petition Loan Documents, which liens and security interests are being primed by the DIP Facility;

(7)     the granting of adequate protection of the liens (if any) of Capacity LLC ("**Capacity**") as of the Petition Date, which liens are being primed by the DIP Liens (defined below) and the Adequate Protection Liens (defined below);

(8)     the granting of a fully perfected first priority lien on and security interest in all of the existing and after acquired real and personal, tangible and intangible, assets of Borrower, including, without limitation, all cash, cash equivalents, bank accounts, accounts,  other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property

interests, franchise rights, patents, tradenames, trademarks, copyrights, other intellectual property, general intangibles, avoidance actions under Section 549 of the Bankruptcy Code (including as may be recovered pursuant to Sections 550 or 551 of the Bankruptcy Code), investment property, supporting obligations, letter of credit rights, commercial tort claims, causes of action, and substitutions, accessions, products and proceeds of the foregoing, wherever located, including insurance or other proceeds, whether existing or arising prior to or after the Petition Date, and including, without limitation, all "Post-Petition Collateral" (as defined in the Ratification);

(9)     the granting to the DIP Lender of super-priority administrative claim status, pursuant to section 364(c)(1) of the Bankruptcy Code, in respect of all obligations owed by the Debtor under and in connection with the DIP Facility;

(10)    authority for the Debtor to use cash collateral (as such term is defined in the Bankruptcy Code) in which Gerber has an interest under the Pre-Petition Loan Documents, and the granting of adequate protection to Gerber with respect to, *inter alia*, such use of cash collateral and all use and diminution in the value of the liens and security interests (the "**Pre-Petition Liens**") in the personal and real property securing the Pre-Petition Debt (as defined below) as described in the Pre-Petition Loan Documents (including all "Collateral" as described in the Pre-Petition Loan Documents, the "**Pre-Petition Collateral**"); provided, however, that the cash collateral described herein shall continue to be paid to Gerber, as has been occurring prior to the Petition Date under the Pre-Petition Loan Documents and as required by the DIP Loan Documents, and shall be used exclusively towards payment in reduction of the outstanding obligations under the Pre-Petition Facility, until such time as the Pre-Petition Facility has been fully,

irrevocably and indefeasibly repaid, and thereafter shall be used exclusively towards payment in reduction of outstanding obligations under the Post-Petition Facility, until no further amounts may or could be incurred or extended pursuant to the DIP Facility;

(11)    that this Court schedule a final hearing (the "**Final Hearing**"), to be held on or before a date no later than twenty-five (25) days after the Petition Date, to consider entry of a final order (the "**Final Order**") granting all of the relief requested in the Motion on a final basis, including (i) the relief granted in this Interim Order, and (ii) authorizing the balance of the borrowings under the DIP Loan Documents, and the use of the advances thereunder by the Debtor pursuant to a final budget (the "**Final Budget**" and, together with the Interim Budget, the "**Budget**") which is attached as Schedule 2 hereto, including, without limitation, the further payment thereunder of fees, costs and expenses of the DIP Lender, and otherwise in connection with the DIP Loan Documents and this Case;

(12)    granting such relief, and the limitation of the Debtor's and its estate's right (if any) to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code; and it appearing that the relief requested in the Motion and provided herein is necessary to provide the Debtor with sufficient capital to continue operations and to preserve the going concern value of its business; and it further appearing that notice of the Interim Hearing and the relief requested in the Motion, having been served on (i) the holders of the twenty largest unsecured claims against the Debtor (the "**20 Largest Unsecured Creditors**"); (ii) Gerber; (iii) the United States Trustee for the District of Connecticut (the "**U.S. Trustee**"); (iv) known holders of liens in property of the Debtor's estate (other than Gerber); (v) known state and federal taxing authorities; and (vi) any party who has

formally appeared and requested service in these proceedings pursuant to Bankruptcy Rule 2002 is good and sufficient notice of the Interim Hearing under the circumstances in accordance with Bankruptcy Rules 4001(b), 4001(c) and 4001(d) and section 102(1) of the Bankruptcy Code, as required or contemplated by sections 363(c), 363(e), 364(c) and 364(d) of the Bankruptcy Code in light of the nature of the relief requested in the Motion; and upon the record made by the Debtor at the Interim Hearing, and upon the Motion, and the filings and pleadings in the Case, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED, ADJUDGED AND DECREED, that:

1.     *Jurisdiction and Venue*.  This Court has core jurisdiction over the Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). The statutory predicates for the relief granted herein are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b), (c) and (d) and 9014.  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

2.     *Notice*.  Under the circumstances, the notice given by the Debtor of the Motion and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b), (c), and (d) and no other notice is required or need be given.

3.     *Findings Regarding the Case*.  The Bankruptcy Court hereby finds:

(a)     On May 20, 2011 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Connecticut (the "**Bankruptcy Court**").  The Debtor continues to operate its business and

manage its property as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

(b)     There has been no trustee or creditors' committee appointed in this Case.

4.     ***Findings Regarding the Prepetition Debt and Prepetition Liens***.   The Debtor hereby irrevocably and finally acknowledges, admits, consents, stipulates and agrees to the following, and the Bankruptcy Court hereby finds that the Debtor has so irrevocably and finally acknowledged, admitted, consented, stipulated and agreed:

(a)     Prior to the Petition Date, Gerber made loans, advances and provided other credit accommodations to the Debtor, and the Debtor guaranteed loans, advances, and other credit accommodations provided by Gerber, pursuant to and/or in accordance with that certain Loan and Security Agreement dated October 10, 2007, between Gerber and the Borrower, as amended by the First Amendment to the Loan and Security Agreement dated June 24, 2008, the Second Amendment to Loan and Security Agreement dated May 6, 2009, the Third Amendment to Loan and Security Amendment dated May 28, 2009, the Fourth Amendment to Loan and Security Agreement dated June 1, 2010, and the Fifth Amendment to Loan and Security Agreement dated December 22, 2010, each executed and delivered by Gerber and the Borrower (collectively the "**Pre-Petition Loan Agreement**," and, together with the documents, instruments, agreements and financing statements executed or delivered therewith prior to the Petition Date, the "**Pre-Petition Loan Documents**"), which provided advances of up to 85% against Eligible Accounts (as such term is defined in the Pre-Petition Loan Documents) and up to 45% against Eligible Inventory (as such term is defined in the Pre-Petition Loan Documents.)

(b)     The Pre-Petition Loan Documents are valid and binding agreements and obligations of the Debtor.

(c)     The Debtor is validly indebted to Gerber under the Pre-Petition Loan Documents, without defense, counterclaim or offset of any kind, and, as of the Petition Date: (1) the principal amount of loans, advances and other indebtedness owed to Gerber by the Borrower under and pursuant to the Pre-Petition Loan Documents is not less than $1,981,908.32, plus (2) interest accrued and accruing thereon, and fees, costs, reasonable out-of-pocket expenses incurred (including reasonable fees, charges and disbursements of counsel, accountants, appraisers and financial advisors) and any other charges accrued and accruing with respect thereto as provided in the Pre-Petition Loan Documents or related documents (collectively, the obligations described in clauses (1) and (2) of this paragraph (4)(c), the "**Pre-Petition Debt**".) The Pre-Petition Debt, all of which is due and payable to Gerber, is valid, enforceable and allowable in an amount not less than that described herein above, plus post-Petition Date interest thereon, as well as pre- and post-Petition Date fees, costs and charges related to the Pre-Petition Debt, all as provided in the Pre-Petition Loan Documents.

(d)     The Pre-Petition Loan Documents constitute valid, binding and enforceable agreements and obligations of the Debtor.

(e)     (1) The Pre-Petition Debt is secured on a first-priority basis in all Pre-Petition Collateral; (2) the Pre-Petition Liens granted for the benefit of Gerber pursuant to the Pre-Petition Loan Documents are valid, binding, perfected, enforceable, non-avoidable, non-rescindable, non-revocable and not subject to subordination; (3) all of the Pre-Petition Debt constitutes allowable claims against the Debtor and is valid, enforceable, non-avoidable, non-rescindable, non-revocable, and not subject to subordination; and (4) the Debtor does not possess and will not and cannot assert any claim, counterclaim, setoff, recoupment or defense of any kind

or nature that would in any way affect the validity, enforceability, priority or nonavoidability of any of the Pre-Petition Debt and/or the Pre-Petition Liens.

(f)    The Pre-Petition Collateral consists of substantially all interests of the Debtor in property arising prior to the Petition Date (and all products, accessories, substitutions and proceeds thereof), including all real and personal, tangible and intangible, assets of the Debtor, including, without limitation, all cash, cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, fixtures, real property interests, franchise rights, patents, trade names, trademarks, copyrights, other intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, and substitutions, accessories, products and proceeds of the foregoing, and further including all "Collateral" (as defined or referenced in the Pre-Petition Loan Documents.)

(g)    The Pre-Petition Debt is over-secured, as described in Section 506(b) of the Bankruptcy Code, however the value of the property which constitutes the Pre-Petition Collateral and the security of the Pre-Petition Liens is not sufficiently greater than the Pre-Petition Debt as of the Petition Date to afford adequate protection to Gerber's position under the Pre-Petition Loan Documents.

(h)    There are no claims against, causes of action against, or other bases for any liability, recovery, setoff, recoupment or defense against, or for subordination of the debt of, Gerber, or any of its current or former employees, agents, representatives, counsel, officers, directors, consultants or other advisors, or their successors and assigns, arising out of, based on or related to, in whole or in part, any of the Pre-Petition Loan Documents, the business of the Debtor or its affiliates (as defined in the Bankruptcy Code) prior to the Petition Date, any aspect

of the relationship of Gerber with, or its dealings with, the Debtor or any of the Debtor's

affiliates prior to the entry of this Interim Order, or any of the other acts or omissions by or on

behalf of Gerber.

(i)     Capacity may have a lien as of the Petition Date (the "**Capacity Pre-Petition Lien**") on certain inventory of the Debtor located at Capacity's warehouse facility (to

the extent covered by such lien, the "**Capacity Pre-Petition Collateral**".) However, any such

Capacity Pre-Petition Lien is subordinate to all liens and security interests of Gerber.

(j)     The Debtor does not dispute any of the findings or the statements set forth

in this paragraph 4, and the Debtor agrees that it shall not dispute, object to or otherwise contest

any such findings or statements, and agrees and consents to such findings and statements.

Subject to paragraph 21(b) hereof, below, the Debtor releases and covenants not to assert or

prosecute any claim, counterclaim, setoff, recoupment or defense of any kind or nature (or

encourage or support any other party in doing so) which would in any way affect the validity

enforceability, priority or non-avoidability of the Pre-Petition Debt or the Pre-Petition Liens,

reduce or affect the Debtor's obligation to pay the Pre-Petition Debt, or be in any other way

contrary to the findings and statements set forth above in this paragraph 4 (and were the Debtor

to do so, an Event of Default (as defined below) shall have immediately occurred.)

(k)     The acknowledgement and agreement by the Debtor of the Pre-Petition

Debt and the liens, rights, priorities and protections granted in favor of Gerber, as well as the

Pre-Petition Liens, all as set forth herein and in the Pre-Petition Loan Documents, shall constitute

a proof of claim on behalf of Gerber in the Case.

5.     *Findings Regarding the Financing*. The Bankruptcy Court hereby finds:

(a)     Good cause has been shown for the entry of this Interim Order.

(b)    The Debtor has an immediate need to obtain financing under the DIP Facility and to use Cash Collateral (as defined below) in order to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational needs. The immediate access of the Debtor to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtor.

(c)    The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lender as set forth herein and in the DIP Loan Documents and is unable to obtain adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit allowable under Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtor granting to the DIP Lender, the DIP Liens and the Superpriority Claims (each as defined below) under the terms and conditions set forth in this Interim Order and in the DIP Loan Documents, as well as all other rights and protections described and set forth in this Interim Order and the DIP Loan Documents. The Debtor has been unable to procure the necessary financing on terms more favorable then the financing offered by the DIP Lender pursuant to the DIP Loan Documents. The consent of Gerber to the priming of its Pre-Petition Liens is subject to the entry of the Interim Order approving the Adequate Protection Obligations (defined below). The terms of the DIP Loan Documents and of this Interim Order, and the use of Cash Collateral, appear to be fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(d)     The relief requested in the Motion is necessary, essential and appropriate for the continued operation of the Debtor's business and the preservation of its estate.

(e)     It is in the best interest of Debtor's estate to establish the DIP Facility on the terms and conditions set forth in the DIP Loan Documents and as otherwise set forth herein.

(f)     The DIP Loan Documents and their terms have been negotiated in good faith and at arm's length between the Debtor and the DIP Lender, with each party having been represented by counsel, and all of the Debtor's obligations and indebtedness arising under, in respect of or in connection with the DIP Facility and the DIP Loan Documents, including without limitation, all loans made to the Debtor pursuant to the DIP Loan Documents and the authority granted hereby, as well as all interest, fees, charges, expenses and any other amounts or liabilities contemplated or permitted by the DIP Loan Documents (collectively, the "**DIP Obligations**"),[2] shall be deemed to have been extended, credited and incurred by the DIP Lender in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. All rights and protections of Gerber pursuant to its rights under the DIP Loan Documents and the Pre-Petition Loan Documents described herein shall continue to be fully effective and enforceable as against all parties and parties-in-interest in the Case and in any case to which it might be converted in the future. Good and sufficient cause has been shown and found for all of the foregoing.

---

[2] The DIP Obligations shall include, without limitation, all interest at any and all rates applicable under the DIP Loan Documents, as well as all charges, fees and expenses described in the DIP Loan Documents.

(g)     Good and sufficient cause has further been shown and found for the entry of this Interim Order.  The Debtor has requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief sought by this Interim Order, the Debtor's estate will be immediately and irreparably harmed.[3]  Consummation of the DIP Facility and the use of Cash Collateral in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interest of the Debtor's estates.

6.     ***Approval of the Motion***. The Motion is granted in all respects.

7.     ***Authorization of the DIP Facility and the DIP Loan Documents***.

(a)     The DIP Facility is approved as set forth in this Interim Order.  The Debtor is hereby authorized to enter into, execute and deliver the DIP Loan Documents.  The Debtor is hereby authorized to immediately borrow money pursuant to the DIP Loan Documents up to a loaned principal amount of disbursements of no more than $500,000, subject in addition to limitations on borrowing and spending in the Interim Budget, which limits borrowing and spending in the Interim Period, and to limitations on borrowing and spending in the Final Budget, which limits borrowing and spending thereafter through the Term (as defined in the Ratification), and any budgetary or other limitations of or on borrowing and spending under the DIP Loan Documents, and in accordance with the terms of this Interim Order and the DIP Loan Documents, which shall be used solely for purposes permitted under the DIP Loan Documents, and subject to the spending limitations set forth in the Budget for the period indicated therein, including, without limitation, to provide working capital for the Debtor, and to pay all amounts, including costs, fees and expenses, in accordance with this Interim Order, the Interim Budget and the DIP Loan Documents.

---

[3]     References to the Debtor's estate herein shall be deemed simultaneous references to the Debtor and its property, as well as the creditors of the Debtor where appropriate in the context.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtor is expressly authorized and directed on an interim basis to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), to perform all obligations thereunder and to pay all fees, that may be required or necessary for the Debtor's performance of its obligations under the DIP Loan Documents, including, without limitation:

(i)     the negotiation, execution, delivery and performance of the DIP Loan Documents, in final form, and any exhibits attached thereto,

(ii)    the non-refundable payment to the DIP Lender from amounts advanced as DIP Obligations of the fees, costs and expenses referred to in the DIP Loan Documents and costs and expenses as may be due from time to time, including, without limitation, the amounts described in Section 6 of the Ratification, and fees and expenses of the professionals retained by the DIP Lender as provided for in the DIP Loan Documents, all of which are expressly authorized and permitted to be paid from funds advanced under the DIP Facility (subject to clause (d), below), and

(iii)   the performance of all other acts required under or in connection with the DIP Loan Documents and this Interim Order, including, without limitation, the making of all payments and transfers of property of the Debtor and its estate to the DIP Lender and Gerber, as pre-Petition Date lender and secured party, as provided for, permitted or required under the DIP Loan Documents, which payments and transfers shall not be avoidable or recoverable from the DIP Lender or Gerber under any section of the Bankruptcy Code or under any other

claim, charge, assessment or other liability, whether by application of the Bankruptcy Code, other law or otherwise.

(c)     Without limiting any other term of this Interim Order, the DIP Lender and Gerber are each expressly authorized to apply the proceeds of all Collateral (as defined in the initial portion of paragraph 9, below) and any other amounts that they may receive in respect of the Pre-Petition Debt and the DIP Obligations to, respectively, the Pre-Petition Debt and the DIP Obligations. All of the rights, protections, benefits and remedies of the DIP Lender and Gerber, as pre-Petition Date lender and secured party, pursuant to the DIP Loan Documents are hereby incorporated in this Interim Order as if fully set forth herein and shall have the effect as if they had been ordered by the Bankruptcy Court pursuant hereto.

(d)     Notwithstanding the foregoing, and without modifying the accrual of such amounts as DIP Obligations pursuant to the other provisions of this Interim Order and the DIP Loan Documents, any amounts of fees or expenses incurred after the Petition Date by attorneys, consultants or other professionals retained by or for the benefit of the DIP Lender or Gerber, as pre-Petition Date lender and secured party, shall be paid prior to the occurrence of an Event of Default from funds loaned to the Debtor under the DIP Facility upon fifteen (15) days' notice of such fees and expenses made in writing to the Debtor, the U.S. Trustee and any Committee (as defined below.) Assuming no objection to such payment is filed with the Bankruptcy Court and served on counsel for the DIP Lender within such ten-day period by any of the Debtor, the U.S. Trustee and any such Committee (a "**Expense Objection**"), payment from funds advanced by the DIP Lender shall promptly occur, consistent with the DIP Loan Documents. In the case that an Expense Objection is timely filed, then such Expense Objection may be resolved by agreement among the DIP Lender or Gerber, on the one hand, and the Debtor, the U.S. Trustee

and the Committee, on the other, and thereafter paid, without any further order of the Bankruptcy Court. In absence of such agreement, such Expense Objection shall be resolved by a hearing before the Bankruptcy Court, with the objector bearing the burden of proof and persuasion to demonstrate that the fee or expense subject to the objection is unreasonable, with a presumption favoring payment of the fee or expense in question that it is reasonable. In the case that the Bankruptcy Court enters a final order finding that the objectionable fee or expense was unreasonable then, to the extent that the Bankruptcy Court so finds by clear and convincing evidence, the obligation of the Debtor to pay such fee or expense pursuant to the DIP Loan Documents (to the extent subject to the objection and the Bankruptcy Court's finding) shall not be paid by the estate of the Debtor in this Bankruptcy Case. To the extent any such Expense Objection does not object to all of any amount described herein, such amount to which there is not objection shall be paid immediately. During the pendency of an Expense Objection and in any case prior to the date of the payment of any such fee or expense and after the distribution of the notice with regard thereto as described above, the full amount asserted thereunder shall be reserved by the DIP Lender against potential borrowing under the DIP Facility. For clarity's sake, the foregoing Expense Objection protocol shall not apply to any fees or charges which are payable or to be paid directly to the DIP Lender or Gerber pursuant to the DIP Loan Documents as described in Section 6 of the Ratification or in Section 5 of the Pre-Petition Loan Agreement, and such amounts shall not be subject to any objection and shall be paid from borrowings under the DIP Facility.

(e)     Subject only to the potential effects of a Challenge (defined below) only with regard to the Pre-Petition Debt or the Pre-Petition Liens, upon execution and delivery of the DIP Loan Documents and the entry of this Interim Order, the DIP Loan Documents shall

constitute valid and binding obligations of the Debtor, enforceable against the Debtor and all other parties in accordance with the terms of the DIP Loan Documents. Subject only to the potential effects of a Challenge only with regard to the Pre-Petition Debt or the Pre-Petition Liens, no obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, avoidable, voidable, rescindable, revocable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under Section 502(d) of the Bankruptcy Code) or subject to any defense, reduction, setoff, recoupment or counterclaim, whether by the Debtor or any successor thereto or by any other party-in-interest at any time in this Case or any case to which it might be converted, including, without limitation, any trustee, examiner or committee as may be appointed or otherwise serve in the future in this Case or in any case to which it might be converted. In addition, all protections and other rights of the DIP Lender granted or described in this Interim Order shall continue, and shall be fully binding and enforceable against the Debtor and all other parties, whether or not, and in any case before and after, (x) the Case is or is not dismissed, (y) this Case becomes a case under chapter 7 of the Bankruptcy Code, or (z) any interim or other trustee, examiner or a committee is appointed or otherwise serves in this Case (the date upon which any of the events described in clauses (x) through (z), above, occurs by entry of an order by the Court effecting same, the "**Case Alteration Date**".) The occurrence of a Case Alteration Date shall be an immediate Event of Default (defined below) hereunder, without requiring the DIP Lender to provide any notice.

(f)      Subject to the terms and conditions of the DIP Loan Documents, the Debtor and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Loan Documents (an "**Amendment**") without further approval or order of the Bankruptcy Court

so long as (i) such Amendment is not material (for purposes hereof, a "material" Amendment

shall mean, any Amendment that operates to increase the rate of interest other than as currently

provided in the DIP Loan Documents, increase the maximum credit available under the DIP

Loan Documents, add specific new Events of Default or enlarge the nature and extent of default

remedies available to the DIP Lender following the time when a default under the DIP Loan

Documents shall have occurred and be continuing (including any "Event of Default" as defined

in the DIP Loan Documents or as otherwise described as such in this Interim Order, an "**Event of**

**Default**"), or otherwise modify any terms and conditions in the DIP Loan Documents in a

manner materially less favorable to the Debtor) and is undertaken in good faith by the Debtor

and the DIP Lender; (ii) the Debtor provides prior written notice of the Amendment (the

"**Amendment Notice**") to the U.S. Trustee, any official committee appointed in the Case under

section 1102 of the Bankruptcy Code (the "**Committee**"), or in the event no such Committee is

appointed at the time of such Amendment, the 20 Largest Unsecured Creditors; (iii) the Debtor

files the Amendment Notice with the Bankruptcy Court; and (iv) no objection to the Amendment

is filed with the Bankruptcy Court within two (2) business days from the later of the date the

Amendment Notice is served or the date the Amendment Notice is filed with the Bankruptcy

Court in accordance with this section. Any material Amendment to the DIP Loan Documents

must be approved by the DIP Lender and the Bankruptcy Court to be effective.

        8.    ***Superpriority Claims****.*

        (a)    Pursuant to Section 364(c)(1) of the Bankruptcy Code, all of the DIP

Obligations shall constitute allowed claims against the Debtor and its estate, with priority over

any and all claims, expenses, administrative expenses, diminution claims (including all Adequate

Protection Obligations (as defined below) and the Capacity Adequate Protection Obligations (as

defined below)), and all other claims against the Debtor or its estate, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, or otherwise authorized or paid as contemplated by section 303(f) of the Bankruptcy Code or on any other basis, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claims**"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-Petition Date property of the Debtor and its estate, and all products, accessions, substitutions and proceeds thereof, subject only to any liens as may be permitted pursuant to the DIP Loan Documents or this Interim Order, and subject to the Carve Out (as defined herein below.)

(b) So long as no Event of Default shall have occurred or be continuing, a Case Alteration Date has not occurred, nor has the Termination Date (as defined in the DIP Loan Documents) otherwise occurred, the Debtor shall be permitted to pay the payments authorized by the Interim Budget, subject to the maximum amounts for such type of expenditures contained in the Interim Budget, and otherwise also subject to the provisions of the DIP Loan Documents, individually and in the aggregate, as the same may be due and payable, subject to variances to be agreed upon by the DIP Lender and the Debtor (if any) without requirement of Bankruptcy Court approval; such payments shall only be made (if at all) from borrowings under the DIP Facility; and it is expressly authorized for the Debtor to borrow for and pay the costs, expenses and fees of or for the benefit of the DIP Lender, subject to the terms of the Interim Budget, the corresponding amounts becoming DIP Obligations; provided further, however, that, whether or

not any amounts expended or committed by the Debtor (with or without the knowledge or consent of the DIP Lender) are in excess of or otherwise not compliant with the Interim Budget, or are otherwise expended or committed in violation of any of this Interim Order or the DIP Loan Documents, the indebtedness further accrued thereby to the DIP Lender for funds advanced by the DIP Lender nevertheless constitute DIP Obligations, and shall enjoy all protections and security in favor of DIP Lender as set forth or described elsewhere in this Interim Order and the DIP Loan Documents.  The DIP Lender is authorized to reserve against amounts available for borrowing under the DIP Facility the amounts Budgeted for "SIGG Legal Fees (Bankruptcy Related)," "Gerber Legal Fees," "Legal Fees" and "Other Professional Fees" at the time(s) during the Interim Period that the DIP Lender shall determine, until such time as the corresponding expense has been paid by the Debtor.

