UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
Bridgeport Division

| | : | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| SIGG SWITZERLAND (USA), INC. | : | CASE NO. 11-51024 (AHWS) |
| | : | |
| Debtor. | : | |
| | : | MAY 27, 2011 |

**MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR AN ORDER (i) AUTHORIZING AND APPROVING FORM OF STALKING HORSE AGREEMENT, (ii) AUTHORIZING AND APPROVING BIDDING PROCEDURES, (iii) AUTHORIZING AND APPROVING PROCEDURES GOVERNING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, (iv) AUTHORIZING AND APPROVING BREAK-UP FEE, (v) SCHEDULING AN AUCTION, (vi) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (vii) GRANTING RELATED RELIEF, ALL IN CONNECTION WITH THE SALE OF <u>SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS</u>**

To:   The Honorable Alan H.W. Shiff,
      United States Bankruptcy Judge

SIGG Switzerland (USA), Inc., Debtor and Debtor-in-Possession ("Debtor"), by

and through its undersigned counsel, hereby submits this Motion for an Order (i)

Authorizing and Approving Form of Stalking Horse Agreement, (ii) Authorizing and

Approving Bidding Procedures, (iii) Authorizing and Approving Procedures Governing

the Assumption and Assignment of Executory Contracts, (iv) Authorizing and

Approving Break-Up Fee, (v) Scheduling an Auction, (vi) Approving the Form and

Manner of Notice Thereof, and (vii) Granting Related Relief, all in Connection with the Sale of Substantially All of the Debtor's Assets (the "Bidding Procedures Motion"). In support of the Bidding Procedures Motion, the Debtor respectfully represents as follows:

**I.      INTRODUCTION**

1. On May 20, 2011 (the "Petition Date"), the Debtor filed with this Court a voluntary petition under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its property and assets as debtor-in-possession. No trustee, examiner or committee has been appointed in this Chapter 11 case.

2. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtor's Chapter 11 case and this Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105, 363(b), 365(a) and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure.

## II. BACKGROUND INFORMATION

4. The Debtor is the exclusive distributor of SIGG aluminum water bottles in the United States. It has no other lines of business.

5. The Debtor purchases all its products from SIGG Switzerland AG ("Parent"). The Parent has been designing and manufacturing household goods for over 100 years. The SIGG brand is respected throughout the world. In 2005, the Parent incorporated the Debtor to serve as its distributor in the United States.

6. As of the Petition Date, the Debtor had assets, primarily inventory and receivables and employed nine people. The Debtor's schedules listed assets of $2,252,909 and liabilities of $13,067,935.

7. In 2009 sales of the Debtor declined heavily due to bad publicity and increased competition. In 2010 sales of the Debtor had declined to approximately $10,000,000. The Debtor has lost millions of dollars in each of the past two years as a result of decreased sales and an unsustainable cost structure. Essentially the Parent has been supplying the Debtor with product for which it has not been paid. The Debtor is unable to satisfy its creditors from future profits.

8. The Debtor and other members of the SIGG corporate group are seeking to restructure their affairs. The Debtor's U.S. sales have stabilized and the Debtor has significantly reduced its operating costs. However, in its current situation, the Debtor is unable to find outside financing at reasonable costs. The Debtor needed to file its petition in order to address accumulated debt and litigation matters.

9. The Debtor's exit strategy is to file a prompt motion pursuant to Section 363 of the Bankruptcy Code to sell substantially all of its assets to SIGG Products Canada, Inc., an entity under the control of the Parent, subject to higher and better bids under procedures to be approved by the Bankruptcy Court. This transaction would accelerate the recent consolidation of the U.S. and Canadian operations and result in significant operational savings. The Debtor is negotiating the sale with the goal of providing some dividend to unsecured creditors after payment of the secured debt.

10. On May 21, 2011, the Debtor filed its Motion to Approve Orders Authorizing Use of Cash Collateral and Borrowing Pursuant to 11 U.S.C. §§ 363(b)(1) and 363(c), 364(c) and 364(d) With Priority Over Administrative Expenses and Secured by Liens on Property of the Estate (the "DIP Financing Motion"), and authorizing the Debtor to enter into post-petition financing with Gerber Finance, Inc. ("Lender"). Based upon certain pre-petition loans, as of the Petition Date, the total pre-petition indebtedness due to Lender was approximately $2.0 million, plus interest and costs, which is secured by blanket liens on all of the Debtor's assets. Capacity LLC ("Capacity") also holds a warehouseman's lien on the Debtor's inventory. Capacity's claim is approximately $160,000.

