**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION**

| | |
|---|---|
| IN RE:<br><br>SIGG SWITZERLAND (USA), INC.<br><br>　　　　　　　　　　Debtor | CHAPTER 11<br><br>CASE NO: 11-51024 (AHWS)<br><br>June 14, 2011 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF SIGG SWITZERLAND (USA), INC. TO THE MOTION OF
DEBTOR AND DEBTOR-IN-POSSESSION FOR AN ORDER (i) AUTHORIZING
AND APPROVING FORM OF STALKING HORSE AGREEMENT,(ii)
AUTHORIZING AND APPROVING BIDDING PROCEDURES, (iii)
AUTHORIZING AND APPROVING PROCEDURES GOVERNING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS,
(iv)AUTHORIZING AND APPROVING BREAK-UP FEE, (v) SCHEDULING AN
AUCTION, (vi) APPROVING FORM AND MANNER OF NOTICE THEREOF,
AND (vii) GRANTING RELATED RELIEF, ALL IN CONNECTION WITH THE
<u>SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS</u>[1]**

The Official Committee of Unsecured Creditors (the "Committee") objects to the

*Motion For An Order Authorizing And Approving (A) The Sale Of Substantially All Of*

*The Debtor's Assets Other Than In The Ordinary Course Of Business, Free And Clear of*

*Liens, Claims, Encumbrances And Interests Pursuant To 11 U.S.C. §§ 105, 363(b) And*

*(f) And Federal Rule Of Bankruptcy Procedure 6004; (B) Assumption And Assignment Of*

*Certain Executory Contracts And Unexpired Leases Of Property Pursuant To 11 U.S.C.*

---

[1] Based upon current status of discussions with the Debtor, the Committee anticipates that it will limit the scope of the objections raised herein at the June 15, 2010 hearing to issues related to the Bidding Procedures Motion, expressly preserving and not waiving any and all of the Committee's rights, objections, and arguments regarding the Sale Motion until the hearing on the Sale Motion, including the propriety of the proposed sale of all the Debtor's assets to an insider/affiliate of the Debtor.

11124407

*§ 365(a) And Federal Rule Of Bankruptcy Procedure 6006; And (C) Disbursement Of Proceeds To Secured Parties* (the "Sale Motion") and *The Motion of Debtor And Debtor-In-Possession For An Order (i) Authorizing And Approving Form Of Stalking Horse Agreement, (ii) Authorizing And Approving Bidding Procedures, (iii) Authorizing And Approving Procedures Governing The Assumption And Assignment Of Executory Contracts, (iv) Authorizing And Approving Break-Up Fee, (v) Scheduling An Auction, (vi) Approving Form And Manner Of Notice Thereof, And (vii) Granting Related Relief, All In Connection With The Sale Of Substantially All Of The Debtor's Assets* (the "Bidding Procedures Motion"), and in support of the Committee's Objection states as follows:

### INTRODUCTION

As is discussed in detail below, the Committee objects to the Bidding Procedures Motion for the following reasons:

- The Debtor has made a wholly insufficient showing in support of its request for approval of the extremely accelerated schedule its has proposed;

- The Debtor has failed to establish that it is entitled to the relief its seeks under Second Circuit precedent;

- The Debtor has failed to demonstrate why the assets should not be sold pursuant to plan of reorganization instead of by an expedited sale;

- The Debtor did not market the assets at all pre-petition, rendering the proposed post-petition efforts inadequate;

- The existence of break-up fee and the proposed minimum initial overbid increment will chill competitive bidding;

- The Debtor's Asset Purchase Agreement (the "APA") is deficient.

Given these significant shortcomings, approval of the Sale Motion and the Bidding Procedures Motion is not in the best interests of the Debtor, its estate or its creditors, and will not create a competitive bidding environment that is likely to lead to a

meaningful bid for the Debtor's assets. The Court should therefore decline the Debtor's request for approval of the Bidding Procedures Motion and the Sale Motion.