9.     **DIP Liens**. As security for the DIP Obligations, effective and perfected upon the entry of this Interim Order and without the necessity of the execution, recordation or filing by the DIP Lender of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to the DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**Collateral**") (all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Loan Documents, the "**DIP Liens**"):

(a)     **First Lien on Cash Balances and Unencumbered Property**. Pursuant to Section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien on all pre-and post-Petition Date tangible and intangible property of the Debtor and its estate (subject only to the Carve Out), whether existing on the Petition Date or thereafter acquired, which, on or as of the Petition Date,

is not subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered Property**"), including without limitation, all cash and cash collateral of the Debtor and its estate (whether maintained with Gerber or otherwise, whether held in or passed through the Debtor Bank Accounts (defined below) or otherwise, and whether commingled with funds of other obligors under the Pre-Petition Facility (so long as such cash collateral of the Debtor's estate remains traceable)) and any investment of such cash and cash collateral, inventory, accounts, other receivables, tax refund claims, insurance proceeds, tort claims, whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, chattel paper, fixtures, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, 100% of the capital stock of domestic subsidiaries and 65% of the voting stock of direct foreign subsidiaries of the Debtor (if any), and the substitutions, accessions, proceeds and products of all the foregoing and further including, without limitation, all Post-Petition Collateral (as defined in the Ratification) which is unencumbered (except with a DIP Lien an Adequate Protection Lien (as defined below) or a Capacity Adequate Protection Lien (as defined below), and "Unencumbered Property" as defined herein shall expressly include all Debtor property subject to the DIP Liens, the Adequate Protection Liens, and the Capacity Adequate Protection Liens) notwithstanding anything to the contrary above, Unencumbered Property in which the DIP Lender is granted a lien shall not, however, include the Debtor's claims and causes of action, if any, which may arise in the future in this Case or exist at this time, exclusively under Sections 502(d), 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code (collectively, "**Avoidance Actions**"), and the proceeds thereof; provided, however that, notwithstanding the immediately preceding statement, the lien described herein shall extend to

claims and causes of action under Section 549 of the Bankruptcy Code (as recovered under

Sections 550 and/or 551 of the Bankruptcy Code) and proceeds thereof. For the purposes of this

Interim Order, "**Debtor Bank Accounts**" shall mean each and all of the following pre-Petition

Date bank accounts of the Debtor at Wells Fargo: account ending in 4350, account ending in

8187, and account ending in 4476.

      (b)    **Liens Priming Gerber's Pre-Petition Liens and the Capacity Pre-**

**Petition Liens**. Pursuant to Section 364(d)(1) of the Bankruptcy Code, a valid, binding,

continuing, enforceable, fully-perfected first priority senior priming security interest in and lien

on all pre- and post-petition tangible and intangible property of the Debtor (including, without

limitation, cash collateral, inventory, accounts receivable, other rights to payment whether

arising before or after the Petition Date, contracts, properties, plants, equipment, general

intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights,

trademarks, trade names, other intellectual property, capital stock of subsidiaries and the

substitutions, accessions, products and proceeds of all the foregoing and further including,

without limitations, the "Collateral" (as defined in the Pre-Petition Loan Documents)), whether

now existing or hereafter acquired, that is subject to the existing liens and security interests

presently securing the Pre-Petition Debt, including all Pre-petition Collateral, and that is subject

to any existing liens of Capacity existing as of the Petition Date (the "**Capacity Pre-Petition**

**Liens**"); subject, however, to the Carve Out. Such security interests and liens shall be senior in

all respects to the interests in such property of Gerber pursuant to the Pre-Petition Loan

Documents (including, without limitation, adequate protection liens granted hereunder), and

shall further be senior in all respects to the interests in such property of Capacity pursuant to the

Capacity Pre-Petition Liens, but shall be subject and subordinate to any other valid, perfected

and unavoidable interests of other parties arising out of unavoidable liens, if any, on such property existing, attached and perfected immediately prior to the Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of liens to which the Pre-Petition Liens of Gerber and the Capacity Pre-Petition Liens of Capacity become subject subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, and shall be further subject to the Carve Out.

(c)     **Liens Junior to Certain Other Liens**.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien on all pre- and post-Petition Date tangible and intangible property of the Debtor (other than the property described in clause (a) or (b) of this paragraph, as to which the liens and security interests in favor of the DIP Lender will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, attached, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Lender are junior to such valid, perfected and unavoidable liens. The property subject to the liens described in this clause (c) shall include, without limitation, all Post-Petition Collateral (as described in the Ratification) to the extent not included in clause (a), above.

(d)     **Liens Senior to Certain Other Liens**.  Notwithstanding any other term hereof, the DIP Liens shall not be subject or subordinate to (1) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under Section 551 of the Bankruptcy Code, or (2) any liens arising after the Petition Date including, without limitation, (i) any liens or security interests granted in favor of any federal, state, municipal or other

governmental unit, commission, board or court for any liability of the Debtor, other than with respect to any liens or security interests arising after the Petition Date and permitted under the DIP Loan Documents to be senior to the DIP Liens (if any), or (ii) the Adequate Protection Liens (defined below) or the Capacity Adequate Protection Liens (defined below), but shall be subject to the Carve Out.

10. **Protection of DIP Lender's Rights**.  The automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified, effective immediately and as necessary, (a) to permit the creation and perfection of all DIP Liens and other liens and protections afforded to the DIP Lender and Gerber, as pre-Petition Date lender and secured party, pursuant to this Interim Order, and (b) to permit the DIP Lender to exercise, immediately upon the occurrence of an Event of Default, or the Termination Date, and at all other times, all rights and remedies under the DIP Loan Documents and under this Interim Order, including all enforcement rights and remedies against the Collateral; provided, however, that the exercising by the DIP Lender of any rights or remedies pursuant to this paragraph 10(b) on the occasion of a Event of Default (but not on the occasion of the Termination Date, upon which event the notice described herein shall not be required) shall require three (3) business days' notice to the Debtor, the U.S. Trustee and any Committee.  For the avoidance of doubt, the stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by any order of the Bankruptcy Court or by law are hereby modified and vacated without further notice, application, or order of the Bankruptcy Court to the extent necessary to permit the DIP Lender and Gerber, as pre-Petition Date lender and secured party, to perform any act authorized or permitted under or by virtue of this Interim Order and the DIP Loan Documents, including, without limitation, (w) the implementation of the post-petition financing arrangements authorized by this Interim Order and pursuant to the terms

of the DIP Loan Documents, (x) the taking of any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (y) the assessment, charge, collection, advance, deduction, and receipt of payments with respect to the Pre-Petition Debt and the DIP Obligations, and the application of such payments thereto pursuant to the DIP Loan Documents and this Interim Order, and (z) the suspension of lending or reserving under the DIP Facility, as and when permitted by the DIP Loan Documents, and the continued application of Cash Collateral towards the payment of the pre-Petition Debt, the Adequate Protection Obligation and the DIP Obligations. The DIP Lender shall have no obligation to lend or advance any additional funds to or on behalf of the Debtor, or provide any other financial accommodations to the Debtor, immediately upon or after the occurrence of an Event of Default or an act, event or condition that with the giving of notice or the passage of time, or both, would constitute and Event of Default. Without limiting the foregoing, upon request of the DIP Lender or Gerber as pre-Petition Date lender and secured party, after or during the continuation of an Event of Default, upon three (3) business days' notice to the Debtor, the U.S. Trustee and any Committee, the Debtor shall exercise its best efforts to sell the Collateral or any portion thereof as may be requested by the DIP Lender or Gerber and to deliver all proceeds thereof to the DIP Lender or Gerber, and the automatic stay provisions of Section 362 are hereby modified and vacated effective immediately, to permit the foregoing. Subject only to the potential effects of a Challenge only with regard to the Pre-Petition Debt or the Pre-Petition Liens, the Debtor, its estate and all other parties-in-interest are hereby be deemed to waive their right to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender or Gerber as pre-Petition Date lender and secured party, as set forth in this Interim Order, or as established in the

DIP Loan Documents, whether as to the amount or enforceability of the DIP Obligations, the priority, enforceability, attachment or perfection of the DIP Liens, the Adequate Protection Obligations or otherwise. Without limiting the foregoing, in no event shall the DIP Lender or Gerber, as pre-Petition Date lender and secured party, be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or the enforcement of any other rights described in this Interim Order or the DIP Loan Documents.

11.    **Limitation on Charging Expenses Against Collateral**.    No expenses of administration of the Case or any future case that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender; subject, however, to the Carve Out.

12.    *The Cash Collateral*. To the extent any funds of any Debtor were on deposit in the Debtor Bank Accounts as of the Petition Date or immediately prior thereto (the "**Petition Time**"), such funds (the "**Deposited Funds**") are subject to rights of setoff by Gerber under the Pre-Petition Loan Documents, applicable non-bankruptcy law, and Section 553 of the Bankruptcy Code. By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of Gerber pursuant to Sections 506(a) and 553 of the Bankruptcy Code.[4] As such, as part of the adequate protection provided hereunder, and notwithstanding any other term of this Interim Order which may be or appear to be to the contrary, the Gerber is hereby authorized to, effective immediately, *nunc pro tunc*, setoff and apply against outstanding Pre-Petition Debt all

---

[4] The Bankruptcy Court hereby finds that the Deposited Funds were in an amount of approximately $57,616 as of the Petition Date. The relief provided in this paragraph is reasonable, including because of this relatively modest amount.

such Deposited Funds, and the automatic stay pursuant to Section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit same.[5]  Any proceeds of the Collateral (as defined in initial portion of paragraph 9, above) (other than the Deposited Funds) are cash collateral of Gerber pursuant to the Pre-Petition Loan Documents (and pursuant to the DIP Loan Documents, such proceeds are cash collateral of the DIP Lender as well) within the meaning of Section 363(a) of the Bankruptcy Code, and to the extent proceeds of inventory subject to the Capacity Pre-Petition Lien are also cash collateral of Capacity, in light of the Capacity Pre-Petition Lien. Such proceeds of such Collateral, other than the Deposited Funds, are referred to herein as "**Cash Collateral**."

13.    *Use of Cash Collateral*.  Subject to the terms and conditions of the DIP Loan Documents and this Interim Order, the Debtor is hereby authorized to use all Cash Collateral of Gerber, of the DIP Lender and of Capacity, *provided* that the use of Cash Collateral shall be limited to paying such amounts over to Gerber towards repayment and otherwise satisfaction of all Pre-Petition Debt, including any amounts of post-Petition Date interests, fees and expenses thereon (and, upon receipt of any Cash Collateral, such funds shall be promptly transmitted to Gerber for application towards repayment of the Pre-Petition Debt and Gerber is authorized to so apply such funds); provided, however, that to the extent there is at such time no Pre-Petition Debt (including any amounts of post-Petition Date interest, fees or expenses), then outstanding or payable, all Cash Collateral shall be received to be held in one of the Debtor Bank Accounts, the account number of which ends in 8187 (which shall, pursuant to a separate order of the Bankruptcy Court, be authorized to be used as a DIP account, and entry of such authorizing order shall be a pre-condition to any obligation of the DIP Lender to make any funds available) for

---

[5]    The provision of relief from the stay under section 362 of the Bankruptcy Code, and all other relief provided in this Interim Order shall be effective immediately. The foregoing is hereby ordered. Good and sufficient cause is found to exist for this relief.

application against DIP Obligations (whether then extant or that may thereafter arise.) To the

extent any DIP Obligations are then outstanding, such Cash Collateral as so held shall be

transferred to the DIP Lender for application in reduction of the DIP Obligations (pursuant to the

DIP Loan Documents,) and the DIP Lender is authorized to so apply such funds. To the extent

that there are no such DIP Obligations then outstanding, all such Cash Collateral shall be held by

the DIP Lender for subsequent application in reduction of any DIP Obligations that may

thereafter arise or become outstanding, until the occurrence of the Termination Date and the final

and full payment on an irrevocable and indefeasible basis of all DIP Obligations. Thereafter, all

such Cash Collateral shall be applied towards payment of any debt owed by the Debtor to

Capacity as of the Petition Date (the "**Capacity Pre-Petition Debt**"). In addition, Gerber is

granted adequate protection as described hereinafter on account of the Pre-Petition Debt and the

Pre-Petition Liens, and Capacity is granted adequate protection as described hereinafter on

account of any Capacity Pre-Petition Debt and the Capacity Pre-Petition Liens. The Debtor

waives any right to request or obtain the authorization to use any Cash Collateral other than and

except as provided in this paragraph 13, unless and until the Pre-Petition Debt and the DIP

Obligations have been indefeasibly and irrevocably paid and repaid in cash in full.

14.    *Gerber's Adequate Protection*.  Gerber, on account of the Pre-Petition Debt and

the Pre-Petition Liens, is entitled, pursuant to Sections 361, 363(e) and 364(d)(1) of the

Bankruptcy Code, to adequate protection of its interest in the Pre-Petition Collateral, including

the Cash Collateral arising from Pre-Petition Collateral, to the extent that its interests in the Pre-

Petition Collateral constitute valid and perfected security interests and liens as of the Petition

Date, for and equal in amount to the aggregate diminution in value, if any, of Gerber's Pre-

Petition Collateral, including, without limitation, any such diminution resulting from the sale,

lease or use by the Debtor (or other decline in value) of such Cash Collateral and any other Pre-Petition Collateral, the priming of Gerber's security interests and liens in the Pre-Petition Collateral pursuant to the DIP Loan Documents and this Interim Order, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. As adequate protection of its Pre-Petition Liens on account thereof and of the Pre-Petition Debt, Gerber is hereby granted the following (in addition to the features of adequate protection described above; i.e., the application of the Deposited Funds and other funds towards satisfaction of the Pre-Petition Debt and other terms of this Interim Order) (collectively, the "**Adequate Protection Obligations**"):

(a)      **Adequate Protection Liens**.  Gerber is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution or filing by Gerber of mortgages, security agreements, pledge agreements, financing statements or other agreements) replacement and additional security interests in and liens on the Collateral in which or on which there are not already Pre-Petition Liens, only to the same extent, validity and priority of the Pre-Petition Liens in the same types and categories of assets, subject and subordinate only to the security interests and liens granted to the DIP Lender in this Interim Order and pursuant to the DIP Loan Documents and any liens on the Collateral to which such liens so granted to the DIP Lender are junior (the "**Adequate Protection Liens**"); and

(b)      **Section 507(b) Claim**.  Gerber is hereby granted a superpriority claim as provided for in Section 507(b) of the Bankruptcy Code, immediately and only junior to the claims under Section 364(c)(l) of the Bankruptcy Code held by the DIP Lender as described above (the "**Section 507(b) Claim**"), subject, however, to the Carve Out.

15.      *Capacity's Adequate Protection*.  Capacity, on account of the Capacity Pre-Petition Debt and the Capacity Pre-Petition Liens, is entitled, pursuant to Sections 361, 363(e)

and 364(d)(1) of the Bankruptcy Code, to adequate protection of its interest in the Capacity Pre-Petition Collateral, including the Cash Collateral arising from the Capacity Pre-Petition Collateral, to the extent that its interests in the Capacity Pre-Petition Collateral constitute valid and perfected security interests and liens as of the Petition Date, for and equal in amount to the aggregate diminution in value, if any, of the Capacity Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of the Cash Collateral in which Capacity has an interest and otherwise the Capacity Pre-Petition Collateral, the priming of any Capacity Pre-Petition Lien pursuant to the DIP Loan Documents and this Interim Order, and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. As adequate protection of the Capacity Pre-Petition Lien on account thereof and of the Capacity Pre-Petition Debt, Capacity is hereby granted the following (in addition to the features of adequate protection described above in the terms of this Interim Order) (collectively, the "**Capacity Adequate Protection Obligations**"):

(a)    **Capacity Adequate Protection Liens**. Capacity is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution or filing by Capacity of mortgages, security agreements, pledge agreements, financing statements or other agreements) replacement and additional liens on the Collateral in which or on which there are not already Capacity Pre-Petition Liens, only to the same extent, validity and priority of the Capacity Pre-Petition Liens in the same types and categories of assets, subject and subordinate only to the security interests and liens (1) of or granted to Gerber in this Interim Order (including the Pre-Petition Liens and the Adequate Protection Liens), (2) granted to the DIP Lender in this Interim Order and pursuant to the DIP Loan Documents, and (3) any liens on

the Collateral to which such liens so granted to the DIP Lender are junior (the "**Capacity**

**Adequate Protection Liens**"); and

(b)      **Capacity Section 507(b) Claim**.  Capacity is hereby granted a

superpriority claim as provided for in Section 507(b) of the Bankruptcy Code, which, however,

notwithstanding the terms of such Section 507(b) of the Bankruptcy Code, shall be junior to the

claims under Section 364(c)(l) of the Bankruptcy Code held by the DIP Lender as described

above and the Section 507(b) Claim of Gerber, also described above (the "**Capacity Section**

**507(b) Claim**"), subject, however, to the Carve Out.

16.      *Sufficiency of Adequate Protection*.  Under the circumstances and given that the

above-described adequate protection is consistent with the Bankruptcy Code, including

Section 506(b) thereof, the Court finds that the adequate protection provided herein to Gerber

and to Capacity is reasonable and sufficient to protect the interests of Gerber and Capacity with

regard to Gerber's Pre-Petition Liens and the Capacity Pre-Petition Lien, securing the Pre-

Petition Debt of Gerber and the Capacity Pre-Petition Debt, respectively (provided, however,

that nothing herein shall prejudice the right of Gerber to request other or further adequate

protection.)

17.      *Right to Credit Bid.*  Gerber, both as pre-Petition Date lender and secured party

and as DIP Lender, shall have the right to credit bid any portion of any of the Pre-Petition Debt,

the DIP Obligations or the Adequate Protection Obligations at any time, in the event of a sale of

any of the Debtor's assets, whether pursuant to a sale under Section 363 of the Bankruptcy Code

or pursuant to or in anticipation of a plan confirmed under Section 1129 of the Bankruptcy Code.

No order shall be entered by the Bankruptcy Court which is contrary to the immediately

preceding sentence.

18.     ***Termination of Right to Use Cash Collateral.*** The Debtor's right to use Cash Collateral hereunder (which is limited to the application towards repayment of the Pre-Petition Debt (including all post-Petition Date interest, fees and expenses thereon) and, thereafter, the DIP Obligations or otherwise application as described in and permitted by the DIP Loan Documents, as otherwise described above herein) shall automatically terminate without further order of the Bankruptcy Court upon (a) a date which is twenty-five (25) days after the date of entry of this Interim Order, if the Final Order has not been entered prior to the expiration of such 25-day period, (b) a date which is three (3) days after the entry of this Interim Order, if the DIP Loan Documents have not been executed and delivered prior thereto; or (c) immediately upon prior written notice to the Debtor, if the Debtor uses Cash Collateral in violation of this Interim Order (which shall constitute an Event of Default) or an Event of Default shall have otherwise occurred; provided, however, that, notwithstanding the foregoing, Cash Collateral may and shall continue to be used to pay or repay all Pre-Petition Debt, including post-Petition Date interest, fees and expenses thereon, and, thereafter, the DIP Obligations, and pay all amounts of fees, interest, charges and expenses provided for in the DIP Loan Documents, until the Pre-Petition Debt and the DIP Obligations have indefeasibly and irrevocably been paid in cash in full.

19.     ***Perfection of DIP Liens, Adequate Protection Liens and Capacity Adequate Protection Liens.***

(a)     The DIP Lender, Gerber and Capacity are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action, including the making of notations on certificates of title, in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Lender, Gerber or Capacity chooses

to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted hereunder, including the making of notations on certificates of title, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order.  No filing of any such financing statement or the like shall change the relative rights and remedies of the DIP Lender and Gerber, on the one hand, and Capacity, on the other, from the priority and order thereof as set forth in this Interim Order.

(b)      A certified copy of this Interim Order may, in the discretion of the DIP Lender, Gerber or Capacity, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)      Any provision of any lease or other license, contract or other agreement that requires (1) the consent or approval of one or more landlords or other parties or (2) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest or other post-petition collateral related thereto, shall be deemed to have no force and effect with respect to the transactions granting post-petition liens and security interests in favor of Capacity, the DIP Lender, Gerber, as pre-Petition Date lender and secured party, in accordance with the terms of the DIP Loan Documents or this Interim Order.

20.      ***Preservation of Rights Granted Under the Order***.

(a)  (1)  No claim, priority, lien, security interest or other interest or encumbrance having a priority superior to or pari passu with those granted by this Interim Order to the DIP Lender shall be granted or allowed while any portion of the DIP Facility (or any refinancing thereof) or the commitments thereunder or the DIP Obligations remain outstanding, or amounts of DIP Obligations may or could otherwise be incurred in the future, and the DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under Section 364(d) of the Bankruptcy Code, as so-called adequate protection or otherwise. (2) No claim, priority, lien, security interest or other interest or encumbrance having a priority superior to or pari passu with those granted or confirmed by this Interim Order to Gerber as pre-Petition lender and secured party, whether pursuant to the Pre-Petition Loan Documents, the Adequate Protection Obligations or otherwise, shall be granted or allowed while any portion of the Pre-Petition Debt or the Adequate Protection Obligations remain outstanding or unfulfilled, and neither the Pre-Petition Liens nor the Adequate Protection Liens shall be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien or security interest, whether under Section 364(d) of the Bankruptcy Code, as so-called adequate protection, or otherwise; provided, however, that the Pre-Petition Liens and the Adequate Protection Liens shall be subject and junior only to, and subordinate only to, to the DIP Liens to the extent otherwise provided in this Interim Order and the DIP Loan Documents and to the Carve Out; and provided further, however, that clause (2) of this paragraph 20(a) is subject to challenge only to the extent described in paragraph 21(b) of this Interim Order.

(b)        Unless (1) all DIP Obligations shall have been paid indefeasibly, irrevocably and in full, (2) the commitments under the DIP Loan Documents have terminated and (3) no other or further DIP Obligations may be or could be incurred, other than any provisions thereof that shall survive the payment in full of the DIP Obligations in accordance with the DIP Loan Documents (all such actions, collectively, the "**DIP Pay-Out**"), neither the Debtor nor Capacity shall seek any modifications or extensions of this Interim Order without the prior written consent of the DIP Lender (and any such modification or extension shall cause and shall be deemed to cause an immediate Event of Default to occur, and in any case the DIP Lender shall have no further obligation to make any funds under the DIP Facility available), and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender. If the Case Alteration Date occurs, the order providing for the event or events that triggered the occurrence of such Case Alteration Date shall also provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests, replacement security interests and other protections granted to the DIP Lender and, as applicable, Gerber based on its interests under the Pre-Petition Loan Documents, pursuant to this Interim Order or as contemplated herein shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until the DIP Pay-Out shall have occurred and all Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming liens, security interests replacement security interests and other protections, shall, notwithstanding any other event, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding any Case dismissal or otherwise, for the purposes of enforcing the claims, liens and security interests or replacement security interests referred to in (x) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (1) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by Gerber of the effective date of such reversal, stay, modification or vacation or (2) the validity or enforceability of any security interest, lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations.   Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations incurred by the Debtor to the DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation (whether or not funds have been at such time disbursed) shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in Section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Loan Documents with respect to all DIP Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, Adequate Protection Liens, the Superpriority Claim, the Section 507(b) Claim and all other rights, remedies and protections of Gerber, as lender and secured party under the Pre-Petition Loan Documents, and as DIP Lender, granted by the provisions of this Interim Order and the DIP Loan Documents shall survive, and shall not be modified, impaired or discharged by the entry of an order converting the Case to a case under chapter 7 or chapter 11, dismissing the Case, or appointing a trustee, examiner or committee, nor shall the DIP Liens, the Adequate Protection Liens, the Superpriority Claim, the Section 507(b) Claim or any of the other rights, remedies and protections of the DIP Lender or otherwise of Gerber

granted by the provisions of this Interim Order or the DIP Loan Documents be modified, impaired or discharged by the entry of an order confirming a plan of reorganization in the Case (or otherwise by any order in the Case, including one authorizing a sale of any assets of the Debtor) and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived and hereby does waive any discharge as to any remaining DIP Obligations, Adequate Protection Obligations and Pre-Petition Debt. The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in this Case, in any successor case if this Case, or in any superseding chapter 7 or chapter 11 case under the Bankruptcy Code, and the DIP Liens, the Superpriority Claim and all other rights, remedies and protections of Gerber, as the pre-Petition lender and secured party and the DIP Lender, granted by the provisions of this Interim Order and the DIP Loan Documents shall continue in full force and effect until the DIP Obligations are indefeasibly and irrevocably paid in full and all Adequate Protection Obligations have been fulfilled. In addition, none of the DIP Liens, the Adequate Protection Liens, the Superpriority Claim, nor any other rights or protections afforded the DIP Lender or Gerber, as pre-Petition lender and secured party, in this Interim Order or the DIP Loan Documents shall be subject to avoidance, revocation, recission or modification under any circumstances, by any trustee, examiner, debtor-in-possession, committee or other estate representative, or otherwise.