11. The Debtor is out of formula with its Lender. Nonetheless the Debtor has been able to negotiate the ability to obtain additional borrowing from Lender in accordance with a budget. The lending agreement provides that a Sale be approved on or before July 19, 2011.

### III. RELIEF REQUESTED

12. The Debtor proposes to sell substantially all of its assets to SIGG Canada Products, Inc. (the "Proposed Buyer"). The Debtor and the Proposed Buyer have agreed on the terms and conditions of such sale, as more fully set forth in an Asset Purchase Agreement to be filed with the Court on or before June 10, 2011 (the "Stalking Horse Agreement"). The attached Letter of Intent (the "LOI") provides the essential terms of the sale. (Exhibit 1). By this Motion, the Debtor seeks to have the Court approve the form of Stalking Horse Agreement, the bidding procedures for the conduct of an auction of substantially all of the Debtor's assets, a break-up fee for the Proposed Buyer and related relief. While the Debtor believes that the sale contemplated by the Stalking Horse Agreement is in the best interest of the Debtor, the estate and creditors, the Debtor shall endeavor to maximize the value of the Debtor's assets by retaining The Rusconi Company ("Rusconi") to solicit competing offers for the Assets. Rusconi shall market the assets and attempt to identify other parties interested in submitting higher and better offers for the assets.

13. On May 27, 2011, the Debtor simultaneously filed its Motion For An Order Authorizing And Approving (A) The Sale Of Substantially All Of The Debtor's Assets Other Than In The Ordinary Course Of Business, Free And Clear Of Liens, Claims, Encumbrances And Interests Pursuant To 11 U.S.C. §§ 105, 363(B) And (F) And Federal Rule Of Bankruptcy Procedure 6004; (B) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases Of Property Pursuant To 11 U.S.C. § 365(A) And Federal Rule Of Bankruptcy Procedure 6006 and (C) the Disbursement of Proceeds to the Secured Parties (the "Sale Motion").

Approval of Form of Stalking Horse Agreement

14. As set forth in the Stalking Horse Agreement, the Proposed Buyer proposes to purchase substantially all of the assets of the Debtor and accept the assignment of certain executory contracts to which the Debtor is a party (collectively, the "Assets"). In consideration for the purchase of the Assets, the Proposed Buyer shall pay cash of $2,350,000 as adjusted for inventory and receivable levels at Closing in accordance with the Stalking Horse Agreement. The Proposed Buyer has also obtained the Agreement of the Parent to subordinate Parent's claim of $9.3 million to those of other unsecured creditors but only if Proposed Buyer is the successful bidder.

15. The Debtor submits that the Stalking Horse Agreement is fair to the Debtor, and its creditors, and contains provisions that are common and customary for such transactions. The Debtor has determined, in the exercise of its business judgment, and in the context of the severe constraints facing the Debtor, the requirements of the Financing Order and the need for the Debtor to preserve its value as a going concern through a prompt sale of the Assets, that entering into the form of Stalking Horse Agreement is in the best interest of the Debtor, its creditors and the estate.

16. The Proposed Buyer is a related party to the Debtor. Both are wholly owned subsidiaries of SIGG Switzerland AG ("Parent"). The Debtor's sole director is also a director of the Proposed Buyer and is a director/officer of the Parent. The Debtor's president is also president of the Proposed Buyer. The Proposed Buyer is represented by counsel.

17. In order to insure that the sale process is fair, the Debtor has undertaken the following measures: (a) the Debtor has given Rusconi complete discretion to market the assets to strategic and financial buyers as he deems appropriate as set forth in the application to retain Rusconi; (b) provided for an auction in open court; (c) given bidders determined by the Debtor to be financing unqualified the opportunity to appear and be heard before the Court; (d) given bidders who are not given a license to market SIGG products at comparable pricing and volume levels the opportunity to appear and be heard before the Court; (e) and has filed its schedules and statement of financial affairs promptly.

18. The Debtor requests that this Court approve the *form and provisions* of the Stalking Horse Agreement as fair and reasonable and authorize the Debtor to execute the Stalking Horse Agreement. The Stalking Horse Agreement shall, however, be subject to (a) higher and better bids at the Auction (as hereinafter defined) and (b) the further order of the Court authorizing the sale of the Assets to the Proposed Buyer pursuant to the Sale Motion.