## BACKGROUND

### A.    Procedural History and Factual Background

1. The Debtor initiated this Chapter 11 case by filing a voluntary petition on May 20, 2011. The Debtor remains as debtor-in-possession and continues to operate its business. Among its first-day motions, the Debtor filed the Sale Motion and the Bidding Procedures Motion.

2. The Committee was appointed pursuant to §1102(a) of the Bankruptcy Code on June 2, 2011.

3. The Debtor is a wholly-owned subsidiary of SIGG Switzerland AG (the "Parent"). The Parent also owns all of the equity of SIGG Products Canada, Inc. ("SIGG Canada"). Neither the Parent nor SIGG Canada filed for bankruptcy protection.

4. As provided in greater detail below, SIGG Canada has been identified as the stalking horse bidder in the Sale Motion and Bidding Procedures Motion.

5. Currently, the Debtor and SIGG Canada share management and operational infrastructure pursuant to an Intercompany Services Agreement. The Debtor's president is also the president of SIGG Canada. The Debtor's sole director is also a director of SIGG Canada and is a director and officer of the Parent.

### B.    Prepetition/DIP Lender

6. As of the petition date, the Debtor owed approximately $2,000,000 to Gerber Financial, Inc. ("Gerber"), allegedly secured by all of the Debtor's assets. This amount will increase somewhat based on DIP financing provided by Gerber. Gerber claims to be

fully secured, and the Debtor agrees.  The obligations owed to Gerber by the Debtor are also guaranteed by the Parent and by SIGG Canada.  Gerber holds $650,000 of cash collateral as part of its security for the Parent's guaranty.  The Parent provided Gerber the cash collateral.

        C.      **The Proposed Insider Sale**

7.  On May 27, 2011, the Debtor filed the Sale Motion and Bidding Procedures Motion. Pursuant to the Sale Motion, the Debtor proposes to sell all of its assets to its sister affiliate, SIGG Canada, in a Section 363 sale (the "Proposed Sale.").  The proposed purchase price consists of (i) the face amount of outstanding accounts receivable, net of bad debt reserves; (ii) 90% of the value of net inventory; (iii) $157,933 for the remaining assets, and (iv) $160,000, for cure costs for assumed contracts.  The Debtor estimates that the total purchase price, subject to later adjustment based on accounts receivable and inventory levels, approximates $2,350,000 (the "Insider Bid").  The purchase price would be funded by (i) application of the $650,000 of cash collateral held by Gerber to outstanding indebtedness on the DIP loan; (ii) assumption by SIGG Canada of the $160,000 in cure costs; and (iii) payment of approximately $1,540,000 in cash by SIGG Canada.

8.  Not accounting for administrative claim expenses, the Debtor estimates that approximately $100,000 will be available for distribution to general unsecured creditors after payment of the proposed purchase price, satisfaction of the DIP loan, and payment of a warehouseman's lien.

9.  This estimated distribution, however, is wholly dependent upon the Parent subordinating a general unsecured claim that it purportedly holds against the Debtor in

4

the scheduled amount of $9,292,877.89 (the "Parent Claim").  The Parent Claim is for inventory the Parent provided to the Debtor for U.S. sales and distribution and amounts advanced by the Parent to the Debtor over time to support operations of the Debtor in the form of a loan. Notably, the Parent intends to subordinate the Parent Claim *only* if SIGG Canada is the prevailing bidder.  That is, the Parent will not subordinate the Parent Claim in the event an arms-length, non-insider bidder surfaces and successfully overbids.  If SIGG Canada is not the winning bidder in the Proposed Sale, the potential distribution to general unsecured creditors will be greatly diminished if not altogether reduced.

10. The Debtor proposes to engage an investment banker to market its assets and seek competing bids.  The Debtor did not engage in any efforts to market or sell its assets prior to the Petition Date.  Indeed, the price offered in the Insider Bid is not the result of any marketing effort.