21.    ***Limitation on Use of Financing Proceeds and Collateral; Limitations on Challenges to Pre-Petition Debt and Pre-Petition Liens***.

(a)    Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Cash Collateral or Collateral (as defined in the initial portion of paragraph 9, above) may be used to (i) object to, challenge, attack, contest or raise any defense to, the amount, validity, perfection, priority, extent, attachment, effectiveness or enforceability of

any amount due under the DIP Loan Documents or the Pre-Petition Loan Documents, or the liens, claims or other rights or protections granted or confirmed under this Interim Order or the DIP Loan Documents, (ii) assert any action for preferences, fraudulent conveyances, fraudulent transfers other avoidance power claims or any other any claims, counterclaims or causes of action, objections, contests or defenses against Gerber, as DIP Lender, pre-Petition Date lender and secured party, or otherwise, or Gerber's agents, affiliates, representatives, attorneys or advisors, (iii) prevent, hinder or otherwise delay the DIP Lender's enforcement or realization on the Cash Collateral or the Collateral (as defined in the initial portion of paragraph 9, above) in accordance with the DIP Loan Documents or this Interim Order, (iv) seek to modify any of the rights granted to Gerber, whether as DIP Lender or pre-Petition Date lender and secured party, in this Interim Order, or under the DIP Loan Documents, in each of the foregoing cases without such party's prior written consent, or (v) pay any amount on account of any claims arising prior to the Petition Date (although Cash Collateral may be and shall be applied towards satisfaction of the Pre-Petition Debt as otherwise described herein), except with the approval by the DIP Lender in its sole discretion. Notwithstanding the foregoing or any other provision of this Interim Order, Gerber may waive any right or protection in the Interim Order (including waiving the effects of an Event of Default), in whole or in part, for any amount of time or permanently, without any further order of the Bankruptcy Court and without consequence to any other rights or protections thereof; provided, however, such waiver must be in writing, executed on or as of a date prior to such waiver taking effect.

(b) No trustee, examiner, creditor, Committee or other party or party-in-interest existing at any time in this Case or in any case to which this one might be converted may (1) challenge, attack, contest, raise any defense to, seek avoidance, revocation or subordination

of, or otherwise object or take a position contrary to (or support or encourage any other party in doing so,) whether by any claim, allegation, statement, adversary proceeding or action, suit, arbitration, proceeding, application, motion or other litigation of any type, whether brought directly or indirectly (any one, a "**Suit**") (i) any of the liens, claims, protections or rights granted or confirmed in favor of Gerber and / or the DIP Lender, whether pursuant to this Interim Order or any of the DIP Loan Documents, including, without limitation, the amount and enforceability of the Pre-Petition Debt and the DIP Obligations, and the priority, perfection, attachment and enforceability of the Pre-Petition Liens and the DIP Liens, (ii) any finding of the Bankruptcy Court described in this Interim Order or the agreements, consents, acknowledgments, stipulations or admissions of the Debtor in this Interim Order, or (2) sue, bring Suit seeking, or otherwise claim or assert (or support or encourage any other party in doing so), any amount of recovery, setoff or recoupment against, or liability of Gerber, its successors and assigns, or their present or former affiliates, subsidiaries, divisions, predecessors, directors, representatives, employees, officers, attorneys, owners, shareholders, principals, agents or other representatives, which arises under or is related in any way to the Debtor, its affiliates, the Pre-Petition Loan Documents, or otherwise any events occurring on or prior to the entry of this Interim Order, except only as follows: only a creditor with an Eligible Claim (defined below) arising prior to the Petition Date which is also a party-in-interest in this Case and which is not an affiliate (as defined in the Bankruptcy Code) or successor of the Debtor and is also not Capacity or its affiliate (a "**Creditor**"), or a Committee may challenge only the findings of the Bankruptcy Court or the admissions, acknowledgments, stipulations, consents or agreements of the Debtor as set forth in paragraph 4 of this Interim Order, above, bring a Suit as described in clause (b) (2) of this paragraph 21 or object to the effectiveness of the release of Gerber described in Section 8 of the

Ratification (collectively, a "**Challenge**") and further provided, however, that (x) no Collateral (as defined in the initial portion of paragraph 9, above) or its proceeds (including any Cash Collateral) may be used, spent or dedicated to conduct any investigation with regard to, prepare or otherwise prosecute any such Challenge (any such activity, a "**Non-Permitted Purpose**"); and (y) such Challenge, if any, must be brought as an adversary proceeding under Bankruptcy Rule 7001 *et seq.*, the complaint commencing which is filed on or before the following deadlines (time being of the essence): (A) on or before a date which is thirty (30) days after the date of entry of this Interim Order, if brought by a Creditor, or (B) on or before a date which is thirty (30) days after its appointment, if brought by a Committee (but in no case later than fifty (50) days after the Petition Date, in the case of either a Creditor or a Committee). If no such Challenge is brought within the time and by the party and the method described in clause (b)(2), above, (I) all findings of the Bankruptcy Court and all admissions, agreements, consents, stipulations and acknowledgments of the Debtor in paragraph 4 of this Interim Order shall be fully conclusive, applicable and enforceable against all parties and parties-in-interest in this Case and in any case to which this Case may be converted, regardless of when such party or party-in-interest became a party or party-in-interest with regard to this Case or any successor case hereto, and constitute, among other things, law of the case in this Case and in any case to which it may be converted and any adversary proceedings arising therein or thereunder or related thereto, as well as res judicata as against all parties and parties-in-interest at all times now or and in the future in this Case and any case to which it might be converted; provided, however, that if such a Challenge is brought on a timely basis and in a form and by a party as described above in this paragraph, it shall not affect the applicability, enforceability or effectiveness of any findings in paragraph 4 of this Interim Order or any admission, agreement, stipulation, consent or

acknowledgment of the Debtor therein which is not specifically challenged in such Challenge (and only on the ground set forth in such Challenge,) and (II) Gerber shall, effective immediately, be released from all suits, claims, causes or action, liabilities, allegations or other alleged recoveries based on or related to in any way the Debtor or any events occurring on or prior to the Petition Date or otherwise described in paragraph 4 hereof above, and, in addition, the terms of Section 8 of the Ratification shall become fully effective as against all parties and parties-in-interest now and in the future in this Case and in any case to which it may be converted. Nothing herein shall establish, or constitute any consent to, any standing by any Creditor or Committee to bring or prosecute any Challenge, as any adversary proceeding, or by any other form or proceeding. For the purposes hereof, "**Eligible Claim**" shall mean a claim that shall have at such time been allowed as a claim pursuant to Section 502 of the Bankruptcy Code pursuant to a final order of the Bankruptcy Court or a claim which is alleged by the holder thereof in the complaint of any such Challenge to be allowable under Section 502 of the Bankruptcy Code, provided that the Bankruptcy Court thereafter adjudicates by final order in the adversary proceeding constituting the Challenge that such claim is allowed under Section 502 of the Bankruptcy Code in any amount greater than zero, with the burden of persuasion and proof on such request for relief being on the holder of such claim (who shall also be the plaintiff.)

22.     ***Prepetition Collateral Agent***. To the extent that Gerber, as pre-Petition lender and secured party, is the secured party under any agreement providing for "control" under the Uniform Commercial Code in respect of any deposit amounts or securities account, is listed as loss payee under the Debtor's insurance policies, or is otherwise the secured party under any of the Pre-Petition Loan Documents, Gerber is deemed agent for the DIP Lender, and shall act in that capacity and distribute any proceeds recovered or received first, to the indefeasible and

irrevocable payment in full of the Pre-Petition Debt (including any post-Petition Date interest, fees and expenses), in accordance with the DIP Loan Documents, and, second, subsequent to indefeasible and irrevocable payment in full of all Pre-Petition Debt, the DIP Obligations.

23.    *Carve Out Expenses.*    Subject to the other terms and conditions hereof, the DIP Liens and the Adequate Protection Liens, the Superpriority Claims and the Section 507(b) Claim shall be subject and subordinate to certain carve outs as follows, and only as follows:

(a)    A carve out for unpaid fees and expenses of professionals of the Debtor, in a one-time, cumulative amount of no greater than $30,000.00 (the "**Professionals' Carve Out**"); provided, however, that such Professionals' Carve Out shall only be available to pay the fees and expenses allowed on a final basis by the Bankruptcy Court pursuant to Section 330 of the Bankruptcy Code for professionals retained by the Debtor (each a "**Professional**") by final order of the Bankruptcy Court pursuant to Section 327 of the Bankruptcy Code; and provided further that the use of proceeds of Collateral to pay such amounts due pursuant to the Professionals' Carve Out shall be subject to the other limitations set forth in this Interim Order regarding the use of Collateral and its proceeds. In addition, the amount described above for the Professionals' Carve Out shall be available only to the extent that amounts which were budgeted on the Budget for payment of such Professionals' fees and expenses (to the extent loaned or reserved by the DIP Lender under the DIP Facility) for all times prior to the application of any part of the Professionals' Carve Out had actually been applied towards payment of such Professionals' fees and expenses.

(b) A carve out for the statutorily mandated costs and fees of the U.S. Trustee (the "**U.S. Trustee Carve Out**".) (It shall be an Event of Default if the Budget or any part thereof does not include items sufficient to satisfy, and that are used to satisfy, the statutorily mandated

costs and fees of the U.S. Trustee to the extent amounts corresponding thereto are actually loaned or reserved by the DIP Lender under the DIP Facility.)

(c) A carve out in the one-time cumulative amount of no greater than $21,000 for unpaid amounts payable to employees of the Debtor related to not more than one week's worth of compensation and all withholding and payroll taxes related thereto (the "**Payroll Carve Out**"); provided, however that such Payroll Carve Out shall only be available for such amounts as described above in this clause (c) which have not been paid but for which the Debtor is liable.

(d) The Professionals' Carve Out, the U.S. Trustee Carve Out and the Payroll Carve Out shall be collectively defined as the "**Carve Out**." Notwithstanding any of the foregoing, no amount of the Carve Out (nor any borrowings under the DIP Facility or any Collateral) shall be applied or used towards payment of any fees, expenses or costs accrued or charged in connection with any Non-Permitted Purpose. Notwithstanding any other term hereof or the DIP Loan Documents, the DIP Lender is authorized to reserve the entire unused amount of the Carve Out (including an amount equivalent to a reasonable estimate of the statutorily mandated costs and fees of the U.S. Trustee for two calendar quarters) against availability under the DIP Facility. The Debtor shall reflect the reduction of the unused Carve Out amount in its borrowing base statements and all other reports of collateral availability as dollar-for-dollar discounts against any availability that the Debtor may then assert it has for loans under the DIP Facility. The DIP Lender has no obligation to fund any portion of the Carve Out (and Gerber, as Pre-Petition Date lender and secured party, has no obligation to advance any loans or make other financial accommodations to the Debtor in any case.) Neither the DIP Lender nor otherwise Gerber shall have any obligation to fund or pay any compensation or other amounts which may be asserted as due to any Professional. Upon any sale of all or substantially all of the Debtor's

assets, by which funds are paid such that the then outstanding amounts of DIP Obligations and Pre-Petition Debt are paid irrevocably, indefeasibly and in full, sufficient funds from the consideration for such sale must, beyond such authorized payment to the DIP Lender and Gerber, remain with the Debtor's estate in an amount not less that the remaining amounts of each of the Carve Outs described above and such amounts shall be designed as separate funds dedicated to the continued purpose of each such Carve Out (and, therefore, no Carve Out shall further apply to any of the funds received by either the DIP Lender or Gerber.) Notwithstanding anything in the DIP Loan Documents that may appear to the contrary each of the Carve Outs described above (i.e., the Professionals' Carve Out, the U.S. Trustee's Carve Out and the Payroll Carve out) shall be separately maintained and calculated, such that none of the Collateral or its proceeds dedicated to any of the three Carve Outs can be consumed for the purpose of any other of the three Carve Outs.

24.     **Objections Overruled.** All objections to the Motion seeking entry of this Interim Order are, to the extent not withdrawn, hereby overruled.

25.     **Binding Effect; Successors and Assigns.** The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, and all other benefits, protections and rights granted or confirmed herein for the benefit of Capacity, the DIP Lender or Gerber, as pre-Petition Date lender and secured party, shall be binding upon those who receive notice including without limitation, the Office of the United States Trustee, Capacity, the DIP Lender, Gerber (as pre-Petition Date lender and secured party), the twenty largest unsecured creditors of the Debtor, and shall inure to the benefit of Gerber, whether as the DIP Lender or as pre-Petition Date lender and secured party, Capacity, and the Debtor, and their respective successors and assigns both before and after any Case Alteration Date; *provided, however,* that the DIP Lender

shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtor. In determining to make any loan under the DIP Loan Documents or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute.)

26.   *Additional Terms and Conditions*.

(a)   Notwithstanding any other term hereof or of the DIP Loan Documents, the DIP Lender shall have no obligation to fund the DIP Facility upon and during the continuation of an Event of Default.

(b)   In case of any inconsistency between the terms of this Interim Order and the terms of any of the DIP Loan Documents, the terms of this Interim Order shall govern and control; provided, however, that rights and protections of the DIP Lender and Gerber, as pre-Petition Date lender and secured party, as described in this Interim Order, which are different from rights and protections thereof as provided in the DIP Loan Documents or the Pre-Petition Loan Documents, respectively, shall be treated and interpreted as further, additional rights and protections of the DIP Lender and Gerber, cumulatively available thereto, and not as being inconsistent with any of such rights and protections in such agreements.

(c)   The DIP Lender and Gerber as pre-Petition Date lender and secured party, shall have access to all locations of the Debtor to prepare for and conduct an orderly liquidation of the Debtor and the Collateral upon and during any Event of Default.

(d)     The DIP Lender and Gerber, as pre-Petition Date lender and secured party, are authorized to retain the services of consultants, appraisers, accountants and attorneys, and other advisors as they shall deem necessary or appropriate in their sole discretion, and Debtor agrees to provide such consultants, appraisers, accountants and attorneys and their employees, designees and agents (as well as the employees and representatives of Gerber) with full access at reasonable times and places to the operations and books and records of the Debtor, and reasonable access to the Debtor's management in connection with enforcement of Gerber's and the DIP Lender's rights under the Interim Order, the DIP Loan Documents and the Pre-Petition Loan Documents.  The Debtor shall be liable for the fees and expenses incurred by DIP Lender or Gerber under this clause (d), which amounts shall constitute a DIP Obligation.

(e)     Neither Gerber, as pre-Petition Date lender and secured party, nor the DIP Lender is obligated to accept title to any portion of the Collateral in payment of any portion of the Pre-Petition Debt or the DIP Obligations in lieu of any cash or cash equivalents, nor shall either the DIP Lender or Gerber, as pre-Petition Date lender and secured party, be required to accept cash or cash equivalents as payment to the extent same is encumbered by any interest of any person or entity other than the DIP Lender or Gerber, respectively.

(f)     Nothing herein shall affect the continuing validity, enforceability or effectiveness of any of the Pre-Petition Loan Documents, and all such Pre-Petition Loan Documents continue to be in full force and effect in accordance with there respective terms, except as expressly modified by the Ratification.  All references in any of the Pre-Petition Loan Documents to "obligations," "indebtedness" or the like shall include all of both the DIP Obligations and the Adequate Protection Obligations.

(g)     Except as otherwise specifically provided in this Interim Order or in the

DIP Loan Documents, neither the DIP Lender nor Gerber, as pre-Petition Date lender and

secured party, waives any rights or remedies that either may have pursuant to the Pre-Petition

Loan Documents, and the DIP Lender and Gerber retain all rights available pursuant to the

Bankruptcy Code and any other applicable law. The rights, claims, liens, security interests and

priorities of the DIP Lender arising under this Interim Order and the DIP Loan Documents are in

addition to, and not intended to waive or substitute for, the rights, obligations, claims, liens,

security interests and priorities granted by the Debtor under the Pre-Petition Loan Documents.

The failure by the DIP Lender or Gerber at any time or times hereafter to require strict

performance by the Debtor (or any successor thereto) of any provision of this Interim Order, the

DIP Loan Documents or the Pre-Petition Loan Documents shall not waive, affect or diminish

any rights of the DIP Lender or Gerber to hereafter demand strict performance and compliance.

(h)     The Debtor shall deliver to the DIP Lender and Gerber, as soon as

practicable, copies of any pleading, notice or other document filed by the Debtor. Any budgets,

financial statements, or other financial data delivered by the Debtor to any party shall be

simultaneously provided to the DIP Lender and Gerber.

(i)     Upon and after a Case Alteration Date or the Termination Date, the rights

and remedies under this Interim Order, the DIP Loan Documents and the Pre-Petition Loan

Documents, of the DIP Lender and of Gerber, as pre-Petition Date lender and secured party, shall

be and remain in full force and effect as if such Case had not been filed or such Case had not

been dismissed, converted or the like. Furthermore, notwithstanding such Case Alteration Date

or the Termination Date, all of the rights, remedies, benefits and protections of the DIP Lender

and Gerber under this Interim Order, including, without limitation, the liens and priorities

granted or confirmed hereunder, shall remain in full force and effect.

(j)     At all times during the Case (and in any case to which it may be

converted) and whether or not an Event of Default has occurred, the Debtor, for itself and on

behalf of all of its successors and legal representatives, irrevocably waives any right to seek

authority to (1) obtain post-petition loans or other financial accommodations pursuant to Section

364(c) or (d) of the Bankruptcy Code, other than from the DIP Lender pursuant to the terms of

the DIP Loan Documents or to fund the immediate payment in full in cash on an irrevocable and

indefeasible basis of the Pre-Petition Debt and the DIP Obligations, (2) challenge or object to the

application of any payments authorized by this Interim Order pursuant to Section 506(b) of the

Bankruptcy Code or seek any setoff, recoupment or discount based thereon, (3) propose or

support a plan for which confirmation could be sought under Section 1129 of the Bankruptcy

Code that does not provide for the indefeasible payment in full in cash on an indefeasible and

irrevocable basis of all Pre-Petition Debt and DIP Obligations upon consummation of such plan,

on terms otherwise acceptable to the DIP Lender, (4) propose or support a sale, leasing or other

divestiture of the Debtor's rights in substantially all of its assets or otherwise of any assets out of

the ordinary course of its business which would not, upon such disposition, result in the full,

indefeasible and irrevocable payment in cash of the DIP Obligations and the Pre-Petition Debt,

and (5) seek relief under the Bankruptcy Code, including under Section 105 of the Bankruptcy

Code, which would in any way restrict or impair the rights, benefits, remedies and protections of

the DIP Lender or Gerber, as pre-Petition Date lender and secured party, as provided in the

Interim Order, the Pre-Petition Loan Documents, and the DIP Loan Documents, or the exercising

of any such rights or remedies by the DIP Lender or Gerber.

(k)     The provisions of this Interim Order shall be binding upon the Debtor, all parties-in-interest in the Case, and their respective successors and assigns, including any trustee or other fiduciary appointed in this Case or in any case to which it might be converted. This Interim Order shall inure to the benefit of the DIP Lender, Gerber, the Debtor and their respective successors and assigns. The provisions of this Interim Order and the DIP Loan Documents, and all the rights, benefits, protections and remedies established or acknowledged herein or under the DIP Loan Documents in favor of the DIP Lender or Gerber, shall be effective immediately upon the entry of this Interim Order pursuant to Bankruptcy Rules 6004(h) and 7062, and shall continue in full force and effect, and shall survive entry of any subsequent order, including without limitation any order confirming a plan, authorizing a sale or other disposition of assets, converting this Case, or dismissing this Case.

(l)     All protections, rights, remedies and other benefits of or to the DIP Lender and Gerber, as pre-Petition Date lender and secured party, of this Interim Order shall remain in effect and be fully enforceable whether or not Capacity does or does not receive the full benefit of its rights, benefits and protections under this Interim Order. Capacity shall not have standing or authority to enforce any right, benefit or protection of the Debtor hereunder as against the DIP Lender or Gerber, as pre-Petition Date lender and secured party.

(m)     The DIP Lender and Gerber are each relying on each and every protection, right, remedy and benefit as provided in this Interim Order (whether as against the interests of the Debtor, Capacity or any other party or party-in-interest) and in the DIP Loan Documents in agreeing to (to the extent that the DIP Lender agrees to) provide the benefits and consideration contemplated by the DIP Loan Documents or, in the case of Gerber, accepting the terms of the Adequate Protection Obligations (subject to the terms otherwise set forth in this Interim Order.)

Any violation or breach of the terms of this Interim Order by Capacity or any other party-in-interest in this Case or in any case that is a successor to this case shall constitute an Event of Default under the DIP Loan Documents.

(n)     Any failure by the Debtor to pay Capacity any of its undisputed fees and charges accruing during the post-Petition Date period shall constitute an Event of Default under the DIP Loan Documents.

(o)     The entry of this Interim Order shall be without prejudice to the following rights and arguments by Capacity in connection with the Final Hearing (described below): (i) to contest the relative priorities of Capacity and Gerber in the Capacity Pre-Petition Collateral with respect to the Capacity Pre-Petition Liens or the Adequate Protection Liens (though not to the extent of any Adequate Protection Obligations arising during the Interim Period or application of any payments towards reduction of the Pre-Petition Debt during the Interim Period, which shall not be subject to challenge by Capacity on any basis including pursuant to paragraph 21(b) hereof), (ii) to object to any DIP Obligations in excess of the $500,000 contemplated for the Interim Period in accordance with the Interim Budget, (iii) to object to the use of any Cash Collateral to repay any Pre-Petition Debt (except as may occur in the Interim Period, which shall not be subject to objection by Capacity on any basis including pursuant to paragraph 21(b) hereof), (iv) to seek additional adequate protection of the Capacity Pre-Petition Lien (though only applicable after the Interim Period), and (v) to assert a lien against the Collateral stored in Capacity's warehouse for any unpaid, post-Petition Date charges due from the Debtor to Capacity. The Debtor, the DIP Lender and Gerber reserve all rights to contest the foregoing.

27.     ***Final Hearing***. The Final Hearing is scheduled for June 15, 2011 at 2:00 p.m. at the U. S. Bankruptcy Court, 915 Lafayette Blvd., Room 123, Bridgeport, CT.

28.     The Debtor shall promptly mail copies of this Interim Order (which shall constitute adequate notice of Final Hearing and all relief requested in the Motion at such hearing, including, without limitation, notice that the Debtor will seek continued approval of a waiver of rights under section 506(c) of the Bankruptcy Code) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court. Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) counsel for the Debtor, (b) counsel for the DIP Lender and Gerber, (c) the 20 Largest Unsecured Creditors, and (d) the U.S. Trustee, and shall be filed with the Clerk of the Bankruptcy Court in each case to allow actual receipt by the foregoing no later than June 14, 2011 at 4:00 p.m., prevailing Eastern time.