19. The Debtor needs approval of the form of Stalking Horse Agreement to market the Assets in a meaningful way so as to allow other potential bidders to know what form of agreement has been approved by the Court in advance such that they will have greater confidence in submitting bids, especially where such bidders may request the Debtor to vary certain terms of the Stalking Horse Agreement to accommodate their bid.

Approval of Bidding Procedures; Auction; Credit Bid; Marketing Efforts

20. In connection with the Debtor's sale of the Assets pursuant to the Sale Motion and the Stalking Horse Agreement, and to ensure that the Debtor receives the highest and best offer for the Assets, the Debtor proposes to notify interested parties of Debtor's intent to sell substantially all its assets and to invite them to conduct due diligence and submit a bid prior to an auction (the "Auction"). Attached to the notice are the bidding procedures (the "Bidding Procedures"). The Notice and Bidding Procedures are attached hereto as Exhibit 2. The Debtor now seeks to have the Court approve the Notice and Bidding Procedures.

21. The Bidding Procedures permit interested parties to bid on the Assets, in a full and fair manner, and allows the Debtor to promptly review, analyze and compare all Qualifying Bids to determine which bid is the highest and best offer for the Assets. The Debtor believes that the Bidding Procedures will foster competitive bidding and ultimately maximize the return on the Assets. The Bidding Procedures should therefore be approved.

22. In brief summary, the Bidding Procedures provide for a process in connection with the sale of the Assets; however, the Bidding Procedures should be consulted for the complete terms and conditions contained therein and the specific procedures to be followed for submitting a counteroffer. The Auction is conditioned on the receipt of Qualifying Bids (as defined in the Bidding Procedures and described herein) no later than 5:00 p.m., Eastern Standard Time, on July 15, 2011, by the Debtor's counsel, Murtha Cullina LLP, with copies to those specified in the Bidding Procedures. If any Qualifying Bids are received, an Auction will be held on July 19,

2011 at _____ p.m., Eastern Daylight Time, at the United States Bankruptcy Court, 915 Lafayette Boulevard, Bridgeport, Connecticut.

    23.    As set forth in the Bidding Procedures, any party that desires to timely consummate the purchase of the Assets for an amount that is higher and better than the Stalking Horse Bid shall submit a competing offer as provided in the Bidding Procedures.  A "Qualifying Bid" is a written offer that:

    a.    Provides that the offeror offers to purchase all or substantially all of the Assets upon terms and conditions substantially as set forth in the Stalking Horse Agreement;

    b.    Results in a value to the Debtor in its business judgment that is more than the "Minimum Bid," which is the sum of (i) the Stalking Horse Bid, (ii) the Break-up Fee of $50,000 (as defined in the Bidding Procedures); (iii) an amount sufficient to pay unsecured creditors as much or more as the Proposed Buyer; and (iv) $50,000 (each, a "Qualifying Bid Amount");

    c.    Does not provide for any payment to the offeror of a break-up fee, expense reimbursement or similar type of fee or payment;

    d.    Is accompanied by a duly executed form of Stalking Horse Agreement;

    e.    Is accompanied by a deposit in the amount of $230,000, payable in immediately available funds (the "Deposit"), to be held by the Debtor's counsel to secure the Qualifying Bid, which Deposit, subject to the provisions of the Bidding Procedures, shall be refunded to the offeror if the offeror's Qualifying Bid is not accepted by the Debtor as the highest and best offer for the Assets;

    f.    Identifies with particularity each executory contract and unexpired lease to be assumed and assigned to the offeror at closing;

    g.    Contains financial and other information sufficient to enable the Debtor and the Court to evaluate and confirm the offeror's financial wherewithal to consummate the purchase of the Assets, including evidence reasonably satisfactory to the Debtor that the offeror has financial resources available and sufficient to finance the purchase of the Assets, and financial and other information

       sufficient to provide adequate assurance of future performance under Section 365 of the Bankruptcy Code;

    h.    Does not contain any due diligence, financing or other contingencies of any kind;

    i.    Fully discloses the identify of the offeror or any entity participating in the competing offer;

    j.    Provides that the offeror consents to the jurisdiction of the Bankruptcy Court; and

    k.    Provides for a closing of the purchase and sale of the Assets no later than July 29, 2011.