11. The assets to be sold consist largely of branded goods (aluminum water bottles) and the opportunity to distribute these goods in the future.  Accordingly, the assets will have no meaningful value to a buyer who does not have (i) a long-term, exclusive license from the Parent to distribute the branded goods, and (ii) the opportunity to obtain a supply of branded goods from the Parent at market-driven prices.

12.  Based on the representations made by the Debtor, the Parent will agree to grant a license and supply contract to a third-party buyer only on the current terms in place between the Parent and the Debtor.  Because the Parent has dictated the price and payment terms to the Debtor (or SIGG Canada), by definition they are not market-driven and probably bear no relationship whatsoever to what an arms-length deal might produce.

**D.      The Insider Break-Up Fee**

13. SIGG Canada will receive a $50,000 breakup fee in the event of a successful overbid by an arms-length buyer.  As noted above, SIGG Canada is an insider of the Debtor, shares common management, and for all intents and purposes is inextricably linked to the Debtor.   The Debtor provides no justifiable rationale for providing SIGG Canada a breakup fee

## THE COMMIITTEE'S OBJECTIONS TO THE
## SALE MOTION AND BIDDING PROCEDURES MOTION

14.  The Committee objects to the relief sought by the Debtor in the Bidding Procedures Motion. The proposed bidding procedures are set up in a way to create several likely predetermined outcomes:  (i) SIGG Canada will become the prevailing bidder; (ii) the Parent will retain effective control of US and Canadian distribution efforts—with a nearly identical management and operational structure that exists today; (iii) current management will continue to market and sell SIGG product in the United States under the same terms and conditions of its existing agreement with the Parent;  (iv) the Debtor's general unsecured creditors will split a nominal recovery based on a transaction never tested by real market forces; the Debtor and the Parent will avoid confirmation issue, including the absolute priority rule.

### A. The Debtor Has Made a Wholly Insufficient Showing In Support of Its Request for Approval of the Extremely Accelerated Scheduled They Have Proposed

15. The Debtor has proposed the following dates in the Bidding Procedures Motion:

| Milestone | Proposed Date | Number of Days after Bidding Procedures Hearing |
| --- | --- | --- |
| Qualified Bid Deadline | July 15, 2011 | 31 |
| Bidders Qualified | July 19, 2011 | 35 |
| Sale Objection Deadline | July 19, 2011 | 35 |
| Auction | July 19, 2011 | 35 |
| Sale Hearing | July 19, 2011 | 35 |
| Closing | July 29, 2011 | 45 |

16. Notwithstanding the expedited timeline, the Debtor's has engaged in no prepetition marketing efforts, and its marketing efforts to date have been limited to "retain[ing] the Rusconi Company ("Rusconi") to market the Debtors' assets and [giving] Rusconi complete discretion to market the assets to strategic and financial buyers as he deems appropriates as set forth in the application to retain Rusconi." Sale Motion, ¶ 16. As of today, Rusconi has not completed any marketing materials, and none have been circulated to any targets.

17. Having only been engaged in late May, Rusconi has not yet taken *any* steps to contact potential buyers, providing said potential buyers with preliminary letters of interest or confidential information memoranda, or engaging in discussions with prospective purchasers.

18. The Sale process must be as robust as possible and potential bidders must be afforded sufficient time to conduct due diligence and submit a preliminary bid. The assets must be marketed to as many potential strategic and financial buyers as possible. The Debtor's proposed schedule all but precludes any of the foregoing from happening, and is too truncated to be meaningful in the context of this case.

19. Indeed, that schedule strongly suggests that the Debtor is seeking as expeditious a sale as possible without regard to maximizing the value for its estate, and for the purpose of benefiting its non-debtor Parent, the members of the shared-management team of the Debtor and SIGG Canada.