Dated: Bridgeport, Connecticut
        _May 26_, 2011

_____
UNITED STATES BANKRUPTCY JUDGE

Exhibit A

Form of Ratification

## RATIFICATION AND AMENDMENT AGREEMENT

RATIFICATION AND AMENDMENT AGREEMENT (this "Agreement") dated as of May __, 2011, by and between SIGG SWITZERLAND (USA), INC., a Connecticut corporation, as Debtor and Debtor-in-Possession ("Debtor") and GERBER FINANCE INC., a New York corporation ("Lender").

### BACKGROUND

A voluntary bankruptcy petition was filed by Debtor on May 20, 2011 and Debtor has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Connecticut, and Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as debtor-in-possession.

Prior to the Chapter 11 Case (as hereinafter defined), Lender made loans and advances to Debtor secured by substantially all assets and properties of Debtor as set forth in the Existing Loan Documents (as hereinafter defined).

Debtor has requested that, during the pendency of the Chapter 11 Case, Lender furnish to Debtor a revolving credit facility in an aggregate principal amount not to exceed $2,300,000.

The Bankruptcy Court (as hereinafter defined) has entered a Financing Order (as hereinafter defined) pursuant to which Lender may make post-petition loans, advances and other financial accommodations to Debtor secured by substantially all assets and properties of Debtor as set forth in the Financing Order.

The Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Debtor shall execute and deliver this Agreement.

Debtor desires to adopt, ratify and reaffirm the obligations under the Existing Loan Documents and to acknowledge its continuing liabilities to Lender thereunder in order to induce Lender to make such post-petition loans and advances to Debtor.

Debtor has also requested that Lender make certain amendments to the Loan Agreement (as hereinafter defined) and Lender is willing to do so subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Debtor, intending to be legally bound, mutually covenant, warrant and agree as follows:

1. **DEFINITIONS**

1.1.    Existing Definitions.    To the extent hereby not defined or amended in this Agreement, capitalized terms used in this Agreement shall have the meanings given to them in the Loan Agreement.

1.2.    Additional Definitions.    As used herein, the following terms shall have the respective meanings given to them below and the Existing Loan Documents shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Applicable Margin" means during the period commencing on the Petition Date 5.25%.

(b)    "Bankruptcy Code" means the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

(c)    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Connecticut.

(d)    "Budget" means the budget attached to this Agreement as Exhibit A.

(e)    "Carve-Out Amount" means $30,000.

(f)    "Carve-Out Expenses" means the fees and expenses incurred by Debtor in accordance with the Budget and allowed by the Bankruptcy Court on and after the Petition Date by professionals retained by Debtor and any statutorily mandated costs and fees of the United States Trustee with respect to the Chapter 11 Case.

(g)    "Carve-Out Reserve" means a Reserve established by Lender against the Formula Amount for the Carve-Out Amount and for unpaid Carve-Out Expenses which amount shall equal the difference between (i) the cumulative amount set forth on the Budget from the Petition Date until the date of determination and (ii) the amount of Carve-Out Expenses allowed by the Bankruptcy Court and paid by Debtor.

(h)    "Chapter 11 Case" means, the Chapter 11 Case pending in the Bankruptcy Court and referred to as:    In re SIGG Switzerland (USA), Inc., Chapter 11, Case No. _____.

(i)    "Debtor" means SIGG Switzerland (USA), Inc., a Connecticut corporation, as debtor and debtor-in-possession, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

.

(j)      "Existing Loan Documents" means the Loan Documents as in effect immediately prior to the Petition Date.

(k)      "Final Financing Order" means, collectively, the order of the Bankruptcy court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied, unless Lender waives such requirement, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of Lender's claims.

(l)      "Financing Order" means, collectively, the Interim Financing Order, the Final Financing Order and such other orders relating thereto or authorizing the granting of credit by Lender to Debtor on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(m)      "Interim Financing Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extension, modifications and amendments thereto, in form and substance satisfactory to Lender, which among other matters, but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, authorizes post–petition financing under the terms of this Agreement in an amount acceptable to Lender, modifies the automatic stay authorizing and granting the senior security interest and liens in favor of Lender and grants super priority expense claim to Lender with respect to all obligations due Lender.

(n)      "Loan Agreement" means the Loan and Security Agreement, dated as of October 10, 2007, by and between Lender and Debtor, as amended and supplemented pursuant to the First Amendment to Loan Agreement dated as of June 24, 2008, the Second Amendment to Loan Agreement dated as of May 6, 2009, the Third Amendment to Loan Agreement dated as of May 28, 2009, the Fourth Amendment to Loan and Security Agreement dated June 1, 2010 and the Fifth Amendment to Loan and Security Agreement dated December 22, 2010, as further amended hereby and as the same now exists or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced.

(o)      "Loan Documents" means, collectively, the Loan Agreement and the Ancillary Agreements, together with all supplements, agreements, notes, documents, instruments and guarantees at any time executed and/or delivered in connection therewith or related thereto, as all of the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(p)      "Minimum Average Monthly Loan Amount" means $1,150,000.

.

(q)      "Petition Date" means May 20, 2011.

(r)      "Post-Petition Collateral" means, collectively, all now existing or hereafter acquired real and personal property of Debtor's estate, wheresoever located, of any kind or nature, upon which Lender is granted a security interest or lien pursuant to the Loan Documents or the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

(i)      all of the "Collateral" (as defined in the Loan Agreement) immediately prior to the Petition Date;

(ii)      all "Accounts" including (1) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the UCC), (2) all rights in, to and under all purchase orders or receipts for goods or services, (3) all rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (4) all rights to payment due for property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered or in connection with any other transaction (whether or not yet earned by performance), (5) all health care insurance receivables, and (6) all collateral security of any kind given by any account debtor or any other person with respect to any of the foregoing;

(iii)      all "Books and Records", including all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities and any and all records and instruments relating to the Collateral;

(iv)      all "Chattel Paper", including all "chattel paper," as such term is defined in the UCC, including electronic chattel paper, now owned or hereafter acquired by any Person;

(v)      all causes or choses in action, whether sounding in law or equity, including any such causes of action or choses in action arising in tort;

(vi)      all "Deposit Accounts", including all "deposit accounts" as such term is defined in the UCC, and other bank accounts and all funds on deposit therein, all money, cash and cash equivalents;

(vii)      all "Documents", including all "documents," as such term is defined in the UCC, by any Person, wherever located, including all bills of lading,

dock warrants, dock receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable;

(viii)   all "Equipment", including all "equipment" as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including any and all machinery, apparatus, equipment, fittings, furniture, fixtures, motor vehicles and other tangible personal property (other than Inventory) of every kind and description that may be now or hereafter used in Debtor's operations or that are owned by Debtor or in which Debtor may have an interest, and all parts, accessories and accessions thereto and substitutions and replacements therefor;

(ix)   all "Fixtures", including all "fixtures" as such term is defined in the UCC;

(x)   all "General Intangibles", including all "general intangibles," as such term is defined in the UCC, including all right, title and interest that Debtor may now or hereafter have in or under any contract, all payment intangibles, customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, goodwill (including the goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit accounts, rights to receive tax refunds and other payments, payment intangibles, rights to received dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, and rights of indemnification;

(xi)   all "Goods", including all "goods," as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including embedded software to the extent included in "goods" as defined in the UCC, manufactured homes, standing timber that is cut and removed for sale and unborn young of animals;

(xii)   all "Instruments", including all "instruments," as such term is defined in the UCC, wherever located, including all certificated securities and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper;

(xiii)   all "Intellectual Property", including any and all Licenses, patents, copyrights, trademarks, trade secrets and customer lists;

(xiv) all "Inventory", including all "inventory," as such term is defined in the UCC, wherever located, including all inventory, merchandise, goods and other personal property that are held by or on behalf of Debtor for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in Debtor's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software;

(xv) all "Investment Property", including all "investment property," as such term is defined in the UCC, wherever located;

(xvi) all "Letter-of-Credit Rights", including all "letter-of-credit rights" as such term is defined in the UCC, including rights to payment or performance under a letter of credit, whether or not Debtor, as beneficiary, has demanded or is entitled to demand payment or performance;

(xvii) all real property, including any and all leasehold interests together with all buildings, structures, fixtures and other improvements relating thereto, wherever located;

(xviii) all "Software", including all "software" as such term is defined in the UCC, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

(xix) all "Stock", including all certificated and uncertificated shares, options, warrants, membership interests, general or limited partnership interests, participation or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934);

(xx) all "Supporting Obligations", including all "supporting obligations" as such term is defined in the UCC, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property; and.

(xxi) all "Proceeds", including "proceeds," as such term is defined in the UCC and, in any event: (A) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any Collateral; (B) any and all payments (in any form whatsoever) made or due and payable to Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any

Governmental Authority (or any Person acting under color of Governmental Authority); (C) any claim of Debtor against third parties (I) for past, present or future infringement of any Intellectual Property or (II) for past, present or future infringement or dilution of any trademark or trademark license or for injury to the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark license; (D) any recoveries by Debtor against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (E) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock; and (F) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral.

(s)     "Post-Petition Obligations" means any and all loans, advances, letter of credit accommodations, debts, obligations, liabilities, covenants and duties of Debtor to Lender of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Agreement, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by Debtor as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, unused line fees, servicing fees, line increase fees, DIP facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(t)     "Pre-Petition Collateral" means, collectively, (i) all "Collateral" as such term is defined in the Loan Agreement, and (ii) all other security for the Pre-Petition Obligations as provided in the Existing Loan Documents immediately prior to the Petition Date.

(u)     "Pre-Petition Obligations" means all loans, advances, letter of credit accommodations, debts, obligations, liabilities, indebtedness, covenants and duties of Borrower to Lender of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, arising before the Petition Date and whether arising under or related to the Existing Loan Documents, by operation of law or otherwise and whether incurred by Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(v)     "Special Availability" means for each Week the amount set forth on Schedule 1 to this Agreement for such Week.

(w)      "Week" means each calendar week commencing on a Sunday and ending on the following Saturday.

### 1.3.   Amendments to Definitions in Existing Loan Documents.

(a)      All references to the term "Collateral" in this Agreement and in any of the Existing Loan Documents or any other term referring to the security for the Pre-Petition Obligations shall be deemed and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(b)      All references to "Borrower", including, without limitation, to the terms "Borrower" or "Debtor" in any of the Existing Loan Documents shall be deemed and each such reference is hereby amended to mean and include Debtor as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(c)      All references to the term "Ancillary Agreements" in this Agreement and in any of the Existing Loan Documents, shall be deemed and each such reference is hereby amended to include, in addition and not in limitation, all of the Ancillary Agreements, as ratified, assumed and adopted by Debtor pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(d)      All references to the term "Loan Agreement" in this Agreement and in any of the Existing Loan Documents, shall be deemed and each such reference is hereby amended to mean the Loan Agreement, as defined herein and amended hereby and ratified, assumed and adopted by Debtor pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)      All references to the terms "Revolving Credit Advance" or "Loan" in this Agreement and in any of the Existing Loan Documents, shall be deemed and each such reference in the Existing Loan Documents is hereby amended to include, in addition and not in limitation, any loans or advances made by Lender to or for the benefit of Debtor pursuant to the terms of the Loan Agreement and the Financing Order.

(f)      All references to the term "Obligations" in this Agreement and in any of the Existing Loan Documents shall be deemed and each such reference is hereby amended to mean, both the Pre-Petition Obligations and the Post-Petition Obligations.

(g)      The following defined terms contained in Section 1(a) of the Loan Agreement are amended to provide as follows:

(i)      "Accounts Availability" means the amount of Revolving Credit Advances against Eligible Accounts Lender may from time to time make available to a Borrower up to eighty-five percent (85%) of the net face amount of such Borrower's Eligible Accounts.

8

(ii)     "Contract Rate" means an interest rate per annum equal to the sum of (a) the Prime Rate plus (b) the Applicable Margin.

(iii)     "Eligible Accounts" means and includes each Account of Borrower which conforms to the following criteria:     (a) shipment of the merchandise or the rendition of services has been completed; (b) merchandise or services shall not have been repossessed, returned, rejected or disputed by the Account Debtor and there shall not have been asserted any offset, defense or counterclaim; (c) continues to be in full conformity with the representations and warranties made by Borrower to Lender with respect thereto; (d) Lender is, and continues to be, satisfied with the credit standing of the Account Debtor in relation to the amount of credit extended; (e) there are no facts existing or threatened which are likely to result in any adverse change in an Account Debtor's financial condition; (f) is documented by an invoice in a form approved by Lender and shall not be unpaid more than ninety (90) days from invoice date; (g) less than thirty-three percent (33%) of the unpaid amount of invoices due from such Account Debtor remain unpaid more than ninety (90) days from invoice date; (h) is not evidenced by chattel paper or an instrument of any kind with respect to or in payment of the Account unless such instrument is duly endorsed to and in possession of Lender or represents a check in payment of an Account; (i) if the Account Debtor is located outside of the United States, the goods which gave rise to such Account were shipped after receipt by Borrower from or on behalf of the Account Debtor of an irrevocable letter of credit, assigned and delivered to Lender and confirmed by a financial institution acceptable to Lender and is in form and substance acceptable to Lender, payable in the full amount of the Account in United States dollars at a place of payment located within the United States; (j) Lender has a first priority perfected Lien in such Account and such Account is not subject to any other Lien other than Permitted Liens; (k) does not arise out of transactions with any employee, officer, agent, director, stockholder or Affiliate of Borrower; (l) is payable to Borrower; (m) does not arise with respect to goods which are delivered on a cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor may be conditional; (n) is not an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors; (o) does not arise out of a bill and hold sale prior to shipment (p) does not arise out of a sale to any Person to which Borrower is indebted, unless the amount of such indebtedness, and any anticipated indebtedness, is deducted in determining the face amount of such Account; (q) is net of any returns, discounts, claims, credits and allowances; (r) if the Account arises out of contracts between Borrower and the United States, any state, or any department, agency or instrumentality of any of them, Borrower has so notified Lender, in writing, prior to the creation of such Account, and, if Lender so requests, there has been compliance with any governmental notice or approval requirements, including compliance with the Federal Assignment of Claims Act; (s) is a good and valid account representing an undisputed bona fide

9

indebtedness incurred by the Account Debtor therein named, for a fixed sum as set forth in the invoice relating thereto with respect to an unconditional sale and delivery upon the stated terms of goods sold by Borrower, or work, labor and/or services rendered by Borrower; (t) the total unpaid Accounts from such Account Debtor does not exceed twenty percent (20%) of all Eligible Accounts with the exceptions as set forth in (u) below, but only the excess above twenty percent (20%) shall be excluded from Eligible Accounts; (u) the total unpaid Accounts due to Borrower from Target does not exceed forty percent (40%) of all Eligible Accounts (to be reviewed at each field exam) but only the excess above forty percent (40%) shall be excluded from all Eligible Accounts; (v) does not arise out of progress billings prior to completion of the order; (w) Borrower's right to payment is absolute and not contingent upon the fulfillment of any condition whatsoever; (x) Borrower is able to bring suit and enforce its remedies against the Account Debtor through judicial process; (y) does not represent interest payments, late or finance charges or service charges owing to Borrower; and (z) is otherwise satisfactory to Lender as determined in good faith by Lender in the reasonable exercise of its discretion.

(iv)   "Eligible Inventory" means Inventory owned by Borrower which Lender, in its sole and absolute discretion, determines: (a) is subject to a first priority perfected Lien in favor of Lender and is subject to no other Liens whatsoever other than Permitted Liens; (b) is located on premises owned or operated by Borrower; (c) is located on premises with respect to which Lender has received a landlord, mortgagee or warehouse agreement acceptable in form and substance to Lender; (d) is not in transit; (e) is not covered by a negotiable document of title, unless such document and evidence of acceptable insurance covering such Inventory has been delivered to Lender; (f) is in good condition and meets all standards imposed by any governmental agency, or department or division thereof having regulatory Governmental Authority over such Inventory, its use or sale including the Federal Fair Labor Standards Act of 1938 as amended, and all rules, regulations and orders thereunder; (g) is currently either usable or saleable in the normal course of Borrower's business; (h) is not placed by Borrower on consignment or held by Borrower on consignment from another Person; (i) is in conformity with the representations and warranties made by Borrower to Lender with respect thereto; (j) is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third parties; (k) does not require the consent of any Person for the completion of manufacture, sale or other disposition of such Inventory by Lender following an Event of Default and such completion, manufacture or sale does not constitute a breach or default under any contract or agreement to which Borrower is a party or to which such Inventory is or may be subject; (l) is not work-in-process; (m) is covered by casualty insurance acceptable to Lender; and (n) not to be ineligible for any other reason.

(v)   "Inventory Availability" means the amount of Revolving Credit Advances against Eligible Inventory Lender may from time to time make available to Borrower up to forty-five percent (45%) of the value of Borrower's

Eligible Inventory (calculated on the basis of the lower of cost or market, on a first-in first-out basis).

    (vi)    "Maximum Revolving Amount" means $2,300,000.

    (vii)    "Minimum Average Monthly Loan Amount" means $1,150,000.

    (viii)    "Termination Date" shall mean the earliest to occur of (a) August 19, 2011, (b) closing of the sale of substantially of Debtor's assets, pursuant to Section 363 of the Bankruptcy Code, (c) the last termination date set forth in any Financing Order, and (d) confirmation of a plan of reorganization in Borrower's Chapter 11 Case.

1.4.    Interpretation.

    (a)    For purposes of this Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used and/or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Loan Agreement.

    (b)    All references to the term "Lender", or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

    (c)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular.

    (d)    All terms not specifically defined herein which are defined in the UCC shall have the meaning set forth therein as in effect on the date hereof, except that the term "Lien" or "lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.

## 2. **ACKNOWLEDGMENT**

2.1.    Pre-Petition Obligations. Debtor hereby acknowledges, confirms and agrees that Debtor is indebted for the Pre-Petition Obligations, as of the close of business on the Petition Date, in respect of the Pre-Petition Obligations consisting of a Revolving Credit Loan made pursuant to the Existing Loan Documents in the principal amount of not less than $1,981,905.32, together with interest accrued and accruing thereon, together with costs, expenses, fees (including attorneys' fees and legal expenses) and other charges now or hereafter owed by Debtor to Lender, all of which are unconditionally owing by Debtor to Lender, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2.    Acknowledgment of Security Interests. Debtor hereby acknowledges, confirms and agrees that Lender has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Lender pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Lender under the

11

Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Lender.

2.3.    Binding Effect of Documents.    Debtor hereby acknowledges, confirms and agrees that: (a) each of the Existing Loan Documents to which it is a party was duly executed and delivered to Lender by Debtor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of Debtor contained in the Existing Loan Documents to which it is a party constitute the legal, valid and binding obligations of Debtor enforceable against Debtor in accordance with their respective terms and Debtor has no valid defense, offset or counterclaim to the enforcement of such agreements and obligations, and (c) Lender is and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Order.

## 3.    **ADOPTION AND RATIFICATION**

Debtor hereby (a) ratifies, assumes, adopts and agrees to be bound by the Existing Loan Documents and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of the Existing Loan Documents and the Financing Order. All of the Existing Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Debtor, as debtor and debtor-in-possession, and considered as agreements between Debtor and Lender. Debtor hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and pursuant to the Financing Order, and Lender agrees to lend, subject to and in accordance with, and Debtor agrees to be fully bound, as a debtor and debtor-in-possession by, the terms of the Loan Documents to which Debtor is a party.

## 4.    **GRANT OF SECURITY INTEREST**

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Debtor hereby grants, pledges and assigns to Lender, and also confirms, reaffirms and restates the prior grant to Lender of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

## 5.    **ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS**

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Debtor to Lender, whether pursuant to the Existing Loan Documents or otherwise, and not in limitation thereof, Debtor hereby represents, warrants and covenants to Lender the following (which shall survive the execution and delivery of this Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Loans by Lender:

5.1.    Financing Order.    The Interim Financing Order has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Lender) and is not subject to any pending appeal or stay. The Bankruptcy Court shall have entered the Final

12

Financing Order on or before the date that is 25 days after the Petition Date. The Final Financing Order shall not have been vacated, stayed, reversed, modified or amended without Lender's consent, shall otherwise be in full force and effect and shall not be the subject of a stay pending appeal.

     5.2.    Use of Proceeds. All of the Loans provided by Lender to Debtor pursuant to the Financing Orders, the Loan Agreement or otherwise, shall be used by Debtor for general operating and working capital purposes in the ordinary course of business of Debtor, to pay the Carve-Out Amount, to pay the Carve-Out Expenses as set forth on the Budget and to pay the fees, expenses and costs of Lender pursuant to this Agreement, the Loan Documents and the Financing Order. Lender is authorized to charge as a Loan any amount payable to Lender under the terms of this Agreement, the Financing Order and the Loan Documents. Except with respect to the foregoing, unless authorized by the Bankruptcy Court and approved by Lender in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of such Loans provided by Lender to Debtor, other than those administrative expense claims and other claims relating to the Chapter 11 Case directly attributable to the operation of the business of Debtor in the ordinary course of business and approved by Lender and otherwise authorized by the Bankruptcy Court. No proceeds of the Loans may be used by Debtor to make any payments to Sigg Canada or SIGG Switzerland AG ("Parent") other than the payment to Parent for purchases of Inventory after the Petition Date in the ordinary course of business and the payment by Debtor to Sigg Canada of an amount not to exceed $25,000 per month to cover the management support provided by Sigg Canada to Debtor. Debtor shall not be permitted to use the proceeds of the Loans to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Pre-Petition Obligations, the rights and remedies of Lender under the Loan Documents or any Financing Order or the validity, perfection, priority or enforceability of any Lien securing such claims or any payment made under the Loan Documents.

     5.3.    Ordinary Course. Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by Lender), except for sales of Debtor's Inventory in the ordinary course of its business.

     5.4.    Budget. The Budget has been prepared by Debtor and presented to Lender and has been agreed to and accepted by Lender. The Budget has been thoroughly reviewed by Debtor and its management and sets forth projected operating cash disbursements and receipts commencing as of May 23, 2011 through and including August 19, 2011. Debtor will act strictly in accordance with the Budget and Lender has relied upon the Budget in determining to enter into the post-petition financing arrangements provided for herein. On Tuesday of each Week, Debtor shall deliver to Lender a compliance report in the same spreadsheet form as the Budget, accompanied by a certificate signed by the President or Chief Financial Officer of Debtor indicating that such information is true and accurate, that shows the comparison of all Budget categories with the actual level of expenditures and revenues generated for the preceding Week.

5.5.    363 Sale. (a) No later than seven (7) days following the Petition Date, Debtor shall file a motion acceptable to Lender regarding any bidding procedures for a sale under Section 363 of the Bankruptcy Code and authority to conduct the sale and authorization to pay proceeds in full to Lender.

(b)    No less than 14 days after such motion's filing, Debtor shall identify a stalking horse bidder and deliver a completed asset purchase agreement and evidence satisfactory to Lender of such bidder's financial ability to consummate such sale.

(c)    No less than 21 days after such motion's filing, Debtor shall obtain approval by Bankruptcy Court of any bidding procedures and the stalking horse bidder.

(d)    No later than 60 days after the Petition Date, the Bankruptcy Court shall enter an order acceptable to Lender approving such Section 363 sale and providing for payment in full of all proceeds thereof to Lender, without discount or reduction of any kind, up to the full amount of all Obligations accrued through and including the date of the closing of such sale and the final and indefeasible payment in full of all consideration owed or to be owed by the purchaser at such sale in cash and such sale shall close and such payment shall be effected and completed no later than the earlier of 85 days after the Petition Date and 25 days after entry of such order by the Bankruptcy Court.

5.6.    Sigg Canada. No later than June 3, 2011, Sigg Canada shall have delivered to Lender, a blocked account agreement for its bank accounts in Canada, in form and substance satisfactory to Lender.

## 6.  **DIP FEE**

Debtor shall pay Lender a closing fee in respect of the financing provided by Lender to Debtor in the Chapter 11 Case in an aggregate amount of $25,000 which shall be fully earned as of the date hereof, and shall be considered a Post-Petition Obligation of Debtor to Lender payable from Loans under the Loan Agreement as follows:  $10,000 upon entry of the Interim Order and $15,000 upon entry of the Final Order.