The Stalking Horse Bid is deemed to be a "Qualifying Bid."

24.    The Debtor may, in its business judgment, at any time prior to the Sale Hearing, with the consent of Lender, continue the Auction from time to time.  The Court may establish, by announcement at the Auction, such modified or additional bidding procedures as it deems appropriate based on the circumstances, provided that such modifications or changes shall not materially alter the bidding procedures set forth herein.

25.    If the Debtor does not receive a Qualifying Bid by the deadline established in the bidding procedures, the Debtor shall cancel the Auction and accept the Stalking Horse Bid.

26.    As set forth in the DIP Financing Agreement, the Lender shall have the right, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the Lender's claim, estimated at $1,986,000 as of the Petition Date, at the Auction, as defined herein.  However, such obligation is likely to increase as a result of post-petition borrowing.

27. In the exercise of its sound business judgment, the Debtor believes that an orderly sale of substantially all of its assets is necessary to maximize value to its estate. The Bidding Procedures are designed to foster a competitive bidding process, which the Debtor believes will generate the highest and best offer for the Assets.

28. By this Motion, the Debtor submits that the relief requested herein is in the best interests of its estate and creditors because the Bidding Procedures, in conjunction with the Debtor's overall marketing efforts, will enable the Debtor to maximize the value of the Assets. Any interruption or perceived interruption in the Debtor's ability to provide its products will cause irreparable harm to the Debtor's business. By effectuating a prompt sale of the Assets, the Debtor will (a) provide uninterrupted service to, and fulfill orders for, customers; and (b) assure the consumers and the marketplace in general that SIGG is an enduring brand. For these reasons, the Debtor believes that the prompt sale of the Assets represents the best opportunity to maximize the value of the estate's assets.

29. In order to achieve the highest and best price for the Assets and gain access to a broadest possible range of potential bidders, the Debtor is filing an application to retain Rusconi to assist the Debtor in marketing the Assets.

30. The implementation of the Bidding Procedures to facilitate the sale of a debtor's assets is routinely approved by Bankruptcy Courts.

31. Attached hereto as Exhibit 2 is a proposed Notice of Auction and the Bid Procedures. The Debtor proposes to send the Notice of Auction to all creditors and parties-in-interest as well as potential bidders.

### Procedures Governing the Assumption and Assignment of Executory Contracts and Unexpired Leases

32.     In accordance with the terms and conditions of the Stalking Horse Agreement, the Debtor proposes to assume, assign and sell to the Proposed Buyer, pursuant to 11 U.S.C. §§ 363(b), 365(a), (b) and (f), certain executory contracts and unexpired leases of the Debtor identified in the Stalking Horse Agreement, as the same may be amended.

33.     The Debtor proposes that within 3 days of entry of the Order on this Motion, the Debtor shall transmit a notice of the proposed assumption and assignment of the applicable executory contracts and unexpired leases to all other parties to such contracts and leases.  Such notices shall included the name of the proposed assignee, including contact information, any available evidence of adequate assurance of future performance by such proposed assignee and any amount that the Debtor believes is necessary to cure defaults thereunder.

34.     The Debtor requests that the Court require other parties to such executory contracts or leases to file and serve any objection to the assumption and assignment of any such contract or lease, including any objections to cure amounts, so that any such objections are filed and received by no later than the Sale Hearing.

### Approval of Break-Up Fee and Expense Reimbursement

35.     The Proposed Buyer has expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations.  The Stalking Horse Agreement is the culmination of these efforts.  The Stalking Horse Agreement provides the Proposed Buyer with a

break-up fee in the amount of $50,000 (the "Break-Up Fee"). Such Break-Up Fee provides the Proposed Buyer with reasonable protection and compensation in consideration of: (i) the Proposed Buyer's agreeing to enter into the Stalking Horse Agreement notwithstanding the uncertainties presented by a sale; (ii) the Proposed Buyer's expenditure of time, energy and resources; and (iii) the benefit to the Debtor's estates of securing a "stalking horse" or minimum bid. Such Break-Up Fee, as negotiated with the Proposed Buyer, was to ensure that the Proposed Buyer would enter into the Stalking Horse Agreement. As reasonable and necessary inducements to the Proposed Buyer to proceed with its offer to purchase the Assets pursuant to the Stalking Horse Agreement, the Debtor requests that the Court approve such Break-Up Fee.