20. Any discussion in the Sale Motion and Bidding Procedures Motion regarding the exigent circumstances provides insufficient basis for proceeding at the speed with which the Debtor seeks to prosecute the sale. Rather, the focus appears to be on trying to justify the Debtor's (or more likely, the Parent's) rush toward closing.

21. The Sale Motion does not provide the Court with enough information to find that the Debtor properly exercised its business judgment in agreeing to the schedule purportedly demanded by the circumstances.

22. In light of the harm to the process caused by the expedited schedule an appropriate extension of time to allow for proper marketing of the assets should be granted. Doing so will strike a fair balance between the desire of the Debtor and Gerber for an expeditious resolution of the case and the need for an open and thorough marketing process that could lead to the submission of qualified bids by potential bidders and a robust auction and fair sale.

8

### B. The Debtor Has Not Provided Sufficient Evidence that the <u>Lionel</u> Factors or <u>GM</u> Factors Can Be Satisfied.

23. The Second Circuit in <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983) concluded that there has to be some articulated business justification, other than appeasement of a particular creditor, for the use, sale or lease of a debtor's property outside of the ordinary course of business. <u>Id.</u> 722 F.3d at 1070. The <u>Lionel</u> court set forth a nonexclusive list of factors (the "Lionel Factors") to guide a court in its consideration of the issue. <u>Id.</u>[2] Judge Gerber in <u>In re General Motors Corp.</u>, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009) also suggested that courts consider additional factors (the "GM Factors"), in appropriate cases. Id. 407 B.R. at 490.[3]

24. Whether relying exclusively on the <u>Lionel</u> factors, or both the <u>Lionel</u> and the <u>GM</u> factors, it is clear that when making a Section 363(b) determination, the court must "expressly find from the evidence presented ... a good business reason to grant such application." <u>Lionel</u> 722 F.2d at 1071.

25. The Debtor has not yet established that either the <u>Lionel</u> Factors or the <u>GM</u> Factors can be satisfied here. In essence, this is little more than a credit bid by the

---

[2] The <u>Lionel</u> Factors include: (i) the proportionate value of the asset to the estate as a whole, (ii) the amount of elapsed time since the filing, (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions, and (vii) whether the asset is increasing or decreasing in value.

[3] The <u>GM</u> Factors include: (i) Does the estate have the liquidity to survive until confirmation of a plan; (ii) Will the sale opportunity still exist as of the time of plan confirmation; (iii) If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors; and (iv) is there a material risk that by deferring the sale, the patient will die on the operating table?

insiders, who are already obligated on the debt that supposedly drives the urgency. First, that debt is oversecured, and no case has been made that Gerber's collateral is declining so quickly in value, or that the Debtor's capital needs are so out of line with the collateral base, that this should be treated like the sale of melting ice or spoiling fruit.

26. Second, as noted further below, there is a simpler and more direct way out of the purported urgency. The fact that it would not yield an expedited sale demonstrates that the Lionel standards are lacking here. The same business justifications touted by the Debtor for the sale could be accomplished using the traditional exit strategy designed by Congress for resolution of a Chapter 11 case: A negotiated plan of reorganization.

27. To be sure, this is not a case where a motivated independent purchaser has emerged, who can salvage a debtor that is about to collapse. This is a case where the Parent and SIGG Canada want to continue to operate their business without paying creditors, because they have concluded that the business is overleveraged.

28. At a minimum, an insider sale requires a greatly heightened level of scrutiny by the Court. Generally, the courts have disqualified fiduciaries of debtors from purchasing assets, to avoid unfairness, the improper use of confidential information, or the appearance of impropriety. In re Russo, 762 F.2d 239, 241 (2d Cir. 1985). Here, SIGG Canada, the Parent, and the Debtor share management, directors or stock ownership, or all of them. In the situation of an insider transaction, heightened scrutiny is required. See In re Bidermann Indus. U.S.A., Inc., 203 B.R. 547 (Bankr. S.D.N.Y. 1997); C&J Clark Am. Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.), 92 B.R. 87 (Bankr. S.D.N.Y. 1988). The SIGG Canada bid might have been a meaningful starting point for a fair auction process if it had been the result of extensive prior marketing. As

10

discussed, <u>supra</u>, no marketing whatsoever has occurred. The Bidding Procedures Motion and stalking horse bid have been engineered entirely by insiders to provide the minimum palatable recovery for unsecured creditors, and should be rejected before it is used to launch a tainted auction process.