## 7.  **AMENDMENTS TO LOAN AGREEMENT**

Subject to the satisfaction of the conditions precedent set forth in Section 9 of this Agreement, the Loan Agreement is hereby amended as follows:

7.1.    Revolving Credit Advances. Section 2(a) is amended to provide as follows:

"Subject to the terms and conditions set forth herein and in the Ancillary Agreements, Lender may, in its sole discretion, make revolving credit advances (the "Revolving Credit Advances") to Borrowers from time to time during the Term which, in the aggregate at any time outstanding, will not exceed the lesser of (x) the Maximum Revolving Amount or (y) an amount equal to the sum of

(i)    Accounts Availability; plus

   (ii) Inventory Availability; plus

   (iii) Special Availability; minus

   (iv) the Reserves, including the Carve-Out Reserve.

   The amount derived at any time from the sum of Section 2(a)(i), (ii) and (iii) minus the amount under Section 2(a)(iv) shall be referred to as the "Formula Amount". Notwithstanding the limitations set forth above, Lender retains the right to lend to Borrower from time to time such amounts in excess of such limitations as Lender may determine in its sole discretion."

 7.2. Payments. Section 3 is amended by adding the following at the end thereof:

   "Without limiting the generality of the foregoing, Lender may, in its discretion, apply any such payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full."

 7.3. Limits and Sublimits. Section 2(f) is amended by adding the following at the end thereof:

   "All limits and sublimits set forth in this Agreement shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations and in respect thereof or with respect to any formula or other provision to which a limit or sublimit may apply."

 7.4. Additional Financial Reporting Requirements. Section 11 is hereby amended by adding the following subsection (h) at the end thereof:

   "(h) Borrower shall also provide Lender with copies of all financial reports, schedules and information related in any way to Borrower's operations at any time furnished by Borrower, or on its behalf, to the Bankruptcy Court, or the U.S. Trustee, or to any creditors' committee or Borrower's shareholders, concurrently with the delivery thereof to the Bankruptcy Court, the U.S. Trustee, any creditors' committee, or Borrower's shareholders, as the case may be."

 7.5. Financial Covenants. Section 13(a) is amended to provide as follows:

   "(a) Intentionally deleted."

 7.6. Events of Default. Section 18 is amended as follows:

 (a) Sections (k) and (l) are hereby deleted in their entirety and the following substituted therefor: "Intentionally deleted".

  (b) The following subsections are added at the end of Section 18:

"(u) the occurrence of any condition or event which permits Lender to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default", as defined in the Financing Order; or

(v) the termination or non-renewal of the Loan Documents as provided for in the Financing Order; or

(w) Debtor violates or is otherwise in breach of any requirement or covenant of the Financing Order or any representation or warranty set forth in the Financing Order is or becomes untrue in any material respect; or

(x) Debtor suspends or discontinues or is enjoined by any court or Governmental Authority from continuing to conduct all or any material part of its business or if a trustee, receiver or custodian is appointed for Debtor or any of its properties; or

(y) any act, condition or event occurring after the date of the commencement of the Chapter 11 Case that has a material adverse effect upon the assets of Debtor or any Guarantor when taken as a whole or the Collateral or the value of the rights and remedies of Lender under this Agreement or any other Loan Documents; or

(z) conversion of Debtor's Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code; or

(aa) dismissal of Debtor's Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily; or

(bb) the grant of a lien on or other interest in any property of Debtor or the grant or allowance of an administrative expense claim (other than such administrative expense claims permitted by the Financing Order or this Agreement) by the Bankruptcy Court, in each case, which is superior to or ranks in parity with Lender's security interests in or liens upon the Collateral or the super-priority administrative claim of Lender against Debtor; or

(cc) the grant of a lien on or other interest in any property of any guarantor or the grant or allowance of an administrative expense claim (other than such administrative expense claims permitted by the Financing Order or this Agreement) by the Bankruptcy Court which is superior to or ranks in parity with Lender's security interest in or lien upon the Collateral or the super-priority administrative claim of Lender against any guarantor; or

(dd) the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender); or

(ee)    the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code in Chapter 11 Case; or

(ff)    the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code in Chapter 11 Case; or

(gg)    the filing of a plan of reorganization by Debtor or on its behalf which does not provide for payment in full of the Obligations on the effective date thereof; or

(hh)    prior to the indefeasible payment and satisfaction in full of Obligations due Lender any party other than Lender shall foreclose upon or otherwise seek to enforce any junior lien or other rights such other party may have in and to any of Debtor's property upon which Lender holds or asserts a lien or security interest.

7.7.    Section 16 is amended to provide as follows:

"16.    Term of Agreement.   Any obligation of Lender to make loans and extend the financial accommodations under this Agreement or any Ancillary Agreement shall continue in full force and effect until the expiration of the Term. The termination of this Agreement shall not affect any of the Lender's rights hereunder or any Ancillary Agreement and the provisions hereof and thereof shall continue to be fully operative until all transactions entered into, rights or interests created and the Obligations have been disposed of, concluded or liquidated. Notwithstanding the foregoing, Lender shall release its security interests at any time after five (5) Business Days notice upon payment to it of all Obligations if Borrower and each Guarantor shall have provided Lender with an executed release of any and all claims which Borrower and each Guarantor may have or thereafter have under this Agreement and/or any Ancillary Agreement."

7.8.    Governing Law.   Section 28 of the Loan Agreement is hereby amended by adding the following at the end thereof:

"except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing."

17

## 8. **RELEASE**

### 8.1. Release.

(a)    Upon entry of the Final Financing Order, and in consideration of the agreements of Lender contained herein and the making of any Loan by Lender to Debtor, pursuant to the Loan Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender, its successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (Lender and all such other parties being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Debtor, or any of its respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Loan Agreement, as amended and supplemented through the date hereof and the other Loan Documents.

(b)    Debtor, understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(c)    Debtor agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the release set forth above.

8.2.    Covenant Not to Sue. Upon entry of the Final Financing Order, Debtor, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by Debtor pursuant to Section 8.1 above. If Debtor violates the foregoing covenant, Debtor agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

## 9. **CONDITIONS PRECEDENT**

In addition to any other conditions contained herein or the Loan Agreement, as in effect immediately prior to the Petition Date, with respect to the Loans and other financial

accommodations available to Debtor (all of which conditions, except as modified or made pursuant to this Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Debtor), the following are conditions to Lender's obligation to extend further loans, advances or other financial accommodations to Debtor pursuant to the Loan Agreement:

9.1.  Entry by the Bankruptcy Court of the Interim Financing Order, by no later than 5 days after the Petition Date in form and substance satisfactory to Lender, among other things, (a) approving the transactions contemplated hereby, (b) granting a first priority perfected security interest in the Collateral subject only to the carve-out expenses up to $30,000 and (c) modifying the automatic stay to permit the creation and perfection of Lender's Liens and automatically vacating the automatic stay to permit enforcement of Lender's default related rights and remedies under this Agreement, the other Loan Documents and applicable law.

9.2.  Debtor shall furnish to Lender, in form and substance satisfactory to Lender, all financial information, projections, business plans, cash flows and such other information, as Lender shall reasonably request from time to time.

9.3.  As of the Petition Date, there shall have been no termination of the Existing Loan Documents.

9.4.  No trustee, examiner or receiver or the like shall have been appointed or designated with respect to Debtor, as debtor and debtor-in-possession, or its business, properties and assets and no motion or proceeding shall be pending seeking such relief;

9.5.  Debtor shall execute and/or deliver to Lender this Agreement and all other Loan Documents that Lender may request to be delivered in connection herewith, in form and substance satisfactory to Lender.

9.6.  Debtor shall deliver to Lender resolutions of Debtor's Board of Directors approving and authorizing the execution, delivery and performance of this Agreement and signature and incumbency certificates of the officers of Debtor, each certified as of the date of this Agreement by Debtor's corporate secretary or assistance secretary as being in full force and effect without any modification or amendment.

9.7.  Sigg Canada and Parent shall have reaffirmed their obligations under their respective Guaranty Agreements pursuant to agreements in form and substance satisfactory to Lender. Parent shall have delivered to Lender $650,000 in cash collateral as security for the Obligations pursuant to agreements and on terms satisfactory to Lender.

9.8.  Other than the commencement of the Chapter 11 Case, no material impairment of the priority of Lender's security interests in the Collateral shall have occurred from the date of the latest field examinations of Lender to the Petition Date and no Event of Default shall have occurred or be existing under any of the Existing Loan Documents, as modified pursuant hereto, and assumed by Debtor.

## 10. **MISCELLANEOUS**

10.1. Amendments and Waivers. Neither this Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

10.2. Further Assurances. Debtor shall, at its expense, at any time or times duly execute and deliver, or shall cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, Uniform Commercial Code financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Lender of all the rights and remedies hereunder, under any of the other Loan Documents, any Financing Order or applicable law with respect to the Collateral, and do or cause to be done such further acts as may be necessary or proper in Lender's opinion to evidence, perfect, maintain and enforce the security interests of Lender, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement, any of the other Loan Documents or the Financing Order. Upon the request of Lender, at any time and from time to time, Debtor shall, at its cost and expense, do, make, execute, deliver and record, register or file, financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or cause the same to be done) and will deliver to Lender such instruments evidencing items of Collateral as may be requested by Lender.

10.3. Headings. The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Agreement.

10.4. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.

10.5. Additional Events of Default. The parties hereto acknowledge, confirm and agree that the failure of Debtor to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by Debtor in connection herewith shall constitute an Event of Default under the Loan Documents.

10.6. Costs and Expenses. Debtor shall pay to Lender on demand all costs and expenses that Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Agreement and the other Loan Documents and the Financing Order, including, without limitation: (a) fees and disbursements of counsel to Lender, (b) costs and expenses (including legal fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) costs and expenses of lien searches, environmental surveys, recording and filing fees and any other recording taxes associated with the perfection of interests in Collateral; (d) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Lender in the Collateral; (e) sums paid or incurred to pay any amount or take any action required of Debtor under the Loan Documents or the Financing Order that Debtor fails to pay or

take; (f) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and Debtor's operations by Lender or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Case; (g) costs and expenses of preserving and protecting the Collateral; (h) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations of the Collateral and Debtor's operations, plus a per diem charge per person per day at Lender's then current rate, for Lender's examiners in the field and office; and (i) costs and expenses (including legal fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Lender, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Debtor. All sums provided for in this Section 10.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents. Lender shall provide Debtor, Debtor's counsel and the U.S. Trustee with notice of any amounts due and payable under this Section 10.6 and if within ten (10) days following such notice, no written objection is received by Lender, Lender is hereby irrevocably authorized to charge as a Loan to Debtor any amounts payable under this Section 10.6.

10.7.   Effectiveness. This Agreement shall become effective upon the execution hereof by Lender and the entry of the Interim Financing Order.

**[Intentionally Left Blank].**

20/05/2011   17:29   +446221-905606                                    1        01:01

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly
executed as of the day and year first above written.

SIGG SWITZERLAND (USA), INC.
as Debtor and Debtor-in-Possession.

By: _____          Rob Dewan.

Name:    By. W. Hinder              President
Title:    DIRECTOR

GERBER FINANCE INC

By: _____

Name: Jennifer Palmer
Title: Vice President

## SCHEDULE 1

## SPECIAL AVAILABILITY

| | Week 21 | Week 22 | Week 23 | Week 24 | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 | Week 33 | Week 34 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Special Availability | $ 430,545.49 | $ -535,530.11 | $ -603,366.11 | $ -573,996.30 | $ -596,608.36 | $ -658,220.39 | $ -711,617.68 | $ -770,449.01 | $ -731,120.61 | $ -612,796.23 | $ -454,756.66 | $ -481,912.36 | $ -528,533.44 | $ -606,751.13 |

**EXHIBIT A - BUDGET**

**Sig Switzerland (SSA) Inc.**

| | Week 21 | Week 22 | Week 23 | Week 24 | Week 25 | Week 26 | Week 27 | Week 28 | Week 29 | Week 30 | Week 31 | Week 32 | Week 33 | Week 34 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | 125,000 | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 | 125,000 | 125,000 | 125,000 | 125,000 | 140,500 | 140,500 | 140,500 | 140,500 |
| collections | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 125,000 | 125,000 | 125,000 | 125,000 | 120,000 | 120,000 | 140,000 | 140,000 | 140,500 |
| cash-out from Gerber | 122,675 | 207,320 | 132,820 | 40,820 | 40,820 | 161,820 | 211,700 | 132,200 | 45,200 | 166,200 | 210,050 | 110,550 | 43,550 | 164,550 |
| cash-out | | | | | | | | | | | | | | |
| material SIGG CH | -166,500 | | | | | -166,500 | | | | -166,500 | | | -166,500 | |
| personal | -46,000 | -37,000 | -37,000 | | -46,000 | -46,000 | | -37,000 | -37,000 | -46,000 | -37,000 | -37,000 | -46,000 | |
| shipping inbound | | -1,000 | -1,000 | -1,000 | -1,000 | -1,000 | -1,250 | -1,250 | -1,250 | -1,250 | -1,500 | -1,500 | -1,500 | -1,500 |
| customer services | -1,000 | -800 | -800 | -800 | -800 | -400 | -1,000 | -1,000 | -1,000 | -1,000 | -1,500 | -1,500 | -1,500 | -1,500 |
| shipping outbound | -4,750 | -4,000 | -4,000 | -4,000 | -4,000 | -4,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -4,000 | -5,000 |
| warehouse and handling | -8,500 | -8,800 | -8,800 | -8,800 | -8,800 | -8,800 | -9,500 | -9,500 | -9,500 | -9,500 | -9,750 | -9,750 | -9,750 | -9,750 |
| legal fees | -750 | -600 | -600 | -600 | -600 | -400 | -750 | -750 | -750 | -750 | -750 | -750 | -750 | -750 |
| business services | -250 | -200 | -200 | -200 | -200 | -200 | -150 | -150 | -150 | -150 | -250 | -250 | -250 | -250 |
| other professional fees | -150 | -120 | -120 | -120 | -120 | -120 | -150 | -150 | -150 | -150 | -150 | -150 | -150 | -150 |
| agent fees | -5,000 | -4,000 | -4,000 | -4,000 | -4,000 | -4,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 |
| Outdoor Retailer show | | -4,000 | -4,000 | 4,000 | | -4,000 | | | | | | | | |
| Expos costs | | | | | | | | | | | | -1,000 | -1,000 | -1,000 |
| trade show other expenses | -4,500 | -3,700 | -3,700 | -3,700 | -3,700 | -3,700 | -4,625 | -4,625 | -4,625 | -4,625 | -4,625 | -4,625 | -4,625 | -4,625 |
| PR firm | | | | | | | | | | | | -200 | -200 | -200 |
| sponsors/shipments | | | | | | | | | | | | -450 | -450 | -450 |
| POS material | -1,875 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -2,500 | -2,500 | -2,500 | -2,500 | -400 | -400 | -400 | -400 |
| custom bottle printing | -250 | -200 | -200 | -200 | -200 | -200 | -1,875 | -1,875 | -1,875 | -1,875 | -1,500 | -1,500 | -1,500 | -1,500 |
| internat/web expenses | -3,750 | -3,000 | -3,400 | -3,400 | -3,400 | -3,400 | -250 | -250 | -250 | -250 | -200 | -200 | -200 | -200 |
| travel & entertainment | -875 | -700 | -700 | -700 | -700 | -700 | -3,750 | -3,750 | -3,750 | -3,750 | -2,500 | -2,500 | -2,500 | -2,500 |
| bank service charges | -625 | -500 | -500 | -500 | -500 | -500 | -875 | -875 | -875 | -875 | -875 | -875 | -875 | -875 |
| postage/delivery office | -750 | -600 | -600 | -600 | -600 | -600 | -625 | -625 | -625 | -625 | -375 | -375 | -375 | -375 |
| rent | -250 | -200 | -200 | -200 | -200 | -200 | -750 | -750 | -750 | -750 | -375 | -375 | -375 | -375 |
| computer repair | -250 | -200 | -200 | -200 | -200 | -200 | -250 | -250 | -250 | -250 | -250 | -250 | -250 | -250 |
| telephone | -250 | -200 | -200 | -200 | -200 | -200 | -250 | -250 | -250 | -250 | -250 | -250 | -250 | -250 |
| office supplies | -100 | -80 | -80 | -80 | -80 | -80 | -100 | -100 | -100 | -100 | -100 | -100 | -100 | -100 |
| sales taxes | -150 | -120 | -120 | -120 | -120 | -120 | -150 | -150 | -150 | -150 | -150 | -150 | -150 | -150 |
| other admin costs | -1,500 | -1,200 | -1,200 | -1,200 | -1,200 | -1,200 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 |
| interest payments | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 |
| Gerber facility fee | -12,500 | | | | | | | | | | | | | |
| Gerber legal fees | | | -30,000 | | | | | | -30,000 | | | -30,000 | | |
| Sigg legal costs (bankruptcy related) | | | | | | -50,000 | | | | -50,000 | | | | -50,000 |
| Trustee fees | | | | | | | | -20,000 | | | | | | |
| Notice of bankruptcy | | -25,000 | | | | | | | | | | | | |
| repayment gerber | | | | | | | | | | | | | | |
| financing cash-flow | | | | | | | | | | | | | | |
| intercompany | -25,000 | | | | | -25,000 | | | | -25,000 | | | | -25,000 |
| contingency | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 |
| ending cash | | | | | | | | | | | | | | |

**gerber repayment schedule pmt.**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| outstanding | 2,004,359 | 1,959,034 | 2,072,354 | 2,111,174 | 2,057,994 | 2,004,814 | 2,072,654 | 2,165,334 | 2,178,534 | 2,104,734 | 2,159,934 | 2,247,984 | 2,244,534 | 2,154,084 |
| repayment schedule | | | | | | | | | | | | | | |

Note: spending items highlighted above are variable with sales and will change. Company acknowledges that payment of variable expense in excess of this forecast requires approval of DIP lender.

## LOAN AND SECURITY AGREEMENT

### GERBER FINANCE INC.

**as Lender**

**and**

### SIGG SWITZERLAND (USA), INC.

**as Borrower**

**Dated: October 10, 2007**

1

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement is made as of October 10, 2007 by and between **GERBER FINANCE INC.**, a New York corporation ("Lender") and **SIGG SWITZERLAND (USA), INC.** an Arizona corporation ("Borrower").

### BACKGROUND

Borrower has requested that Lender make loans and advances available to Borrower; and

Lender has agreed to make such loans and advances to Borrower on the terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and undertakings and the terms and conditions contained herein, the parties hereto agree as follows:

1. (a) General Definitions. When used in this Agreement, the following terms shall have the following meanings:

"Account Debtor" means any Person who is or may be obligated with respect to, or on account of, an Account, Chattel Paper or General Intangibles (including a Payment Intangible).

"Accountants" has the meaning given to such term in Section 11(a).

"Accounts" means all "accounts", as such term is defined in the UCC, now owned or hereafter acquired by any Person.

"Accounts Availability" means the amount of Revolving Credit Advances against Eligible Accounts Lender may from time to time make available to Borrower up to eighty five percent (85%) of the net face amount of Borrower's Eligible Accounts.

"Affiliate" of any Person means (a) any Person (other than a Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (i) to vote ten percent (10.00%) or more of the securities having ordinary voting power for the election of directors of such Person, or (ii) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Ancillary Agreements" means the Note, each Guaranty Agreement, each Validity Agreement, each Guaranty Security Agreement, each Mortgage, each Intercreditor Agreement, each Subordination Agreement, and all other agreements, instruments, documents, mortgages, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, trust agreements and guarantees whether heretofore, concurrently, or hereafter executed by or on behalf of Borrower or any other Person or delivered to Lender, relating to this Agreement or to the transactions contemplated by this Agreement.

2

"Books and Records" means all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities and any and all records and instruments relating to the Collateral or otherwise necessary or helpful in the collection thereof or the realization thereupon.

"Borrowing Base Certificate" means a certificate in the form of Exhibit C.

"Business Day" means a day on which Lender is open for business and that is not a Saturday, a Sunday or other day on which banks are required or permitted to be closed in the State of New York.

"Change of Control" means, with respect to any Person on or after the Closing Date, that any change in the composition of such Person's stockholders as of the Closing Date shall occur which would result in any stockholder or group acquiring 50.1% or more of any class of Stock of such Person, or that any Person (or group of Persons acting in concert) shall otherwise acquire, directly or indirectly (including through Affiliates), the power to elect a majority of the board of directors of such Person or otherwise direct the management or affairs of such Person by obtaining proxies, entering into voting agreements or trusts, acquiring securities or otherwise.

"Chattel Paper" means all "chattel paper," as such term is defined in the UCC, including electronic chattel paper, now owned or hereafter acquired by any Person.

"Closing Date" means October 10, 2007 or such other date as may be agreed upon by the parties hereto.

"Collateral" means all of Borrower's right, title or interest in all of the following property in which it now has or at any time in the future may acquire any right, title or interest:

(i)    all Inventory;

(ii)   all Accounts;

(iii)  all Deposit Accounts, other bank accounts and all funds on deposit therein;

(iv)   all Chattel Paper;

(v)    all Books and Records;

(vi)   all Supporting Obligations including letters of credit and guarantees issued in support of Accounts, and Chattel Paper;

(vii)  (i) all money, cash and cash equivalents and (ii) all cash held as cash collateral to the extent not otherwise constituting Collateral, all other cash or property at any time on deposit with or held by Lender for the account of Borrower (whether for safekeeping, custody, pledge, transmission or otherwise) to the extent consisting of and related to proceeds of Accounts and Inventory; and

(viii) all products and Proceeds of all or any of the foregoing.

3

"Collateral Account" means an account in Lender's name under the dominion and control of Lender maintained at a financial institution acceptable to Lender into which all cash, checks, notes, drafts and other similar items relating to or constituting Proceeds of or payments made in respect of any Collateral shall be deposited.

"Contract Rate" means an interest rate per annum equal to Prime Rate plus two and one half percent (2.5%).

"Default" means any act or event which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" has the meaning given to such term in Section 5(a)(iii).

"Deposit Accounts" means all "deposit accounts" as such term is defined in the UCC, now or hereafter held in the name of any Person.

"Documents" means all "documents", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including all bills of lading, dock warrants, dock receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable.

"Eligible Accounts" means and includes each Account of Borrower which conforms to the following criteria: (a) shipment of the merchandise or the rendition of services has been completed; (b) merchandise or services shall not have been repossessed, returned, rejected or disputed by the Account Debtor and there shall not have been asserted any offset, defense or counterclaim; (c) continues to be in full conformity with the representations and warranties made by Borrower to Lender with respect thereto; (d) Lender is, and continues to be, satisfied with the credit standing of the Account Debtor in relation to the amount of credit extended; (e) there are no facts existing or threatened which are likely to result in any adverse change in an Account Debtor's financial condition; (f) is documented by an invoice in a form approved by Lender and shall not be unpaid more than ninety (90) days from invoice date; (g) less than thirty three percent (33%) of the unpaid amount of invoices due from such Account Debtor remain unpaid more than ninety (90) days from invoice date; (h) is not evidenced by chattel paper or an instrument of any kind with respect to or in payment of the Account unless such instrument is duly endorsed to and in possession of Lender or represents a check in payment of a Account; (i) if the Account Debtor is located outside of the United States, the goods which gave rise to such Account were shipped after receipt by Borrower from or on behalf of the Account Debtor of an irrevocable letter of credit, assigned and delivered to Lender and confirmed by a financial institution acceptable to Lender and is in form and substance acceptable to Lender, payable in the full amount of the Account in United States dollars at a place of payment located within the United States; (j) Lender has a first priority perfected Lien in such Account and such Account is not subject to any other Lien other than Permitted Liens; (k) does not arise out of transactions with any employee, officer, agent, director, stockholder or Affiliate of Borrower; (l) is payable to Borrower; (m) does not arise with respect to goods which are delivered on a cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor may be conditional; (n) is not an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors; (o) does not arise out of a bill and hold sale prior to shipment (p) does not arise out of a sale to any Person to which Borrower is indebted, unless the amount of such indebtedness, and any anticipated indebtedness, is deducted in determining the face amount of such Account; (q) is net of any returns, discounts, claims, credits and allowances; (r) if the Account arises out of contracts between Borrower and the United States, any state, or any department, agency or instrumentality of any of them, Borrower has so notified Lender, in writing, prior to the

4

creation of such Account, and, if Lender so requests, there has been compliance with any governmental notice or approval requirements, including compliance with the Federal Assignment of Claims Act; (s) is a good and valid account representing an undisputed bona fide indebtedness incurred by the Account Debtor therein named, for a fixed sum as set forth in the invoice relating thereto with respect to an unconditional sale and delivery upon the stated terms of goods sold by Borrower, or work, labor and/or services rendered by Borrower; (t) the total unpaid Accounts from such Account Debtor does not exceed twenty percent (20%) of all Eligible Accounts; (u) does not arise out of progress billings prior to completion of the order; (v) Borrower's right to payment is absolute and not contingent upon the fulfillment of any condition whatsoever; (w) Borrower is able to bring suit and enforce its remedies against the Account Debtor through judicial process; (x) does not represent interest payments, late or finance charges or service charges owing to Borrower; and (y) is otherwise satisfactory to Lender as determined in good faith by Lender in the reasonable exercise of its discretion.