36. In the event that (a) the Debtor accepts a higher and better offer for the Assets (other than that of the Proposed Buyer), or (b) the Bankruptcy Court enters an order approving any counterbid as the highest and best bid (other than a sale of the Assets to the Proposed Buyer), the Debtor shall pay the Break-Up Fee to the Proposed Buyer.

37. The Break-Up Fee was a material inducement for, and a condition of the Proposed Buyer's entry into the Stalking Horse Agreement. The Debtor believes that the Break-Up Fee is fair and reasonable in view of, among other things, (a) it is approximately 2% of the Purchase Price; and (b) the fact that the efforts of the Proposed Buyer have increased the chances that the Debtor will receive the highest and best offer for the Assets by establishing a minimum bid for other potential bidders which benefits the Debtor, its estate, and its creditors.

38.  The Proposed Buyer is unwilling to commit to holding open its offer to purchase the assets under the terms of the Stalking Horse Agreement unless the Break-Up Fee is approved and payment of the Break-Up Fee is authorized.  The Debtor thus requests that the Court approve the Break-Up Fee and authorize payment of the Break-Up Fee pursuant to the terms and conditions of the Stalking Horse Agreement.

The Provision of a Break-Up Fee and Expense Reimbursement is Warranted

39.  The Debtor submits that break-up fees and expense reimbursements are a normal, and oftentimes necessary component of sales outside the ordinary course of business under Section 363 of the Bankruptcy Code.  In re Integrated Resources, Inc., 147 B.R. 650 at 660 (S.D.N.Y. 1992) (noting that break-up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirements in an amount equal to the approved break-up fee).

40.  Other entities bidding to purchase the Assets will have the benefit of such extensive work and will not incur similar expenses because they must bid on the existing Stalking Horse Agreement.  As a result, it is fair to compensate the Proposed Buyer if it is not the successful bidder.

41.  Finally, the Break-Up Fee is necessary to ensure the Proposed Buyer will continue to pursue its proposed acquisition of the Assets.  See 11 U.S.C. § 502(b)

(defining actual and necessary costs and expenses of preserving a debtor's estate). Accordingly, the Debtor believes that the Break-Up Fee should be approved.

### Scheduling of the Auction and Sale Hearing

42.  Pursuant to the Bid Procedures, the Debtor requests that the Court enter an order scheduling a deadline for the submission of bids, the Auction and the hearing to approve the sale of the Assets. The Debtor request the Court to order that:

    a.    Bids shall be due on July 15, 2011 at 5:00 p.m. and delivered to the parties specified in the Bidding Procedures; and

    b.    The Auction shall be held on July 19, 2011 at _____ a.m. at the United States Bankruptcy Court, 915 Lafayette Boulevard, Bridgeport, Connecticut; and

    c.    The hearing to approve the Sale of the Assets shall be held on July 19, 2011 at 2:00 p.m.

### Notice

43.  A copy of this Motion was served upon: (a) the Office of the United States Trustee; (b) each of the twenty largest Unsecured Creditors; (c) counsel to the Lender; (d) counsel to Capacity LLC; (e) all parties requesting notice pursuant to Rule 2002.

WHEREFORE, the Debtor respectfully requests that entry of an order, substantially in the form attached hereto as Exhibit 3: (i) approving the form of the Stalking Horse Agreement; (ii) approving the Bidding Procedures; (iii) approving procedures governing the assumption and assignment of executory contracts; (iv) approving the proposed Break-Up Fee; (v) scheduling the Auction; (vi) approving the form and manner of notice hereof; and (vii) granting such other relief as is just and proper.

Dated at Hartford, Connecticut, this 27th day of May, 2011.

        DEBTOR - SIGG SWITZERLAND (USA), INC.

        By /s/ Robert A. White
           Robert A. White - ct08277
           rwhite@murthalaw.com
           Robert E. Kaelin - ct11631
           rkaelin@murthalaw.com
           Meredith C. Burns – ct27544
           mcburns@murthalaw.com

        Murtha Cullina LLP
        CityPlace I - 185 Asylum Street
        Hartford, Connecticut 06103-3469
        Telephone:  860-240-6000
        Facsimile:  860-240-6150
        Its Attorneys

2296834v1