29. If the Court nonetheless approves a sale process utilizing the Insider Bid as a stalking horse, the playing field should be leveled so that there is at least a point to have any sale process at all. Any independent buyer will need an arms-length license and supply agreement from the Parent. All the Parent has (informally) committed to, as represented by the Debtor, is to provide inventory at a price that it has dictated in prior years to its subsidiary, which has always operated at a loss as a result, and it will require that the buyer commit to sales volumes based on previously established targets. The Debtor needs to consult appropriately with knowledgeable professionals concerning competitive distribution terms and to propose a form of license and supply agreement with the Parent that any bidder could assume in conjunction with a winning bid. Without such a feature, the sale process is illusory. The Parent will have a stranglehold over the process, and only the bid it has sponsored could prevail. Also, the Parent's limitation on its agreement to subordinate its trade debt, that being that it will only do so if it wins the bidding, needs to be removed. Unless the Parent is willing to subordinate for any buyer, the Parent clearly has set up the sale to ensure a transition of the business that is purely a corporate group shell game. Finally, the process should be extended for at least another 30 days, to ensure the minimum amount of time necessary to do the barest essentials for a meaningful marketing effort.

### C.   The Debtor Has Failed to Demonstrate Why the Assets Should Not be Sold Pursuant to a Plan of Reorganization Instead of an Expedited Sale Process

30. The Committee objects to the Debtor's efforts at transferring the US assets by way of an accelerated sale process rather than conveying them to SIGG Canada or another party pursuant to a plan of reorganization. See 11 U.S.C. § 1123(b)(4). To be sure, the Committee believes that in doing so, the Debtor is acting in derogation of its fiduciary duties owed to all creditor constituencies. See In re Adelphia Communications Corp., 336 B.R. 610-669-70 (Bankr. S.D.N.Y. 2006) (footnote omitted)(quoting In re Hampton Hotel Investors, L.P., 270 B.R. 346, 361 (Bankr. S.D.N.Y. 2001))(debtor's directors and officers owe duty "to refrain from self-dealing, to avoid conflicts of interest and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate"); see also In re Global Grossing Ltd., 295 B.R. 726, 745 (Bankr. S.D.N.Y. 2003)(noting under Second Circuit case law that "debtor should not take an action simply because a particular constituency, even an important one, wants it").

31. The Proposed Sale "will 'short circuit the requirements of chapter 11 for confirmation of a reorganization plan.'" Motorola vs. Official Committee of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 466 (2d Cir. 2007)(quoting Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983)).

32. By way of example, and not limitation, the Proposed Sale would utilize Section 363 of the Bankruptcy Code to circumvent, among other things, the absolute priority rule. See 11 U.S.C. 1129(b)(1) (providing that for a bankruptcy court to confirm a plan over the votes of a dissenting class of claims, the Code demands that the plan be

fair and equitable, with respect to each class of claims that is impaired under, and has not accepted the plan.). "The Code does not does not define the full extent of 'fair and equitable," but it includes a form of the absolute priority rule as a prerequisite." In re DBSD North America, Inc., 634 F.3d 79, 94 (2d Cir. 2011). It is "well settled that stockholders are not entitled to any share of the capital stock nor to any dividend of the profits until all of the debts of the corporation are paid." Id. (quoting R.R vs. Howard, 74 U.S. 392, 409-10 (1868)); see also Bank of America v. 203 North LaSalle Street Partnership, 526 U.S. 434, 444 (1999) (holding that the purpose of the absolute priority rule was to protect creditors from "the danger inherent in any reorganization plan proposed by a debtor, then and now, that the plan will simply turn out to be too good a deal for the debtor's owners.").