            "Eligible Inventory" means Inventory owned by Borrower which Lender, in its sole and absolute discretion, determines: (a) is subject to a first priority perfected Lien in favor of Lender and is subject to no other Liens whatsoever other than Permitted Liens; (b) is located on premises owned or operated by Borrower; (c) is located on premises with respect to which Lender has received a landlord, mortgagee or warehouse agreement acceptable in form and substance to Lender; (d) is not in transit; (e) is not covered by a negotiable document of title, unless such document and evidence of acceptable insurance covering such Inventory has been delivered to Lender; (f) is in good condition and meets all standards imposed by any governmental agency, or department or division thereof having regulatory Governmental Authority over such Inventory, its use or sale including the Federal Fair Labor Standards Act of 1938 as amended, and all rules, regulations and orders thereunder; (g) is currently either usable or salable in the normal course of Borrower's business; (h) is not placed by Borrower on consignment or held by Borrower on consignment from another Person; (i) is in conformity with the representations and warranties made by Borrower to Lender with respect thereto; (j) is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third parties; (k) does not require the consent of any Person for the completion of manufacture, sale or other disposition of such Inventory by Lender following an Event of Default and such completion, manufacture or sale does not constitute a breach or default under any contract or agreement to which Borrower is a party or to which such Inventory is or may be subject; (l) is not work-in-process; (m) is covered by casualty insurance acceptable to Lender; (n) is located within the USA and (o) not to be ineligible for any other reason.

            "Environmental Complaint" shall have the meaning given to such term in Section 12(p)(iv).

            "Equipment" means all "equipment" as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located.

            "ERISA" shall have the mean the Employee Retirement Income Security Act of 1974 and the regulations and published interpretations therewith.

            "Event of Default" means the occurrence of any of the events set forth in Section 18.

            "Fixtures" means all "fixtures" as such term is defined in the UCC, now owned or hereafter acquired by any Person.

            "Formula Amount" shall have the meaning given to such term in Section 2(a).

            "GAAP" means generally accepted accounting principles, practices and procedures in effect from time to time in the United States of America.

                                        5

"General Intangibles" means all "general intangibles" as such term is defined in the UCC, now owned or hereafter acquired by any person including all right, title and interest that such Person may now or hereafter have in or under any contract, all Payment Intangibles, customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, data bases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including the Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit accounts, rights to receive tax refunds and other payments, rights to received dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, and rights of indemnification.

"Goods" means all "goods", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including embedded software to the extent included in "goods" as defined in the UCC.

"Goodwill" means all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter acquired by any Person.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantor" means individually, SIGG Switzerland AG and any other Person who may guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guarantor Security Agreements" means collectively, all security agreements, mortgages, cash collateral deposit letters, pledges, and other agreements which are executed by any Guarantor in favor of Lender.

"Guaranty Agreements" means collectively, the Guaranty Agreements which are executed by each Guarantor in favor of Lender.

"Indemnified Person" shall have the meaning given to such term in Section 25.

"Instruments" means all "instruments", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including all certificated securities and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" means any and all Licenses, patents, patent registrations, copyrights, copyright registrations, trademarks, trademark registrations, trade secrets and customer lists.

"Inventory" means all "inventory", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located.

"Investment Property" means all "investment property", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located.

"Inventory Availability" means the amount of Revolving Credit Advances against Eligible Inventory Lender may from time to time make available to Borrower up to the lesser of (a) fifty percent (50%) of the value of Borrower's Eligible Inventory (calculated on the basis of the lower of cost or market, on a first-in first-out basis) or (b) 60% of the Accounts Availability.

"License" means any rights under any written agreement now or hereafter acquired by any Person to use any trademark, trademark registration, copyright, copyright registration or invention for which a patent is in existence or other license of rights or interests now held or hereafter acquired by any Person.

"Lien" means any mortgage, security deed, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the UCC or comparable law of any jurisdiction.

"Loans" means the Revolving Credit Advances and all extensions of credit hereunder or under any Ancillary Agreement, including Letter of Credit Obligations.

"Material Adverse Effect" means a material adverse effect on (a) the financial condition, operations, assets, or business of Borrower, (b) Borrower's ability to pay or perform the Obligations in accordance with the terms hereof or any Ancillary Agreement, or (c) the value of any material portion of the Collateral, the Liens on the Collateral or the priority of any such Lien.

"Maximum Capital Expenditure Amount" means $50,000.

"Maximum Legal Rate" shall have the meaning given to such term in Section 5(a)(iv).

"Maximum Revolving Amount" means ONE MILLION DOLLARS ($1,000,000).

"Minimum Average Monthly Loan Amount" means $500,000.

"Note" means the promissory note of Borrower executed in favor of Lender substantially in the form of Exhibit A.

"Obligations" means all Loans, all advances, debts, liabilities, obligations, covenants and duties owing by Borrower to Lender (or any corporation that directly or indirectly controls or is controlled by or is under common control with Lender) of every kind and description (whether or not evidenced by any note or other instrument and whether or not for the payment of money or the performance or non-performance of any act), direct or indirect, absolute or contingent, due or to become due, contractual or tortious, liquidated or unliquidated, whether existing by operation of law or otherwise now existing or hereafter arising including any debt, liability or obligation owing from Borrower to others which Lender may have obtained by assignment or otherwise and further including all interest (including interest accruing at the then applicable rate provided in this Agreement after the maturity of the Loans and interest accruing at the then applicable rate provided in this Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), charges or any other

7

payments Borrower is required to make by law or otherwise arising under or as a result of this Agreement and the Ancillary Agreements, together with all reasonable expenses and reasonable attorneys' fees chargeable to Borrower's account or incurred by Lender in connection with Borrower's account whether provided for herein or in any Ancillary Agreement.

"Payment Intangibles" means all "payment intangibles" as such term is defined in the UCC, now owned or hereafter acquired by any Person, including, a General Intangible under which the Account Debtor's principal obligation is a monetary obligation.

"Permitted Liens" means (a) Liens of carriers, warehousemen, artisans, bailees, mechanics and materialmen incurred in the ordinary course of business securing sums not overdue; (b) Liens incurred in the ordinary course of business in connection with workmen's compensation, unemployment insurance or other forms of governmental insurance or benefits, relating to employees, securing sums (i) not overdue or (ii) being diligently contested in good faith provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP; (c) Liens in favor of Lender; (d) Liens for taxes (i) not yet due or (ii) being diligently contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP; provided, that, the Lien shall have no effect on the priority of Liens in favor of Lender or the value of the assets in which Lender has a Lien; (e) Purchase Money Liens securing Purchase Money Indebtedness to the extent permitted in this Agreement and (f) Liens specified on Schedule 1(B) hereto.

"Person" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

"Prime Rate" means the "prime rate" which is normally published in the "Money Rates" of The Wall Street Journal (Eastern Edition, New York Metro); provided, however, if the Money Rates Column of The Wall Street Journal (Eastern Edition, New York Metro) ceases to be published or otherwise does not designate a "prime rate" as of a Business Day, Lender shall have the right to obtain such information from a similar business publication of its selection. The Prime Rate shall be increased or decreased as the case may be for each increase or decrease in the Prime Rate in an amount equal to such increase or decrease in the Prime Rate; each change to be effective as of the day of the change in such rate.

"Proceeds" means "proceeds", as such term is defined in the UCC and, in any event, shall include: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower or any other Person from time to time with respect to any Collateral; (b) any and all payments (in any form whatsoever) made or due and payable to Borrower from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any governmental body, governmental authority, bureau or agency (or any person acting under color of governmental authority); (c) any claim of Borrower against third parties (i) for past, present or future infringement of any Intellectual Property or (ii) for past, present or future infringement or dilution of any trademark or trademark license or for injury to the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark License; (d) any recoveries by Borrower against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock; and (f) any

8

and all other amounts , rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"Purchase Money Indebtedness" means (a) any indebtedness incurred for the payment of all or any part of the purchase price of any fixed asset, (b) any indebtedness incurred for the sole purpose of financing or refinancing all or any part of the purchase price of any fixed asset, and (c) any renewals, extensions or refinancings thereof (but not any increases in the principal amounts thereof outstanding at that time).

"Purchase Money Lien" means any Lien upon any fixed assets that secures the Purchase Money Indebtedness related thereto but only if such Lien shall at all times be confined solely to the asset the purchase price of which was financed or refinanced through the incurrence of the Purchase Money Indebtedness secured by such Lien and only if such Lien secures only such Purchase Money Indebtedness.

"Reserves" means reserves established by Lender from time to time in its good faith credit judgment, including to protect Lender's interest in the Collateral, to protect Lender against possible non-payment of Accounts for any reason by Account Debtors, to protect against the diminution in value of any Collateral, to protect Lender against the possible non-payment of any Obligations, to protect Lender for any unpaid taxes, to protect Lender in respect of any state of facts that could constitute a Default or Event of Default and to protect Lender for any Letter of Credit Obligations.

"Revolving Credit Advances" shall have the meaning given to such term in Section 2(a).

"Software" means all "software" as such term is defined in the UCC, now owned or hereafter acquired by any Person, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Stock" means all certificated and uncertificated shares, options, warrants, membership interests, general or limited partnership interests, participation or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"Subchapter S Distributions" mean dividends declared and paid by Borrower to its shareholders, or which could have been declared and paid by Borrower, in an amount not to exceed the Subchapter S Tax Liabilities.

"Subchapter S Tax Liabilities" means the amount of state and federal income tax paid or to be paid by Borrower's shareholders on taxable income earned by Borrower and attributable to the shareholder as a result of Borrower's Subchapter S tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any shareholder is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other deductions, credits, deferrals and other reductions available to the shareholders from or through Borrower.

"Subordinated Debt" means the indebtedness evidenced by the Subordinated Note and any other note, document, instrument or agreement now or any time hereafter executed and/or delivered by Borrower with or in favor of any Subordinated Lender which evidences the principal, interest and

9

other amounts owed by Borrower to such Subordinated Lender. Subordinated Debt does not include trade payables.

"Subordinated Lender" means collectively, SIGG Switzerland AG and any other Person who enters into a Subordination Agreement with Lender with respect to amounts owed by Borrower to such Subordinated Lender.

"Subordinated Note" means one million two hundred eighty thousand dollars ($1,280,000).

"Subordination Agreement" means collectively, the Subordination Agreement executed by the applicable Subordinated Lender in favor of Lender and acknowledged by Borrower, and any and all other subordination agreements accepted by Lender from time to time with respect to indebtedness of Borrower.

"Subsidiary" of any Person means a corporation or other entity whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person.

"Supporting Obligations" means all "supporting obligations" as such term is defined in the UCC, including letters of credit and guaranties issued in support of Accounts and Chattel Paper.

"Tangible Net Worth" at a particular date means (a) the aggregate amount of all assets of Borrower as may be properly classified as such in accordance with GAAP consistently applied excluding (i) all amounts owed to Borrower from any employee, officer, agent, director, stockholder or Affiliate of Borrower, (ii) goodwill, organizational expenses, research and development expenses, trademarks, trade names, copyrights, patents, patent applications, licenses and rights in any thereof, and other similar intangibles, (iii) all deferred charges or unamortized debt discount and expense, (iv) all reserves carried and not deducted from assets, (v) treasury stock and capital stock, obligations or other securities of, or capital contributions to, or investments in, any of its Subsidiaries, (vi) securities which are not readily marketable, (vii) cash held in a sinking or other analogous fund established for the purpose of redemption, retirement or prepayment of capital stock or indebtedness and (viii) such other assets as are properly classified as intangible assets under GAAP, less (b) the aggregate amount of all liabilities of Borrower.

"Term" means the Closing Date through the Termination Date subject to acceleration upon the occurrence of an Event of Default hereunder or other termination hereunder.

"Termination Date" means October 9, 2008.

"UCC" means the Uniform Commercial Code as the same may, from time be in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions; provided further, that to the extent that UCC is used to define any term herein or in any Ancillary Agreement and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

"Uniform Customs" shall mean with respect to a documentary Letter of Credit the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, as the same may be amended from time to time and with respect to a standby Letter of Credit, the International Standby Practices, International Chamber of Commerce Publication No. 590, as the same may be amended from time to time.

"Validity Agreements" means the Validity Guaranty Agreements executed by each Validity Guarantor in favor of Lender.

(b)     Accounting Terms. Any accounting terms used in this Agreement which are not specifically defined shall have the meanings customarily given them in accordance with GAAP and all financial computations shall be computed, unless specifically provided herein, in accordance with GAAP consistently applied.

(c)     Other Terms. All other terms used in this Agreement and defined in the UCC, shall have the meaning given therein unless otherwise defined herein.

(d)     Rules of Construction. All Schedules, Addenda and Exhibits hereto or expressly identified to this Agreement are incorporated herein by reference and taken together with this Agreement constitute but a single agreement. The words "herein", hereof" and "hereunder" or other words of similar import refer to this Agreement as a whole, including the Exhibits and Schedules thereto, as the same may be from time to time amended, modified, restated or supplemented, and not to any particular section, subsection or clause contained in this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. The term "or" is not exclusive. The term "including" (or any form thereof) shall not be limiting or exclusive. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. All references in this Agreement or in the Schedules to this Agreement to sections, schedules, disclosure schedules, exhibits, and attachments shall refer to the corresponding sections, schedules, disclosure schedules, exhibits, and attachments of or to this Agreement. All references to any instruments or agreements, including references to any of this Agreement or the Ancillary Agreements shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

2.     Revolving Credit Advances.

(a)     Subject to the terms and conditions set forth herein and in the Ancillary Agreements, Lender may, in its sole discretion, make revolving credit advances (the "Revolving Credit Advances") to Borrower from time to time during the Term which, in the aggregate at any time outstanding together with all outstanding Letter of Credit Obligations, will not exceed the lesser of (x) the Maximum Revolving Amount or (y) an amount equal to the sum of:

(i)     Accounts Availability, plus

(ii)     Inventory Availability, minus

(iii)     such Reserves as Lender may reasonably deem proper and necessary from time to time, including the outstanding amount of Letter of Credit Obligations.

11

The amount derived at any time from Section 2(a)(y)(i), plus (ii), minus (iii) shall be referred to as the "Formula Amount". Notwithstanding the limitations set forth above, Lender retains the right to lend Borrower from time to time such amounts in excess of such limitations as Lender may determine in its sole discretion.

(b)    Borrower acknowledges that the exercise of Lender's discretionary rights hereunder may result during the term of this Agreement in one or more increases or decreases in the advance percentages used in determining Accounts Availability, and Inventory Availability and Borrower hereby consents to any such increases or decreases which may limit or restrict advances requested by Borrower.

(c)    If Borrower does not pay any interest, fees, costs or charges to Lender when due, Borrower shall thereby be deemed to have requested, and Lender is hereby authorized at its discretion to make and charge to Borrower's account, a Revolving Credit Advance to Borrower as of such date in an amount equal to such unpaid interest, fees, costs or charges.

(d)    If Borrower at any time fails to perform or observe any of the covenants contained in this Agreement or any Ancillary Agreement, Lender may, but need not, perform or observe such covenant on behalf and in the name, place and stead of Borrower (or, at Lender's option, in Lender's name) and may, but need not, take any and all other actions which Lender may deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to Account Debtors, lessors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments). The amount of all monies expended and all costs and expenses (including attorneys' fees and legal expenses) incurred by Lender in connection with or as a result of the performance or observance of such agreements or the taking of such action by Lender shall be charged to Borrower's account as a Revolving Credit Advance and added to the Obligations. To facilitate Lender's performance or observance of such covenants of Borrower, Borrower hereby irrevocably appoints Lender, or Lender's delegate, acting alone, as Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements and writings required to be obtained, executed delivered or endorsed by Borrower.

(e)    Lender will account to Borrower monthly with a statement of all Loans and other advances, charges and payments made pursuant to this Agreement, and such account rendered by Lender shall be deemed final, binding and conclusive unless Lender is notified by Borrower in writing to the contrary within thirty (30) days of the date each account was rendered specifying the item or items to which objection is made.

(f)    During the Term, Borrower may borrow, prepay and reborrow Revolving Credit Advances, all in accordance with the terms and conditions hereof.

3.    Repayment of the Revolving Credit Advances. Borrower shall be required to (a) make a mandatory repayment hereunder at any time that the aggregate outstanding principal balance of the Revolving Credit Advances made by Lender to Borrower hereunder is in excess of the Formula Amount, in an amount equal to such excess, and (b) repay on the expiration of the Term (i) the then aggregate outstanding principal balance of Revolving Credit Advances made by Lender to Borrower hereunder together with accrued and unpaid interest, fees and charges and (ii) all other amounts owed Lender under this Agreement and the Ancillary Agreements. Any payments of principal, interest, fees or any other

12

amounts payable hereunder or under any Ancillary Agreement shall be made prior to 12:00 noon (New York time) on the due date thereof in immediately available funds.

4. <u>Procedure for Revolving Credit Advances</u>. Borrower may by written or telephonic notice request a borrowing of Revolving Credit Advances prior to 11:00 a.m. (New York time) on the Business Day of its request to incur, on that day, a Revolving Credit Advance. All Revolving Credit Advances shall be disbursed from whichever office or other place Lender may designate from time to time and, together with any and all other Obligations of Borrower to Lender, shall be charged to Borrower's account on Lender's books. The proceeds of each Revolving Credit Advance made by Lender shall be made available to Borrower on the Business Day so requested by way of credit to Borrower's operating account maintained with such bank as Borrower designated to Lender. Any and all Obligations due and owing hereunder may be charged to Borrower's account and shall constitute Revolving Credit Advances.

5. <u>Interest and Fees</u>.

(a) Interest.

(i) Except as modified by Section 5(a)(iii) below, Borrower shall pay interest on the unpaid principal balance of the Loans for each day they are outstanding at the Contract Rate.

(ii) Interest and fees shall be computed on the basis of actual days elapsed in a year of 360 days. Interest shall be payable in arrears on the last day of each month and upon termination of this Agreement, or, at Lender's option, Lender may charge Borrower's account for said interest.

(iii) Effective upon the occurrence of any Event of Default and for so long as any Event of Default shall be continuing, the Contract Rate shall automatically be increased by two percentage points (2%) per annum (such increased rate, the "Default Rate"), and all outstanding Obligations, including unpaid interest and Letter of Credit Fees, shall continue to accrue interest from the date of such Event of Default at the Default Rate applicable to such Obligations.

(iv) Notwithstanding the foregoing, in no event shall the aggregate interest exceed the maximum rate permitted under any applicable law or regulation, as in effect from time to time (the "Maximum Legal Rate") and if any provision of this Agreement or Ancillary Agreement is in contravention of any such law or regulation, interest payable under this Agreement and each Ancillary Agreement shall be computed on the basis of the Maximum Legal Rate (so that such interest will not exceed the Maximum Legal Rate) and once the amount of interest payable hereunder or under the Ancillary Agreements is less than the Maximum Legal Rate, Lender shall not reduce interest payable hereunder or any Ancillary Agreement below the amount computed based upon the Maximum Legal Rate until the aggregate amount of interest paid equals the amount of interest which would have been payable if the Maximum Legal Rate had not been imposed.

(v) Borrower shall pay principal, interest and all other amounts payable hereunder, or under any Ancillary Agreement, without any deduction whatsoever, including any deduction for any set-off or counterclaim.

(b) Fees.

13

(i)   Minimum Loan Fee. In the event the average closing daily unpaid
balances of all Loans hereunder during any calendar month is less than the Minimum Average
Monthly Loan Amount, Borrower shall pay to Lender a minimum loan fee at a rate per annum
equal to the Contract Rate on the amount by which the Minimum Average Monthly Loan Amount
exceeds such average closing daily unpaid balances. Such fee shall be charged to Borrower's
account on the first day of each month with respect to the prior month.

(ii)   Closing Fee. Upon execution of this Agreement by Borrower and
Lender, Borrower shall pay to Lender a closing fee in an amount equal to one and one quarter
percent (1.25%) of the Maximum Revolving Amount. The closing fee shall be deemed earned as
of the Closing Date and shall not be subject to rebate or proration for any reason.

(iii)   Facility Fee. Borrower hereby agrees to pay Lender a facility fee in
an amount equal to one and one quarter percent (1.25%) of the Maximum Revolving Amount for
each anniversary of the Closing Date which occurs prior to the Termination Date. The Facility
Fee for the period ending on the Termination Date shall be deemed fully earned on the
anniversary of the Closing Date and shall be payable by a charge to Borrower's account upon the
earlier of each anniversary of the Closing Date or the termination of this Agreement for any
reason.

(iv)   Collateral Monitoring Fee. Borrower shall pay Lender a collateral
monitoring fee of $500 per month, payable on the Closing Date and on the first day of each
month thereafter.

(v)   Field Examination Fee. Upon Lender's performance of any
collateral monitoring and/or verification including any field examination, collateral analysis or
other business analysis, the need for which is to be determined by Lender and which monitoring
is undertaken by Lender or for Lender's benefit, an amount equal to the established rate by
Lender from time to time which rate on the Closing Date is $750 per day plus all costs,
disbursements and expenses incurred by Lender and the person performing such collateral
monitoring and/or verification shall be charged to Borrower's account. The field examination fee
shall be limited to $2,000 per annum, unless an Event of Default has occurred and is continuing,
plus reasonable out-of -pocket expenses. Nothing herein limits Lender's right to conduct field
examinations at its own expense.

(vi)   Overline/Overadvance Fees. Under circumstances where
Borrower requests Revolving Credit Advances which would cause Borrower to exceed the
Maximum Revolving Amount and/or the Formula Amount, Lender may charge a 1% fee of the
excess amount at the time of the advance and 1% of the excess amount for each successive month
that the amount owing exceeds the Maximum Revolving and/or the Formula Amount.

6.   Security Interest.

(a)   To secure the prompt payment to Lender of the Obligations, Borrower hereby
assigns, pledges and grants to Lender a continuing security interest in and Lien upon all of the Collateral.
All of Borrower's Books and Records relating to the Collateral shall, until delivered to or removed by
Lender, be kept by Borrower in trust for Lender until all Obligations have been paid in full. Each
confirmatory assignment schedule or other form of assignment hereafter executed by Borrower shall be
deemed to include the foregoing grant, whether or not the same appears therein.

14

(b)     As additional security for the payment and performance of the Obligations, Borrower hereby assigns to Lender any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and Borrower hereby directs the issuer of any such policy to pay all such monies directly to Lender. At any time, whether or not a Default or Event of Default then exists, Lender may (but need not), in Lender's name or in Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy.

(c)     Borrower hereby (i) authorizes Lender to file any financing statements, continuation statements or amendments thereto that (x) indicate the Collateral and (y) contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment and (ii) ratifies its authorization for Lender to have filed any initial financial statements, or amendments thereto if filed prior to the date hereof. Borrower acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of Lender and agrees that it will not do so without the prior written consent of Lender, subject to Borrower's rights under Section 9-509(d)(2) of the UCC.

(d)     Borrower hereby grants to Lender an irrevocable, non-exclusive license (exercisable upon the occurrence and during the continuance of an Event of Default without payment of royalty or other compensation to Borrower) to use, transfer, license or sublicense any Intellectual Property now owned, licensed to, or hereafter acquired by Borrower, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer and automatic machinery software and programs used for the compilation or printout thereof, and represents, promises and agrees that any such license or sublicense is not and will not be in conflict with the contractual or commercial rights of any third Person; provided, that such license will terminate upon the termination of this agreement and the payment in full of all Obligations.