33. Specifically, SIGG Canada is a wholly owned subsidiary of the Parent. If SIGG Canada is the winning bidder, the Parent will retain ownership and effective control of the U.S. distribution business currently housed in the Debtor without satisfying the "fair and equitable" requirements mandated by Section 1129(b) of the Bankruptcy Code.

34. Absent from the Sale Motion or Bidding Procedures Motion is any compelling presentation of the reasons why the Debtor has chosen to pursue the sale of its U.S. assets to SIGG Canada at breakneck speed rather than propose and seek confirmation of reorganization plan under Chapter 11 of the Bankruptcy Code. The urgency is purportedly driven by nervousness of an oversecured creditor—whose debt is guaranteed and collateralized by both affiliates, in addition to all of the Debtor's assets.

35. Moreover, the Debtor, itself, characterizes this proposed transaction as part of a larger corporate reorganization (to "accelerate the recent consolidation of the U.S. and Canadian operations and result in significant operational savings" See Sale Motion, ¶ 9). In that context, it is especially appropriate to proceed by way of a plan, instead of ramming through a Section 363 sale to existing equity, when the affiliates could use the money they would pay as the purchase price instead to pay off their guarantees. The negotiation of a Chapter 11 plan with the Committee can take place expeditiously – it need not occur in an environment fueled by artificial urgency.

**D. The Debtor's Prepetition Marketing Efforts Were Nonexistent and Do Not Provide Sufficient Basis for Granting the Sale Motion and Bidding Procedures Motion**

36. The Committee further objects to the approval of the Bidding Procedures Motion because the Debtor has made no efforts at marketing its assets to *any* arm-length buyer prior to the Petition Date.

37. As noted above, the Debtor did not engage in any marketing efforts prepetition. Potential buyers have not been identified or contacted, no preliminary letters of interest or confidential information memoranda have been sent, and no discussions with prospective purchasers have begun.

38. Because the Debtor's prepetition marketing efforts were non-existent, and in the absence of more information as to precisely what the Debtor and its advisors did as part of those efforts and intend to so as those efforts are continued post-petition, the Bidding Procedures Motion cannot be approved.

14

### E. The Amounts of the Break-Up Fee and Minimum Initial Overbid Increment Will Chill Competitive Bidding.

39. In addition to the foregoing, the proposed bid protections and the minimum initial bid increment contained in the Bidding Procedure will likely discourage the submission of qualifying bids and participation in the auction, and, as proposed, will not confer sufficient benefits upon the Debtor's estate.

40. The determination of the amount of required overbids in a sale conducted pursuant to Section 363 of the Bankruptcy Code is to be made by the Court. See, e.g., In re Mama's Original Foods, Inc., 234 B.R. 500, 505 (Bankr. C.D. Cal. 1999). Nevertheless, excessive minimum overbids can discourage competition. Id. An appropriate overbid amount is one that advances the sale by fostering robust competition and encouraging the submission of interested parties' highest bids for the assets. Id.

41. Here, in order for any other bidder to present a bid which yields a better result than the stalking horse bid, due to the Parent's refusal to subordinate its claims for any other bidder, the real minimum overbid amount will require an increase of approximately $600,000 (increasing the dollar amount of the necessary overbid from $2,350,000 to $2,950,000, an increase of approximately 25%) despite having barely 30 days to undertake this complicated due diligence and bargaining process. This is unreasonable and will chill competitive bidding, to the benefit of SIGG Canada and the Parent. On the other hand, the Debtor's estate and its creditors will suffer the consequences of this bid-chilling structure.

42. Also likely to chill competitive bidding is SIGG Canada's right to receive a break-up fee of $50,000.00 if it is not the successful bidder. The "allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's

15

ability to show that the fees were actually necessary to preserve the value of the estate." Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999).