7.      Representations, Warranties and Covenants Concerning the Collateral. Borrower represents, warrants (each of which such representations and warranties shall be deemed repeated upon the making of each request for a Revolving Credit Advance and made as of the time of each and every Revolving Credit Advance hereunder) and covenants as follows:

(a)     All of the Collateral (i) is owned by Borrower free and clear of all Liens (including any claims of infringement) except those in Lender's favor and Permitted Liens and (ii) is not subject to any agreement prohibiting the granting of a Lien or requiring notice of or consent to the granting of a Lien.

(b)     Borrower shall not encumber, mortgage, pledge, assign or grant any Lien in any Collateral or any of Borrower's other assets to anyone other than Lender and except for Permitted Liens.

(c)     The Liens granted pursuant to this Agreement, upon completion of the filings and other actions listed on Schedule 7(c) (which, in the case of all filings and other documents referred to in said Schedule, have been delivered to Lender in duly executed form) constitute valid perfected security interests in all of the Collateral in favor of Lender as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof against any and all creditors of and any purchasers from Borrower (other than purchasers of Inventory in the ordinary course

15

of business) and such security interests are prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens that have priority by operation of law.

(d)      No effective security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is or will be on file or of record in any public office, except those relating to Permitted Liens.

(e)      Borrower shall not dispose of any of the Collateral whether by sale, lease or otherwise except for (i) the sale of Inventory in the ordinary course of business, and (ii) the disposition or transfer in the ordinary course of business during any fiscal year of obsolete and worn-out Equipment (although not Lender's Collateral) having an aggregate fair market value of not more than $10,000 without Lender's prior written consent which shall not be unreasonably withheld.

(f)      Borrower shall defend the right, title and interest of Lender in and to the Collateral against the claims and demands of all Persons whomsoever, and take such actions, including (i) all actions necessary to grant Lender "control" of any, Deposit Accounts, or electronic Chattel Paper owned by Borrower, with any agreements establishing control to be in form and substance satisfactory to Lender, (ii) the prompt delivery to Lender of all original Chattel Paper, (in each case, accompanied by stock powers, allonges or other instruments of transfer executed in blank), (iii) notification of Lender's interest in Collateral at Lender's request, and (iv) the institution of litigation against third parties as shall be prudent in order to protect and preserve Borrower's and Lender's respective and several interests in the Collateral.

(g)      Borrower shall promptly, and in any event within two (2) Business Days after the same is acquired by it, notify Lender of any commercial tort claim (as defined in the UCC) acquired by it and unless otherwise consented by Lender, Borrower shall enter into a supplement to this Loan Agreement granting to Lender a Lien in such commercial tort claim.

(h)      Borrower shall place notations upon Borrower's Books and Records and any financial statement of Borrower to disclose Lender's Lien in the Collateral.

(i)      Intentionally Deleted.

(j)      Borrower shall perform all other steps requested by Lender to create and maintain in Lender's favor a valid perfected first Lien in all Collateral subject only to Permitted Liens.

(k)      As of the date of each Borrowing Base Certificate delivered to Lender, each Account listed thereon as an Eligible Account shall be an Eligible Account and all Inventory listed thereon as Eligible Inventory shall be Eligible Inventory. Borrower shall notify Lender promptly and in any event within two (2) Business Days after obtaining knowledge thereof (i) of any event or circumstance that to Borrower's knowledge would cause Lender to consider any then existing Account with a balance in excess of $10,000 or Inventory with a value in excess of $10,000 as no longer constituting an Eligible Account or Eligible Inventory, as the case may be; (ii) of any material delay in Borrower's performance of any of its obligations in an amount in excess of $10,000 to any Account Debtor; (iii) of any assertion by an Account Debtor of any material claims, offsets or counterclaims in amount in excess of $10,000; (iv) of any allowances, credits and/or monies granted by Borrower to any Account Debtor in excess of $10,000; (v) of all material adverse information relating to the financial condition of an Account Debtor; (vi) of any material return of goods; and (vii) of any loss, damage or destruction of any of the Collateral.

16

(l) All Accounts (i) represent complete bona fide transactions which require no further act under any circumstances on Borrower's part to make such Accounts payable by the Account Debtors, (ii) to the best of Borrower's knowledge, are not subject to any present, future or contingent offsets or counterclaims, and (iii) do not represent bill and hold sales, consignment sales, guaranteed sales, sale or return or other similar understandings or obligations of any Affiliate or Subsidiary of Borrower. Borrower has not made, and will not make, any agreement with any Account Debtor for any extension of time for the payment of any Account, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance for prompt or early payment allowed by Borrower in the ordinary course of its business consistent with historical practice and as previously disclosed to Lender in writing. Schedule 7(l) sets forth each contract of Borrower with any Account Debtor that gives such Account Debtor the right (under such contract, under common law or otherwise) to offset any Accounts for Borrower's failure to perform under such contract and Borrower has obtained an offset waiver for each such contract in form and substance satisfactory to Lender.

(m) Borrower shall keep and maintain the Equipment in good operating condition, except for ordinary wear and tear, and shall make all necessary repairs and replacements thereof so that the value and operating efficiency shall at all times be maintained and preserved. Borrower shall not permit any such items to become a Fixture to real estate or accessions to other personal property.

(n) All Inventory manufactured by Borrower in the United States of America shall be produced in accordance with the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto or promulgated thereunder.

(o) Borrower shall maintain and keep all of Borrower's Books and Records concerning the Collateral at Borrower's executive offices listed in Schedule 12(d).

(p) Borrower shall maintain and keep the Collateral at the addresses listed in Schedule 12(d), provided, that Borrower may change such locations or open a new location provided, that Borrower provides Lender thirty (30) days prior written notice of such change or new location and (ii) prior to such change or opening of a new location it executes and delivers to Lender such financing statements and other agreements as Lender may request, including landlord agreements, mortgagee agreements and warehouse agreements, each in form and substance satisfactory to Lender.

(q) Schedule 7(q) lists all banks and other financial institutions at which Borrower maintains deposits and/or other accounts, and such Schedule correctly identifies the name, address and telephone number of each such depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. Borrower shall not establish any depository or other bank account of any with any financial institution (other than the accounts set forth on Schedule 7(q) without Lender's prior written consent.

8. Collateral Accounts. Borrower shall deposit all items of payment received as respects the Collateral to the Collateral Account. Borrower will irrevocably direct all present and future Account Debtors and other Persons obligated to make payments constituting Collateral to make such payments directly to the Collateral Account. All of Borrower's invoices, account statements and other written or oral communications directing, instructing, demanding or requesting payment of any Account of Borrower or any other amount constituting Collateral shall conspicuously direct that all payments be made to the Collateral Account and shall include the address for the Collateral Account. If, notwithstanding the instructions to Account Debtors to make payments to the Collateral Account, Borrower receives any payments, Borrower shall immediately deposit such payments into the Collateral

17

Account. Until so deposited, Borrower shall hold all such payments in trust for and as the property of Lender and shall not commingle such payments with any of its other funds or property.

(b)      All deposits in the Collateral Account shall constitute Proceeds. Lender from time to time may apply deposited funds in the Collateral Account to the payment of the Obligations, in any order or manner of application satisfactory to Lender.

(c)      All items deposited in the Collateral Account shall be subject to final payment. If any such item is returned uncollected, Borrower will immediately pay Lender, or, for items deposited in the Collateral Account, the bank maintaining such account, the amount of that item, or such bank at its discretion may charge any uncollected item to Borrower's commercial account or other account at such bank. Borrower shall be liable as an endorser on all items deposited in the Collateral Account, whether or not in fact endorsed by Borrower.

9.      Collection and Maintenance of Collateral.

(a)      Lender may at any time verify Borrower's Accounts utilizing an audit control company or any other agent of Lender. Lender or Lender's designee may notify Account Debtors, at any time after the occurrence and during the continuance of an Event of Default at Lender's sole discretion, of Lender's security interest in Accounts, collect them directly and charge the collection costs and expenses to Borrower's account, but, unless and until Lender does so or gives Borrower other instructions after the occurrence of an event of Default, Borrower shall collect all Accounts for Lender, receive all payments thereon for Lender's benefit in trust as Lender's trustee and immediately deliver them to Lender in their original form with all necessary endorsements or, as directed by Lender, deposit such payments as directed by Lender pursuant to Section 8.

(b)      For purposes of determining the balance of the Loans outstanding, Lender will credit (conditional upon final collection) all such payments to Borrower's account upon receipt by Lender of good funds in dollars of the United States of America in Lender's account, provided, however, for purposes of computing interest on the Obligations, Lender will credit (conditional upon final collection) all such payments to Borrower's account three (3) Business Days after receipt by Lender of good funds in dollars of the United States of America in Lender's account. Any amount received by Lender after 12:00 noon (New York time) on any Business Day shall be deemed received on the next Business Day.

10.      Inspections. At all times during normal business hours, Lender shall have the right to (a) have access to, visit, inspect, review, evaluate and make physical verification and appraisals of Borrower's properties and the Collateral, (b) inspect, examine and copy (or take originals if necessary) and make extracts from Borrower's Books and Records, including management letters prepared by independent accountants, and (c) discuss with Borrower's principal officers, and independent accountants, Borrower's business, assets, liabilities, financial condition, results of operations and business prospects. Borrower will deliver to Lender any instrument necessary for Lender to obtain records from any service bureau maintaining records for Borrower. If any internally prepared financial information, including that required under this paragraph is unsatisfactory in any manner to Lender, Lender may request that the Accountant's review the same.

11.      Financial Reporting. Borrower will deliver, or cause to be delivered, to Lender each of the following, which shall be in form and detail acceptable to Lender:

(a)      As soon as available, and in any event within one hundred and twenty (120) days after the end of each fiscal year of Borrower, Borrower's reviewed financial statements which annual

financial statements shall include Borrower's balance sheet as at the end of such fiscal year and the
related statements of Borrower's income, retained earnings and cash flows for the fiscal year then ended,
prepared, if Lender so requests, on a consolidating and consolidated basis to include any Affiliates, all in
reasonable detail and prepared in accordance with GAAP, together with (i) copies of all management
letters prepared by such accountants; (ii) a review signed by the Accountants stating that in making the
investigations necessary for said opinion and review they obtained no knowledge, except as specifically
stated, of any Default or Event of Default; and (iii) a certificate of Borrower's President or Chief
Financial Officer or IFS stating that such financial statements have been prepared in accordance with
GAAP and whether or not such officer has knowledge of the occurrence of any Default or Event of
Default hereunder and, if so stating in reasonable detail the facts with respect thereto;

(b)     As soon as available and in any event within forty-five (45) days after the end of
each quarter an unaudited/internal balance sheet and statements of income, retained earnings and cash
flows of Borrower as at the end of and for such quarter and for the year to date period then ended,
prepared, if Lender so requests, on a consolidating and consolidated basis to include any Affiliates, in
reasonable detail and stating in comparative form the figures for the corresponding date and periods in the
previous year, all prepared in accordance with GAAP or IFS, subject to year-end audit adjustments; and
accompanied by a certificate of Borrower's President or Chief Financial Officer, stating (i) that such
financial statements have been prepared in accordance with GAAP, subject to year-end audit adjustments,
and (ii) whether or not such officer has knowledge of the occurrence of any Default or Event of Default
hereunder not theretofore reported and remedied and, if so, stating in reasonable detail the facts with
respect thereto;

(c)     Within fifteen (15) days after the end of each month or more frequently if Lender
so requests, agings of Borrower's Accounts and its accounts payable, a perpetual Inventory certification
report, and a calculation of Borrower's Accounts, Eligible Accounts, Inventory and Eligible Inventory as
at the end of such month or shorter time period in the form of Exhibit B;

(d)     Together with each request for a Loan (but in no event later than the last day of
each month) and at such intervals as Lender may request a Borrowing Base Certificate in the form of
Exhibit C as of the last day of the previous Borrowing Base Certificate detailing ineligible Accounts and
Inventory of adjustment to the Formula Amount, certified as true and correct by the President or Chief
Financial Officer of Borrower;

(e)     Together with each request for a Loan (but in no event later than the last day of
each month) and at such other intervals as Lender may require: (i) copies of all entries to the sales journal
and the cash receipt journal; (ii) copies of all credit memos; and (iii) copies of all invoices in excess of ten
thousand dollars ($10,000), together with proof of delivery, in each case as and for the immediately
preceding week;

(f)     Promptly following Lender's request, receivable schedules, copies of invoices to
Account Debtors, shipping documents, delivery receipts and such other material, reports, records or
information as Lender may request;

(g)     Borrower will cause each Guarantor to comply with the financial reporting
requirements set forth in their respective Guaranties.

12.     Additional Representations, Warranties and Covenants. Borrower represents, warrants
(each of which such representations and warranties shall be deemed repeated upon the making of a

19

request for a Revolving Credit Advance and made as of the time of each Revolving Credit Advance made hereunder), and covenants as follows:

(a)      Borrower is a corporation or limited liability company, as applicable, duly organized and validly existing under the laws of the jurisdiction of its incorporation, organization or formation and duly qualified and in good standing in every other state or jurisdiction in which the nature of Borrower's business requires such qualification.

(b)      The execution, delivery and performance of this Agreement and the Ancillary Agreements (i) have been duly authorized, (ii) are not in contravention of Borrower's certificate of incorporation or formation, by-laws, operating agreement or of any indenture, agreement or undertaking to which Borrower is a party or by which Borrower is bound and (iii) are within Borrower's corporate powers.

(c)      This Agreement and the Ancillary Agreements executed and delivered by Borrower are Borrower's legal, valid and binding obligations, enforceable in accordance with their terms.

(d)      Schedule 12(d) sets forth Borrower's name as it appears in official filing in the state of its incorporation or organization, the type of entity of Borrower, the organizational identification number issued by Borrower's state of incorporation or organization or a statement that no such number has been issued, Borrower's state of organization or incorporation, and the location of Borrower's chief executive office, corporate offices, warehouses, other locations of Collateral and locations where records with respect to Collateral are kept (including in each case the county of such locations) and, except as set forth in such Schedule 12(d), such locations have not changed during the preceding twelve months. As of the Closing Date, during the prior five years, except as set forth in Schedule 12(d), Borrower has not been known as or conducted business in any other name (including trade names). Borrower has only one state of incorporation or organization.

(e)      Borrower will not change (i) its name as it appears in the official filings in the state of its incorporation or formation, (ii) the type of legal entity it is, (iii) its organization identification number, if any, issued by its state of incorporation or organization, (iv) its state of incorporation or organization or (v) amend its certificate of incorporation, by-laws, certificate of formation, operating agreement or other organizational document.

(f)      Borrower is solvent, able to pay its debts as they mature, has capital sufficient to carry on its business and all businesses in which Borrower is about to engage and the fair saleable value of its assets (calculated on a going concern basis) is in excess of the amount of its liabilities.

(g)      There is no pending or threatened litigation, action or proceeding which involves the possibility of having a Material Adverse Effect.

(h)      All balance sheets and income statements which have been delivered to Lender fairly, accurately and properly state Borrower's financial condition on a basis consistent with that of previous financial statements and there has been no material adverse change in Borrower's financial condition as reflected in such statements since the date thereof and such statements do not fail to disclose any fact or facts which might have a Material Adverse Effect on Borrower's financial condition.

(i)      Borrower possesses all of the Intellectual Property necessary to conduct its business. There has been no assertion or claim of violation or infringement with respect to any Intellectual Property. Schedule 12(i) sets forth all Intellectual Property of Borrower.

20

(j)      Borrower will pay or discharge when due all taxes, assessments and governmental charges or levies imposed upon Borrower or any of the Collateral unless such amounts are being diligently contested in good faith by appropriate proceedings provided that (i) adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP and (ii) the related Lien shall have no effect on the priority of the Liens in favor of Lender or the value of the assets in which Lender has a Lien.

(k)      Borrower will promptly inform Lender in writing of: (i) the commencement of all proceedings and investigations by or before and/or the receipt of any notices from, any governmental or nongovernmental body and all actions and proceedings in any court or before any arbitrator against or in any way concerning any event which might singly or in the aggregate, have a Material Adverse Effect; (ii) any amendment of Borrower's certificate of incorporation, by-laws, certification of formation, operating agreement or other organizational document; (iii) any change which has had or might have a Material Adverse Effect; (iv) any Event of Default or Default; (v) any default or any event which with the passage of time or giving of notice or both would constitute a default under any agreement for the payment of money to which Borrower is a party or by which Borrower or any of Borrower's properties may be bound which would have a Material Adverse Effect and (vii) any change in Borrower's name or any other name used in its business.

(l)      Borrower will not (i) create, incur, assume or suffer to exist any indebtedness (exclusive of trade debt) whether secured or unsecured other than Borrower's indebtedness to Lender and as set forth on Schedule 12(l) attached hereto and made a part hereof; (ii) cancel any debt owing to it; (iii) not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by Borrower for deposit or collection or similar transactions in the ordinary course of business; (iv) directly or indirectly declare, pay or make any dividend or distribution on any class of its Stock or apply any of its funds, property or assets to the purchase, redemption or other retirement of any Stock of Borrower except so long as (x) Borrower is an S Corporation within the meaning of the Internal Revenue Code of 1986, as amended, (y) no Default or Event of Default shall have occurred and be continuing and (z) after first providing such supporting documentation as Lender may request (including the personal state and federal tax returns of each shareholder), Borrower may pay Subchapter S Distributions not exceeding Subchapter S Tax Liabilities. Payments to shareholders shall be made so as to be available when the tax is due, including in respect of estimated tax payments. In the event (x) the actual Subchapter S Distributions to any shareholder exceeds the actual income tax liability of such shareholder due to Borrower's status as an S Corporation or (y) Borrower would be entitled to a refund of income taxes previously paid as a result of a tax loss during a year in which Borrower is an S Corporation, then the applicable shareholders shall repay Borrower the amount of such excess or refund, as the case may be, no later than the date Borrower's annual tax return must be filed by Borrower (without giving effect to any filing extensions). In the event such amounts are not repaid in a timely manner by the applicable shareholder, then Borrower shall not pay or make any Subchapter S Distribution with respect to, or purchase, redeem or retire, any stock of Borrower held or controlled by, directly or indirectly, such shareholder until such payment has been made; (v) purchase or hold beneficially any Stock or other securities or evidences of indebtedness of, make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person, including any partnership or joint venture, except travel advances or loans to Borrower's officers and employees;(vi) create or permit to exist any Subsidiary, other than any Subsidiary in existence on the date hereof and listed in Schedule 12(m); (vii) directly or indirectly, prepay any indebtedness (other than to Lender), or repurchase, redeem, retire or otherwise acquire any indebtedness; (viii) enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a portion of the assets or Stock of any Person or permit any other Person to consolidate with or merge with it; (ix) materially change the nature of the business in which it is presently

21

engaged; (x) change its fiscal year or make any changes in accounting treatment and reporting practices without prior written notice to Lender except as required by GAAP or in the tax reporting treatment or except as required by law; (xi) enter into any transaction with any employee, director or Affiliate, except in the ordinary course on arms-length terms; or (xii) bill Accounts under any name except the present name of Borrower; or (xiii) directly or indirectly, redeem, repurchase, retire or otherwise acquire or make any payment or distribution with respect to the Subordinated Debt except to the extent permitted pursuant to the applicable Subordination Agreement; or (xiv) change or modify the terms of any Subordinated Debt (or any indenture or agreement in connection therewith).

(m)     None of the proceeds of the Loans hereunder will be used directly or indirectly to "purchase" or "carry" "margin stock" or to repay indebtedness incurred to "purchase" or "carry" "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect.

(n)     Borrower will bear the full risk of loss from any loss of any nature whatsoever with respect to the Collateral. At Borrower's own cost and expense in amounts and with carriers acceptable to Lender, Borrower shall (i) keep all its insurable properties and properties in which it has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrower's including business interruption insurance; (ii) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to Borrower's insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrower either directly or through Governmental Authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrower is engaged in business; and (v) furnish Lender with (x) copies of all policies and evidence of the maintenance of such policies at least thirty (30) days before any expiration date, (y) endorsements to such policies naming Lender as "co-insured" or "additional insured" and appropriate loss payable endorsements in form and substance satisfactory to Lender, naming Lender as loss payee, and (z) evidence that as to Lender the insurance coverage shall not be impaired or invalidated by any act or neglect of Borrower and the insurer will provide Lender with at least thirty (30) days notice prior to cancellation. Borrower shall instruct the insurance carriers that in the event of any loss thereunder, the carriers shall make payment for such loss to lender and not to Borrower and Lender jointly. If any insurance losses are paid by check, draft or other instrument payable to Borrower and Lender jointly, Lender may endorse Borrower's name thereon and do such other things as Lender may deem advisable to reduce the same to cash. Lender is hereby authorized to adjust and compromise claims. All loss recoveries received by Lender upon any such insurance may be applied to the Obligations, in such order as Lender in its sole discretion shall determine. Any surplus shall be paid by Lender to Borrower or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Borrower to Lender, on demand.

(o)     (i)     Borrower has delivered to Lender all reports, permits, licenses and other documents describing or relating in any way to Borrower's business or its property.

(ii)     The operation of each Borrower's business is and will continue to be in compliance in all material respects with all applicable federal, state and local laws, rules and ordinances, including to all laws, rules, regulations and orders relating to taxes, payment and withholding

22

of payroll taxes, employer and employee contributions and similar items, securities, employee retirement and welfare benefits, employee health safety and environmental matters.

(iii) For purposes of Section 12(f), all references to Borrower's property shall be deemed to include all of Borrower's right, title and interest in and to all owned and/or leased premises.

(q) Based upon the ERISA: (i) Borrower has not engaged in any Prohibited Transactions as defined in Section 406 of ERISA and Section 4975 of the Internal Revenue Code, as amended; (ii) Borrower has met all applicable minimum funding requirements under Section 302 of ERISA in respect of its plans; (iii) Borrower has no knowledge of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any employee benefit plan(s); (iv) Borrower has no fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than Borrower's employees; and (v) Borrower has not withdrawn, completely or partially, from any multi-employer pension plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980.

13. Financial Covenants.

(a) Net Loss: Borrower shall not incur a net post-tax loss for the twelve month period ending December 31, 2007 and any Fiscal Year thereafter.

(b) Subordination: Borrower will comply with the provisions of the Subordination Agreement and not create, incur, assume or suffer any additional indebtedness, exclusive of permitted indebtedness permitted by Section 12(l) and/or as set forth on Schedule 12(l).

For purposes of this Agreement, a breach of any financial covenants set forth herein shall be deemed to have occurred as of any date of determination by Lender or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to Lender.

14. Further Assurances. At any time and from time to time, upon the written request of Lender and at the sole expense of Borrower, Borrower shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Lender may request (a) to obtain the full benefits of this Agreement and the Ancillary Agreements, (b) to protect, preserve and maintain Lender's rights in the Collateral and under this Agreement or any Ancillary Agreement, or (c) to enable Lender to exercise all or any of the rights and powers herein granted or any Ancillary Agreement.

15. Power of Attorney. Borrower hereby, but only after the occurrence and during the continuance of an Event of Default, appoints Lender as Borrower's attorney, with power to: (i) endorse Borrower's name on any checks, notes, acceptances, money orders, drafts or other forms of payment or security that may come into Lender's possession; (ii) sign Borrower's name on any invoice or bill of lading relating to any Accounts, drafts against Account Debtors, schedules and assignments of Accounts, notices of assignment, financing statements and other public records, verifications of Accounts and notices to or from Account Debtors; (iii) verify the validity, amount or any other matter relating to any Account by mail, telephone, telegraph or otherwise with Account Debtors; (iv) execute customs declarations and such other documents as may be required to clear Inventory through Customs; (v) do all things necessary to carry out this Agreement, any Ancillary Agreement and all related documents; and (vi)notify the post office authorities to change the address for delivery of Borrower's mail to an address

23

designated by Lender, and to receive, open and dispose of all mail addressed to Borrower. Such power of attorney is exercisable by Lender only during the continuance of an Event of Default. Neither Lender nor the attorney will be liable for any acts or omissions or for any error of judgment or mistake of fact or law unless they are a result of negligence or misconduct. This power, being coupled with an interest, is irrevocable so long as Lender has a security interest and until the Obligations have been fully satisfied, subject to the provision that such power is only exercisable during the continuance of an Event of Default.