43. The Sale Motion or Bidding Procedures Motion are void of any justification, for including such a provision in an insider deal. The proposed break-up fee to SIGG Canada only serves to stifle bidding. See Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659-660 (S.D.N.Y. 1992).

44. Likewise, the inclusion of the break-up fee will inure to the detriment of the Debtor's estate and its creditors.

**F. The Asset Purchase Agreement is Deficient**

45. For these additional reasons, the Sale Motion and the Bidding Procedures should not be granted or approved:

  a. The APA does not provide for any deposit of earnest money by SIGG Canada. The APA is toothless in regard to a remedy for a breach by SIGG Canada of its obligations to close. The APA should require a deposit (as would be required of any other purchaser under the terms proposed by the Debtor), with the funds to be forfeited on breach by SIGG Canada.

  b. The APA provides a release to SIGG Canada of any claims that the Debtor may have against it. There is no valid reason to provide a settlement to SIGG Canada without investigation of whatever claims might exist in favor of the Debtor, and with

substantial consideration in favor of the Debtor, in the APA. The release would prevent the estate from investigating and pursuing fiduciary claims, as well as potential avoidance claims, against SIGG Canada, despite the fact that the two entities have had a complicated and intertwined financial history that merits review and investigation.

c. As the APA is currently drafted, SIGG Canada would obtain the benefit of the release even if it is not the successful bidder. There is nothing in the way of consideration to support such a release. Instead, it is a windfall for SIGG Canada, provided by an agreement with its affiliate, under common control and without additional or independent investigation.

d. The APA would transfer cash equivalents in the form of deposits to the buyer, regardless of whether the buyer also assumed the contract that gave rise to the deposit. Only deposits relating to assumed contracts should be transferred to a buyer.

e. Similarly, there is no reason why the buyer should obtain the right to tax refunds due to the Debtor. It would be acceptable to allow the buyer to obtain the benefit of tax attributes such as credits and NOLs, but there is no justification to turn the right to a tax refund for prepetition periods into an asset of the buyer.

f. The APA would transfer all claims (other than avoidance actions) to the buyer. However, litigation claims, particularly

      claims against the Parent, SIGG Canada, and their respective officers and directors, should remain with the estate.

g.   The buyer's obligations to close under the APA are conditioned on the buyer reaching agreements with vendors that are acceptable to the buyer. This condition renders the buyer's obligation to close illusory, because it vests in the buyer the complete discretion to refuse to close based on circumstances beyond anyone else's control.

h.   The provisions of the APA which permit the Debtor and SIGG Canada to agree that terms of the APA may be waived illustrates the problems raised by an APA between parties under common control. Basically, this provision would permit the two affiliates to collude and alter essential deal terms to the detriment of the other parties.

i.   By listing the above objectionable items, the Committee does not intend to limit its objections to these items, and it has communicated other objectionable terms in the APA to the Debtor and SIGG Canada previously, and reserves all of its rights to object to such provisions of the APA. The above are by way of illustration only.

## CONCLUSION

For the foregoing reasons, the Committee respectfully request that the Court deny the Sale Motion and Bidding Procedures Motion and grant the Committee such other and further relief that it deems just and proper.

Dated: Hartford, Connecticut
       June 14, 2011

                                         RESPECTFULLY SUBMITTED,

                                         THE OFFICIAL COMMITTEE OF
                                         UNSECURED CREDITORS OF SIGG
                                         SWITZERLAND (USA), INC.

                                         By:  /s/Patrick M. Birney _____
                                            Michael R. Enright (ct10286)
                                            Patrick M. Birney (ct19875)
                                            Robinson & Cole LLP
                                            280 Trumbull Street
                                            Hartford, CT 06103-3597
                                            Main (860) 275-8200
                                            Fax (860) 275-8299
                                            menright@rc.com
                                            pbirney@rc.com