16.     Term of Agreement. Any obligation of Lender to make Loans and extend their financial accommodations under this Agreement or any Ancillary Agreement shall continue in full force and effect until the expiration of the Term. The termination of the Agreement shall not affect any of Lender's rights hereunder or any Ancillary Agreement and the provisions hereof and thereof shall continue to be fully operative until all transactions entered into, rights or interests created and the Obligations have been disposed of, concluded or liquidated. The Termination Date shall be automatically extended for successive periods of one (1) year each unless Borrower shall have provided Lender with a written notice of termination, at least sixty (60) days prior to the expiration of the Termination Date or any renewal of the Termination Date. Notwithstanding the foregoing, Lender shall release its security interests at any time after notice upon payment to it in good funds of all Obligations if Borrower shall have (i) provided Lender with an executed release of any and all claims which Borrower may have or thereafter have under this Agreement and/or any Ancillary Agreement and (ii) paid to Lender the Facility Fee. The Facility Fee shall also be due and payable by Borrower to Lender upon termination of this Agreement by Lender after the occurrence of an Event of Default.

17.     Termination of Lien. The Liens and rights granted to Lender hereunder and any Ancillary Agreements and the financing statements filed in connection herewith or therewith shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrower's account may from time to time be temporarily in a zero or credit position, until (a) all of the Obligations of Borrower have been paid or performed in full after the termination of this Agreement or Borrower has furnished Lender with an indemnification satisfactory to Lender with respect thereto and (b) Borrower has an executed release of any and all claims which Borrower may have or thereafter have under this Agreement or any other Ancillary Agreement. Accordingly, Borrower waives any rights which it may have under the UCC to demand the filing of termination statements with respect to the Collateral, and Lender shall not be required to send such termination statements to Borrower, or to file them with any filing office, unless and until this Agreement and the Ancillary Agreements shall have been terminated in accordance with their terms and all Obligations paid in full in immediately available funds.

18.     Events of Default. The occurrence of any of the following shall constitute an Event of Default:

        (a)     failure to make payment of any of the Obligations when required hereunder;

        (b)     failure to pay any taxes when due unless such taxes are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been provided on Borrower's books;

        (c)     failure to perform under and/or committing any breach of this Agreement or any Ancillary Agreement or any other agreement between Borrower and Lender;

        (d)     the occurrence of a default under any agreement to which Borrower is a party with third parties which has a Material Adverse Effect;

24

(e) any representation, warranty or statement made by Borrower hereunder, in any Ancillary Agreement, any certificate, statement or document delivered pursuant to the terms hereof, or in connection with the transactions contemplated by this Agreement should at any time be false or misleading in any material respect;

(f) if any Guarantor or Validity Guarantor attempts to terminate, challenges the validity of, or its liability under any Guaranty Agreement, any Guarantor Security Agreement or any Validity Agreement or if any individual Guarantor or Validity Guarantor shall die and Borrower shall fail to provide Lender with a replacement Guarantor acceptable to Lender within thirty (30) days of such occurrence or if any other Guarantor shall cease to exist;

(g) should any Guarantor default in its obligations under any Guaranty Agreement, any Guarantor Security Agreement or any Validity Guarantor or if any proceeding shall be brought to challenge the validity, binding effect of any Guaranty Agreement, or any Guarantor Security Agreement or any Validity Guaranty, or should any Guarantor or Validity Guarantor breach any representation, warranty or covenant contained in any Guaranty Agreement, any Validity Agreement or any Guarantor Security Agreement or should any Guaranty Agreement or Guarantor Security Agreement cease to be a valid, binding and enforceable obligation;

(h) an attachment or levy is made upon any of Borrower's assets having an aggregate value in excess of $10,000 or a judgment is rendered against Borrower or any of Borrower's property involving a liability of more than $10,000 which shall not have been vacated, discharged, stayed or bonded pending appeal within thirty (30) days from the entry thereof;

(i) any change in Borrower's condition or affairs (financial or otherwise) which in Lender's opinion impairs the Collateral or the ability of Borrower to perform its Obligations;

(j) any Lien created hereunder or under any Ancillary Agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest;

(k) if Borrower shall (i) apply for, consent to or suffer to exist the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vi) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (vii) take any action for the purpose of effecting any of the foregoing;

(l) Borrower shall admit in writing its inability, or be generally unable to pay its debts as they become due or cease operations of its present business;

(m) any Affiliate or any Subsidiary or any Guarantor shall (i) apply for, consent to or suffer to exist the appointment of, or the taking possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to,

25

or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws or (viii) take any action for the purpose of effecting any of the foregoing;

(n) Borrower directly or indirectly sells, assigns, transfers, conveys, or suffers or permits to occur any sale, assignment, transfer or conveyance of any assets of Borrower or any interest therein, except as permitted herein;

(o) Borrower fails to operate in the ordinary course of business;

(p) Lender shall in good faith deem itself insecure or unsafe or shall fear diminution in value, removal or waste of the Collateral;

(q) a default by Borrower in the payment, when due, of any principal of or interest on any indebtedness for money borrowed;

(r) the occurrence of a Change of Control or a change in senior management of Borrower;

(s) the indictment or threatened indictment of Borrower, any officer of Borrower or any Guarantor under any criminal statute, or commencement or threatened commencement of criminal or civil proceeding against Borrower, any officer of Borrower or any Guarantor pursuant to which statute or proceeding penalties or remedies sought or available include forfeiture of any of the property of Borrower or any Guarantor; or

(t) Borrower shall take or participate in any action which would be prohibited under the provisions of any Subordination Agreement or Intercreditor Agreement or make any payment on the Subordinated Debt that any Person was not entitled to receive under the provisions of the applicable Subordination Agreement or Intercreditor Agreement.

19. Remedies. Upon the occurrence of an Event of Default pursuant to Section 18(k) herein, all Obligations shall be immediately due and payable and this Agreement shall be deemed terminated; upon the occurrence and continuation of any other of the Events of Default, Lender shall have the right to demand repayment in full of all Obligations, whether or not otherwise due. Until all Obligations have been fully satisfied, Lender shall retain its Lien in all Collateral. Lender shall have, in addition to all other rights provided herein, the rights and remedies of a secured party under the UCC, and under other applicable law, all other legal and equitable rights to which Lender may be entitled, including the right to take immediate possession of the Collateral, to require Borrower to assemble the Collateral, at Borrower's expense, and to make it available to Lender at a place designated by Lender which is reasonably convenient to both parties and to enter any of the premises of Borrower or wherever the Collateral shall be located, with or without force or process of law, and to keep and store the same on said premises until sold (and if said premises be the property of Borrower, Borrower agrees not to charge Lender for storage thereof), and the right to apply for the appointment of a receiver for Borrower's property. Further, Lender may, at any time or times after default by Borrower, sell and deliver all Collateral held by or for Lender at public or private sale for cash, upon credit or otherwise, at such prices and upon such terms as Lender, in Lender's sole discretion, deems advisable or Lender may otherwise recover upon the Collateral in any commercially reasonable manner as Lender, in its sole discretion, deems advisable. The requirement of reasonable notice shall be met if such notice is mailed postage prepaid to Borrower at Borrower's address as shown in Lender's records, at least ten (10) days before the time of the event of which notice is being given. Lender may be the purchaser at any sale, if it is public. In connection with the exercise of the foregoing remedies, Lender is granted permission to use all of Borrower's trademarks, tradenames,

26

tradestyles, patents, patent applications, licenses, franchises and other proprietary rights which are used in connection with (a) Inventory for the purpose of disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods. The proceeds of sale shall be applied first to all costs and expenses of sale, including attorneys' fees, and second to the payment (in whatever order Lender elects) of all Obligations (including the cash collateralization of any Letter of Credit Obligations). After the indefeasible payment and satisfaction in full in cash of all of the Obligations, and after the payment by Lender of any other amount required by any provision of law, including Section 608(a)(1) of the Code (but only after Lender has received what Lender considers reasonable proof of a subordinate party's security interest), the surplus, if any, shall be paid to Borrower or its representatives or to whosoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct. Borrower shall remain liable to Lender for any deficiency.

20.      Waivers. To the full extent permitted by applicable law, Borrower waives (a) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all of this Agreement and the Ancillary Agreements or any other notes, commercial paper, Accounts, Contracts, Documents, Instruments, Chattel Paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard; (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, any Collateral or any bond or security that might be required by any court prior to allowing Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal and exemption laws. Borrower acknowledges that it has been advised by counsel of its choices and decisions with respect to this Agreement, the Ancillary Agreements and the transactions evidenced hereby and thereby.

21.      Expenses. Borrower shall pay all of Lender's out-of-pocket costs and expenses, including reasonable fees and disbursements of counsel and appraisers, in connection with the preparation, execution and delivery of this Agreement and the Ancillary Agreements, and in connection with the prosecution or defense of any action, contest, dispute, suit or proceeding concerning any matter in any way arising out of, related to or connected with this Agreement or any Ancillary Agreement. Borrower shall also pay all of Lender's fees, charges, out-of-pocket costs and expenses, including reasonable fees and disbursements of counsel and appraisers, in connection with (a) the preparation, execution and delivery of any waiver, any amendment thereto or consent proposed or executed in connection with the transactions contemplated by this Agreement or the Ancillary Agreements, (b) Lender's obtaining performance of the Obligations under this Agreement and any Ancillary Agreement, including, but not limited to, the enforcement or defense of Lender's security interests, assignments of rights and Liens hereunder as valid perfected security interests, (c) any attempt to inspect, verify, protect, collect, sell, liquidate or otherwise dispose of any Collateral, (d) any appraisals or re-appraisals of any property (real or personal) pledged to Lender by Borrower as Collateral for, or any other Person as security for, Borrower's Obligations hereunder and (e) any consultations in connection with any of the foregoing. Borrower shall also pay Lender's customary bank charges for all bank services (including wire transfers) performed or caused to be performed by Lender for Borrower at Borrower's request or in connection with Borrower's loan account with Lender. All such costs and expenses together with all filing, recording and search fees, taxes and interest payable by Borrower to Lender shall be payable on demand and shall be secured by the Collateral. If any tax by any Governmental Authority is or may be imposed on or as a result of any transaction between Borrower and Lender which Lender is or may be required to withhold or pay, Borrower agrees to indemnify and hold Lender harmless in respect of such taxes, and Borrower will repay to Lender the amount of any such taxes which shall be charged to Borrower's account; and until Borrower shall furnish Lender with indemnity therefor (or supply Lender with evidence satisfactory to it that due provision for the payment thereof has been made), Lender may

27

hold without interest any balance standing to Borrower's credit and Lender shall retain its Liens in any and all Collateral.

22. Assignment By Lender. Lender may assign any or all of the Obligations together with any or all of the security therefor and any transferee shall succeed to all of Lender's rights with respect thereto in the ordinary course of business. Upon such transfer, Lender shall be released from all responsibility for the Collateral to the extent same is assigned to any transferee. Lender may from time to time sell or otherwise grant participations in any of the Obligations and the holder of any such participation shall, subject to the terms of any agreement between Lender and such holder, be entitled to the same benefits as Lender with respect to any security for the Obligations in which such holder is a participant. Borrower agrees that each such holder may exercise any and all rights of banker's lien, set-off and counterclaim with respect to its participation in the Obligations as fully as though Borrower were directly indebted to such holder in the amount of such participation.

23. No Waiver; Cumulative Remedies. Failure by Lender to exercise any right, remedy or option under this Agreement, any Ancillary Agreement or any supplement hereto or thereto or any other agreement between Borrower and Lender or delay by Lender in exercising the same, will not operate as a waiver; no waiver by Lender will be effective unless it is in writing and then only to the extent specifically stated. Lender's rights and remedies under this Agreement and the Ancillary Agreements will be cumulative and not exclusive of any other right or remedy which Lender may have.

24. Application of Payments. Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by Lender from or on Borrower's behalf and Borrower hereby irrevocably agrees that Lender shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter against Borrower's Obligations hereunder in such manner as Lender may deem advisable notwithstanding any entry by Lender upon any of Lender's books and records.

25. Indemnity. Borrower agrees to indemnify and hold Lender and its affiliates, and their respective employees, attorneys and agents (each, an "Indemnified Person"), harmless from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses of any kind or nature whatsoever (including attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement or any of the Ancillary Agreements or with respect to the execution, delivery, enforcement, performance and administration of, or in any other way arising out of or relating to, this Agreement, the Ancillary Agreements or any other documents or transactions contemplated by or referred to herein or therein and any actions or failures to act with respect to any of the foregoing, except to the extent that any such indemnified liability is finally determined by a court of competent jurisdiction to have resulted solely from such Indemnified Person's gross negligence or willful misconduct. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO BORROWER OR TO ANY OTHER PARTY OR TO ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY ANCILLARY AGREEMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

26. Revival. Borrower further agrees that to the extent Borrower makes a payment or payments to Lender, which payment or payments or any part thereof are subsequently invalidated,

28

declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made.

27.    Notices.  Any notice or request hereunder may be given to Borrower or Lender at the respective addresses set forth below or as may hereafter be specified in a notice designated as a change of address under this Section.  Any notice or request hereunder shall be given by registered or certified mail, return receipt requested, hand delivery, overnight mail or telecopy (confirmed by mail).  Notices and requests shall be, in the case of those by hand delivery, deemed to have been given when delivered to any officer of the party to whom it is addressed, in the case of those by mail or overnight mail, deemed to have been given when deposited in the mail or with the overnight mail carrier, and, in the case of a telecopy, when confirmed.

        Notices shall be provided as follows:

        If to Lender:          Gerber Finance Inc.
                               110 East 55th Street, 7th Floor
                               New York, New York 10022-1540
                               Attention: Gerald Joseph
                               Telephone: 212-888-3833
                               Telecopier: 212-888-1637


        If to Borrower:        SIGG Switzerland, Inc.
                               1177 High Ridge Road
                               Stamford, CT 06905
                               Attention: Steve Wasik
                               Telephone: 203-321-1232
                               Telecopier: 203-321-1286

        28.    Governing Law, Jurisdiction and Waiver of Jury Trial.  (a) THIS AGREEMENT AND THE ANCILLARY AGREEMENTS SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.

        (b)    BORROWER HEREBY CONSENTS AND AGREES THAT THE FEDERAL COURTS LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK AND THE STATE COURTS LOCATED IN NEW YORK COUNTY, THE STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE ANCILLARY AGREEMENTS; PROVIDED, THAT LENDER AND BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF NEW YORK; AND FURTHER PROVIDED, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER

                                        29

COURT ORDER IN FAVOR OF LENDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH IN SECTION 27 AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

(c) THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN LENDER AND BORROWER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE TRANSACTIONS RELATED THERETO.

29. Limitation of Liability. Borrower acknowledges and understands that in order to assure repayment of the Obligations hereunder Lender may be required to exercise any and all of Lender's rights and remedies hereunder and agrees that neither Lender nor any of Lender's agents shall be liable for acts taken or omissions made in connection herewith or therewith except for actual bad faith.

30. Entire Understanding. This Agreement and the Ancillary Agreements contain the entire understanding between Borrower and Lender and any promises, representations, warranties or guarantees not herein contained shall have no force and effect unless in writing, signed by Borrower's and Lender's respective officers. Neither this Agreement, the Ancillary Agreements, nor any portion or provisions thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.

31. Severability. Wherever possible each provision of this Agreement or the Ancillary Agreements shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or the Ancillary Agreements shall be prohibited by or invalid under applicable law such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions thereof.

32. Captions. All captions are and shall be without substantive meaning or content of any kind whatsoever.

33. Counterparts; Telecopier Signatures. This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same agreement. Any signature delivered by a party via telecopier transmission shall be deemed to be any original signature hereto.

30

34.    Construction. The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

35.    Publicity. Borrower hereby authorizes Lender to make appropriate announcements of the financial arrangement entered into by and between Borrower and Lender, including, without limitation, announcements which are commonly known as tombstones, in such publications and to such selected parties as Lender shall in its sole and absolute discretion deem appropriate.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

SIGG SWITZERLAND, INC.                    SIGG SWITZERLAND, INC.

By:                                       By:
Kai Köppen                                Stephan Lack  Hermann Hasen
Partner, Riverside Munich                 CEO, SIGG Group
Manager, SIGG Group and SIGG US           Manager, SIGG USA

GERBER FINANCE INC.

By:
Gerald Joseph
President/CEO

31

Schedule 1

The Interim Budget

The Interim Budget is the portion of the budget set forth in Schedule 2 hereto corresponding to
the Interim Period.

| Sigg Switzerland (USA) Inc | May 2011 Week 21 | June 2011 Week 22 |
|---|---|---|
| Net sales | 125,000 | 95,000 |
| collections | 100,000 | 100,000 |
| cash-in from Gerber | 122,675 | 207,320 |
| cash-out | | |
| material SIGG CH | | -186,500 |
| personnel | -48,000 | |
| legal fees | -750 | -600 |
| business services | -250 | -200 |
| other professional fees | -150 | -120 |
| | -5,000 | -5,000 |
| Outdoor Retailer show | - | -4,000 |
| Expos costs | | - |
| trade show other expenses | -4,500 | -3,700 |
| PR firm | - | - |
| sponsorship/events | - | - |
| POS material | - | - |
| custom bottle printing | -1,875 | -1,500 |
| internet/web expenses | -250 | -200 |
| travel & entertainment | -3,750 | -3,400 |
| bank service charges | -675 | -700 |
| postage/delivery office | -625 | -500 |
| rent | -750 | -600 |
| cumputer repair | -250 | -200 |
| telephone | -250 | -200 |
| office supplies | -100 | -80 |
| other admin costs | -1,500 | -1,200 |
| interest payments | -2,400 | -2,400 |
| Gerber facility fee | -12,500 | |
| Gerber legal fees | | |
| Sigg legal costs (bankruptcy related) | - | - |
| Trustee fees | | |
| Notice of bankruptcy | | |
| repayment gerber | | - |
| financing cash-flow | - | - |
| intercompany | -25,000 | - |
| contingency | -2,500 | -2,500 |

| gerber repayment schedule prel. | | | |
|---|---|---|---|
| outstanding | 2,004,359 | 1,969,034 | 2,072,354 |
| repayment schedule | | | |

<u>Schedule 2</u>
<u>The Final Budget</u>

| Sps Switzerland (USA) Inc | Apr 2011 Week 21 | June 2011 Week 22 | June 2011 Week 23 | June 2011 Week 24 | June 2011 Week 25 | June 2011 Week 26 | July 2011 Week 27 | July 2011 Week 28 | July 2011 Week 29 | July 2011 Week 30 | Aug 2011 Week 31 | Aug 2011 Week 32 | Aug 2011 Week 33 | Aug 2011 Week 34 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | 125,000 | 95,000 | 95,000 | 95,000 | 95,000 | 95,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 140,500 | 140,500 | 140,500 |
| collections | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 125,000 | 125,000 | 125,000 | 125,000 | 125,000 | 120,000 | 120,000 | 120,000 |
| cash-in from Gerber | 122,675 | 207,320 | 132,820 | 40,820 | 40,820 | 161,820 | 211,700 | 132,200 | 45,200 | 166,200 | 210,050 | 110,550 | 43,550 | 164,550 |
| cash-out | | | | | | | | | | | | | | |
| material SKGG CH | -166,500 | -166,500 | -37,000 | | | -46,000 | -166,500 | -37,000 | | -46,000 | -166,500 | -37,000 | | -46,000 |
| personnel | -46,000 | | | | | | | | | | | | | |
| shipping inbound | | -1,000 | -1,000 | -1,000 | -1,000 | -1,000 | -1,250 | -1,250 | -1,250 | -1,250 | -1,500 | -1,500 | -1,500 | -1,500 |
| customs services | | -800 | -800 | -800 | -800 | -800 | -1,000 | -1,000 | -1,000 | -1,000 | -1,500 | -1,500 | -1,500 | -1,500 |
| shipping outbound | -4,750 | -4,000 | -4,000 | -4,000 | -4,000 | -4,200 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 |
| warehouse and handling | -8,500 | -8,800 | -8,800 | -8,800 | -8,800 | -8,800 | -9,500 | -9,500 | -9,500 | -9,500 | -9,500 | | | |
| legal fees | -750 | -600 | -600 | -600 | -600 | -600 | -750 | -750 | -750 | -750 | -750 | -750 | -750 | -750 |
| business services | -250 | -200 | -200 | -200 | -200 | -200 | -150 | -150 | -150 | -150 | -250 | -250 | -250 | -250 |
| other professional fees | -150 | -120 | -120 | -120 | -120 | -120 | -150 | -150 | -150 | -150 | -150 | -150 | -150 | -150 |
| agent fees | -4,000 | -4,000 | -4,000 | -4,000 | -4,000 | -4,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 | -5,000 |
| Outdoor Retailer show | | | | | | | | | | | | | | |
| Expo costs | | | | | | | | | | | | | | |
| trade show other expenses | -4,500 | -3,700 | -3,700 | -3,700 | -3,700 | -3,700 | -4,625 | -4,625 | -4,625 | -4,625 | -1,000 | -1,000 | -1,000 | -1,000 |
| PR firm | | | | | | | | | | | -625 | -625 | -625 | -625 |
| sponsorship/events | | | | | | | | | | | -200 | -200 | -200 | -200 |
| POS material | | | | | | | | | | | -450 | -450 | -450 | -450 |
| custom bottle printing | -1,875 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,875 | -1,875 | -1,875 | -1,875 | -400 | -400 | -400 | -400 |
| internet/web expenses | -250 | -200 | -200 | -200 | -200 | -200 | -250 | -250 | -250 | -250 | -1,500 | -1,500 | -1,500 | -1,500 |
| travel & entertainment | -3,750 | -3,400 | -3,400 | -3,400 | -3,400 | -3,400 | -3,750 | -3,750 | -3,750 | -3,750 | -200 | -200 | -200 | -200 |
| bank service charges | -875 | -700 | -700 | -700 | -700 | -700 | -875 | -875 | -875 | -875 | -2,500 | -2,500 | -2,500 | -2,500 |
| postage/delivery office | -625 | -500 | -500 | -500 | -500 | -500 | -625 | -625 | -625 | -625 | -875 | -875 | -875 | -875 |
| rent | -750 | -600 | -600 | -600 | -600 | -600 | -750 | -750 | -750 | -750 | -375 | -375 | -375 | -375 |
| computer repair | -250 | -200 | -200 | -200 | -200 | -200 | -250 | -250 | -250 | -250 | -375 | -375 | -375 | -375 |
| telephone | -250 | -200 | -200 | -200 | -200 | -200 | -250 | -250 | -250 | -250 | -250 | -250 | -250 | -250 |
| office supplies | -100 | -80 | -80 | -80 | -80 | -80 | -100 | -100 | -100 | -100 | -100 | -100 | -100 | -100 |
| sales taxes | -150 | -120 | -120 | -120 | -120 | -120 | -150 | -150 | -150 | -150 | -150 | -150 | -150 | -150 |
| other admin costs | -1,500 | -1,200 | -1,200 | -1,200 | -1,200 | -1,200 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 |
| interest payments | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 | -2,400 |
| Gerber facility fee | -12,500 | | | | | | | | | | | | | |
| Gerber legal fees | | | | | | | | | | | | | | |
| Sps legal costs (bankruptcy related) | | | -50,000 | | | -50,000 | | -30,000 | | -50,000 | | -30,000 | | -50,000 |
| Trustee fees | | | | | | | | -20,000 | | | | | | |
| Notice of bankruptcy | | -25,000 | | | | | | | | | | | | |
| repayment gerber | | | | | | | | | | | | | | |
| financing cash-flow | | | | | | | | | | | | | | |
| intercompany | -25,000 | | | | | -25,000 | | -30,000 | | -25,000 | | -30,000 | | -25,000 |
| contingency | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 | -2,500 |
| ending cash | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| gerber repayment schedule pmt | | | | | | | | | | | | | | |
| outstanding | 2,004,359 | 1,959,234 | 2,072,354 | 2,111,174 | 2,057,994 | 2,004,814 | 2,072,634 | 2,165,334 | 2,178,534 | 2,104,734 | 2,151,934 | 2,247,984 | 2,244,534 | 2,154,084 | 2,204,654 |
| repayment schedule | | | | | | | | | | | | | | |

Note: spending items highlighted above are variable with sales and will change. Company acknowledges that payment of variable expense in excess of the amounts listed is approved at our sole discretion.